AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED

**Jan 11, 2021**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| Jose Guadalupe LOPEZ-ZAMORA | ) |
| Leonardo FLORES BELTRAN | ) |
| Christian Anthony ROMERO | ) |
| Jason Lamar LEE | ) |
| Alejandro TELLO | ) |
| Joaquin Alberto SOTELO VALDEZ | ) |
| Sandro ESCOBEDO | ) |
| Rudi Jean Carlos FLORES | ) |
| Erika Gabriela ZAMORA ROJO | ) |
| Jose Luis AGUILAR SAUCEDO | ) |
| | ) |

Case No.   2:21-mj-0008 KJN

# SEALED

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of    August 2019 to the Present Date    in the county of    Sacramento and Various other Counties    in the

Eastern    District of    California    , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| COUNT ONE – 21 U.S.C. §§ 841(a)(1) and 846 | Conspiracy to Distribute and Possess with Intent to Distribute at least 400 grams of a mixture and substance containing Fentanyl (September 13, 2019 to the present). [Defendants LOPEZ-ZAMORA, FLORES BELTRAN, ROMERO, LEE, TELLO, SOTELO VALDEZ, ESCOBEDO, FLORES, and ZAMORA ROJO] |
| COUNT TWO – 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute at least 50 grams of methamphetamine (actual) (November 18, 2020). [Defendants LOPEZ-ZAMORA and LEE] |
| COUNT THREE – 21 U.S.C. § 841(a)(1) | Distribution of Fentanyl (March 10, 2020). [Defendant AGUILAR SAUCEDO] |
| COUNT FOUR – 21 U.S.C. § 841(a)(1) | Distribution of at least 40 grams of a mixture and substance containing Fentanyl (April 14, 2020). [Defendant AGUILAR SAUCEDO] |
| COUNT FIVE –21 U.S.C. § 841(a)(1) | Distribution of Fentanyl (August 13, 2020). [Defendant AGUILAR SAUCEDO] |

This criminal complaint is based on these facts:
(see attachment)

☒ Continued on the attached sheet.

/s/ Matthew Clayton

*Complainant's signature*

Special Agent Matthew Clayton
Drug Enforcement Administration

*Printed name and title*

Sworn to before me and signed telephonically.

Date:    January 11, 2021

City and state:    Sacramento, California

Kendall J. Newman, U.S. Magistrate Judge

*Printed name and title*

## AFFIDAVIT OF DEA SPECIAL AGENT MATTHEW CLAYTON IN SUPPORT OF SEARCH WARRANTS AND CRIMINAL COMPLAINT

1.  I, Drug Enforcement Administration ("DEA") Special Agent Matthew Clayton, being duly sworn, hereby state:

### SCOPE OF REQUESTED SEARCH WARRANTS

2.  This affidavit supports an application for warrants to search the locations, vehicles, and persons further described below and in **Attachments A-1 through A-12**.  The contraband, objects, and information for which we will search are described in **Attachment B**.  Attachments A-1 through A-12 and Attachment B are incorporated by reference.

3.  We request authority to search the following locations for the items described in **Attachment B**:

    i.  **8357 Yermo Way, Sacramento, California 95828** (Residence of Jose LOPEZ-ZAMORA, Joaquin SOTELO VALDEZ, and Erika ZAMORA ROJO), more fully described in **Attachment A-1**.

    ii.  **3205 West Capitol Avenue, #12, West Sacramento, California 95691** (Stash House Location and Residence of Christian ROMERO), more fully described in **Attachment A-2**.

    iii.  **7675 Manorside Drive, Sacramento, California 95832** (Residence of Alejandro TELLO), more fully described in **Attachment A-3**.

    iv.  **7381 Pritchard Road, Sacramento, California 95828** (Stash House Location and Residence for Eric Perez Alvarez), more fully described in **Attachment A-4**.

    v.  **8528 Bellamy Way, Sacramento, California 95828** (Stash House Location), more fully described in **Attachment A-5**.

    vi.  **4190 Sierra Vista Avenue, Sacramento, California 95820** (Stash House Location), more fully described in **Attachment A-6**.

    vii.  **5241 Crystal Hill Way, Sacramento, California 95820** (Stash House Location and Residence for Leonardo FLORES BELTRAN), more fully described in **Attachment A-7**.

    viii.  **3205 West Capitol Avenue #21, West Sacramento, California 95691** (Residence of Jaime Castro Lazcano), more fully described in **Attachment A-8**.

    ix.  **3205 West Capitol Avenue #38, West Sacramento, California 95691** (Residence of Javier Hernandez), more fully described in **Attachment A-9**.

1

    x.    **1182 Franklin Avenue, Yuba City, California 95991** (Residence of Robert Frandsen), more fully described in **Attachment A-10**.

    xi.    **425 Chablis Way, Manteca, California 95337** (Residence of Rudi FLORES), more fully described in **Attachment A-11**.

    xii.    **7618 Amherst Street, Apt. 4, Sacramento, California** (Residence of Jose AGUILAR SAUCEDO), more fully described in **Attachment A-12**.

### SCOPE OF REQUESTED CRIMINAL COMPLAINT

4.    This affidavit also supports an application for a criminal complaint and arrest warrants for:

    i.    Jose Guadalupe LOPEZ-ZAMORA
        (Counts 1, 2)

    ii.    Leonardo FLORES BELTRAN
        (Count 1)

    iii.    Christian Anthony ROMERO
        (Count 1)

    iv.    Jason Lamar LEE
        (Counts 1, 2)

    v.    Alejandro TELLO
        (Count 1)

    vi.    Joaquin Alberto SOTELO VALDEZ
        (Count 1)

    vii.    Sandro ESCOBEDO
        (Count 1)

    viii.    Rudi Jean Carlos FLORES
        (Count 1)

    ix.    Erika Gabriela ZAMORA ROJO
        (Count 1)

    x.    Jose Luis AGUILAR SAUCEDO
        (Counts 3, 4, 5)

COUNT ONE –    Conspiracy to Distribute and Possess with Intent to Distribute at least 400 grams of a mixture and substance containing Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 846 (September 13, 2019 to the present).

| COUNT TWO – | Possession with Intent to Distribute at least 50 grams of methamphetamine (actual), in violation of 21 U.S.C. § 841(a)(1) (November 18, 2020). |
|---|---|
| COUNT THREE – | Distribution of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) (March 10, 2020). |
| COUNT FOUR – | Distribution of at least 40 grams of a mixture and substance containing Fentanyl, in violation of 21 U.S.C. § 841(a)(1) (April 14, 2020). |
| COUNT FIVE – | Distribution of Fentanyl, in violation of 21 U.S.C. § 841(a)(1) (August 13, 2020). |

## BACKGROUND AND EXPERTISE

5.   I am a Special Agent of the United States Department of Justice, Drug Enforcement Administration (the "DEA").  I have been a DEA Special Agent since September 2004.  I am currently assigned to the DEA Sacramento District Office ("SDO") charged with investigating major drug trafficking organizations operating in the Eastern District of California.  I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

6.   I was trained as a DEA Special Agent at the DEA/FBI Academy, Quantico, Virginia.  During my training, I received special training in the Controlled Substances Act, Title 21 United States Code, including, but not limited to, Sections 841 and 846, Controlled Substance Violations and Conspiracy to Commit Controlled Substance Violations, respectively.  I have received special training regarding criminal organizations engaged in conspiracies to manufacture and/or possess with intent to distribute fentanyl, counterfeit pharmaceutical tablets, ecstasy/MDMA, methamphetamine, cocaine, cocaine base, heroin, marijuana, and other dangerous drugs prohibited by law.  I received further training in search and seizure law and many other facets of drug law enforcement including clandestine laboratory investigations.

7.   As a DEA agent, I have assisted in the execution of search warrants on many occasions for controlled substances and/or related paraphernalia, indicia, and other evidence of violations of federal drug statutes.  I have participated in multiple investigations targeting individuals and organizations trafficking fentanyl, counterfeit pharmaceutical tablets,

3

ecstasy/MDMA, cocaine, heroin, marijuana, methamphetamine and other drugs.  During the course of these investigations, I have become familiar with the manner in which drug traffickers use telephones, often cellular telephones, to conduct their illegal operations.  I have participated in wire interception cases encompassing multiple telephones and have previously written wire interception affidavits.  Furthermore, I have served as both a monitor and wire room supervisor on federal wiretap investigations.  Additionally, I have attended the California Department of Justice's eight-hour wire interception certification course, as set out in California Penal Code § 629.94.

8.     Through my training, experience, and interaction with other experienced Special Agents, Task Force Agents, and other drug investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs, to collect and conceal drug related proceeds, and to communicate with other participants to accomplish such objectives.  These methods include the use of telephones, pre-paid or debit calling cards, public telephones, wireless communications technology such as paging devices and cellular telephones, counter-surveillance, elaborately planned smuggling schemes tied to legitimate businesses, and use of codes in communications in an attempt to avoid detection by law enforcement.  Based on my training and experience, I also know that violators of the controlled substances laws often purchase telephones or subscribe to telephone service using false names and/or other individuals' names to avoid detection by law enforcement.

9.     In addition to my personal knowledge, this affidavit is based on (1) information I obtained from related investigations; (2) conversations with other law enforcement officers including oral and written investigative and laboratory reports that I received directly or indirectly from other law enforcement officials; (3) review and analysis of information received from various sources, including evidence provided pursuant to subpoenas and search warrants, such as GPS tracking data; (4) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (5) a review of public records, telephone toll records, and subscriber information; (6) information provided from confidential sources of information, cooperating defendants, and other sources of information working with law enforcement agencies; (7) a review of driver's license and automobile registration records; (8) records from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (9) my training and experience as a DEA agent and/or; (10) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.  This affidavit is also based upon Title III intercepts of telephone number 916-896-8190 (**Target Telephone 1** or **TT#1**), used

by Jose LOPEZ-ZAMORA.  Pursuant to those intercepts, I have reviewed transcripts and audio recordings of intercepted telephone calls from **Target Telephone 1**.

10.   Because this affidavit is submitted for the limited purpose of supporting the requested search warrants, criminal complaint, and arrest warrants, I have not included the details of every aspect of the investigation.  I have set forth only the facts that I believe are necessary to establish a foundation for an order authorizing the search and seizure of the property identified in this affidavit.

## OVERVIEW OF THE INVESTIGATION

11.   Since August 2019, agents and officers of the DEA's Sacramento District Office (SDO) have been conducting an investigation into the Jose LOPEZ-ZAMORA Drug Trafficking Organization (DTO), which is a drug trafficking enterprise engaged in, among other things, the importation from Mexico and distribution of large quantities of counterfeit oxycodone tablets containing fentanyl and other controlled substances, in the areas of Sacramento, California and elsewhere.  During this investigation, multiple controlled purchases of counterfeit oxycodone tablets containing fentanyl were conducted by confidential sources and an undercover officer from multiple co-conspirators within the LOPEZ-ZAMORA DTO.

12.   Between the period of October 13, 2020 through December 9, 2020, Title III intercepts were authorized on **Target Telephone 1**, used by Jose LOPEZ-ZAMORA.  Between the period of November 10, 2020 through December 9, 2020, Title III intercepts were also authorized on **Target Telephone 2**, used by Luis Felipe LOPEZ ZAMORA.  During these periods, Jose LOPEZ-ZAMORA (J. LOPEZ-ZAMORA) and Luis LOPEZ ZAMORA (L. LOPEZ ZAMORA) spoke explicitly with co-conspirators about their counterfeit oxycodone tablet distribution operations.

## STATEMENT OF PROBABLE CAUSE

### *On September 13, 2019, CS-1 purchased approximately 100 counterfeit oxycodone tablets containing fentanyl from Christopher Williams, Sandro ESCOBEDO, and Jose LOPEZ-ZAMORA.*

13.   On September 13, 2019, a controlled purchase operation[1] was conducted by the DEA in Sacramento, CA resulting in a Confidential Source ("CS-1") purchasing approximately

---

[1] Except as otherwise noted, a "controlled purchase operation" is a drug transaction conducted by a CS and/or a UC under the direction of law enforcement for the purpose of acquiring evidence of drug trafficking against the Target Subject(s).  During each controlled purchase operation, the CS or UC is provided with officially advanced

100 counterfeit oxycodone pills containing fentanyl from Sandro ESCOBEDO. CS-1 was introduced to ESCOBEDO by Christopher "Bhris" Williams, and the pills were supplied to ESCOBEDO by Jose LOPEZ-ZAMORA. CS-1 communicated with Williams via social media.

14. It should be noted that CS-1 was working with law enforcement for monetary compensation. CS-1 has criminal history that includes felony convictions related to drug sales, robbery, and possession of a controlled substance. After the September 13, 2019 controlled purchase, CS-1 was arrested for robbery and domestic violence. As a result, CS-1 was temporarily deactivated as a DEA source. Later the charges were dropped and CS-1 was reactivated again by DEA. In July 2020, CS-1 was arrested again for assault and robbery and as a result CS-1 was deactivated as a DEA source. Agents have been able to independently corroborate much of the information provided by CS-1 related to the drug trafficking activities of J. LOPEZ-ZAMORA, ESCOBEDO, Williams, Jose AGUILAR SAUCEDO and the other targets of this investigation through physical surveillance, audio and video recordings, and other information. I am not aware of CS-1 providing false or misleading information during this investigation. For these reasons, I believe the information provided by CS-1 to be reliable.

15. On September 13, 2019, during the controlled purchase operation conducted by the DEA, CS-1 stated that Williams directed and accompanied CS-1 to the residence located at 1321 Main Avenue, Sacramento, CA for the purpose of purchasing approximately 100 oxycodone pills from an individual later identified as ESCOBEDO. At approximately 1:43PM, an agent observed CS-1 and Williams enter the 1321 Main Avenue residence. While CS-1 and Williams were meeting with ESCOBEDO inside of the 1321 Main Avenue residence, CS-1 stated that ESCOBEDO made a telephone call to order up more pills because he (ESCOBEDO) did not have enough pills to sell to CS-1. CS-1 stated that according to ESCOBEDO, the supplier that he (ESCOBEDO) called, and the person who would be bringing the pills, was the individual who actually presses the pills. On the same day, during the meeting between CS-1, Williams and ESCOBEDO, CS-1 stated that an individual later identified as J. LOPEZ-ZAMORA arrived at the 1321 Main Avenue residence and supplied the pills to ESCOBEDO, who then sold the pills to CS-1 in the presence of Williams. CS-1 stated that Williams then crushed and snorted one of the pills and stated that it was "good." On the same day, at approximately 2:35PM, agents observed CS-1 and Williams depart the 1321 Main Avenue residence. The pills were

---

government funds to purchase drugs, the CS and CS's vehicle are searched before and after the operation for weapons and contraband, the CS or UC is equipped with concealed audio/video recorder(s) and a transmitter, surveillance is conducted on the CS/CS's vehicle and/or the UC/UC's vehicle during the operation, and post-operation statements are taken from the CS or UC.

then submitted to a DEA laboratory for analysis and a single pill was analyzed and found to contain fentanyl and acetaminophen.

16. On September 17, 2019, agents learned that the Sacramento Municipal Utilities District ("SMUD") account at the 1321 Main Avenue residence was in the name of Fernando ESCOVERDO.  During the controlled purchase operation conducted on September 13, 2019, agents observed a vehicle at the 1321 Main Avenue residence which was registered to Fernando ESCOBEDO or Enrique ESCOBEDO.  It is believed that the last name on the SMUD account is most likely misspelled and should be ESCOBEDO.  A commercial database query revealed that Fernando ESCOBEDO is associated with the residence located at 1321 Main Avenue, Sacramento, CA, and that Sandro ESCOBEDO is a relative of Fernando ESCOBEDO.

17. A query of a money remitter database indicated that Sandro ESCOBEDO was the sender and recipient of wire transfers of funds.  This activity was conducted in January 2018 and December 2018.  The telephone number listed for Sandro ESCOBEDO as the sender and recipient of wire transfers of funds was 541-720-2042 (the "ESCOBEDO PHONE").  A Sacramento County law enforcement database also identified the ESCOBEDO PHONE as a phone number used by Sandro ESCOBEDO; the same database also indicated that Sandro ESCOBEDO was a member of the Surenos street gang.

18. On September 18, 2019, agents learned via an administrative subpoena that the ESCOBEDO PHONE was subscribed to Fernando E. MALDONADO, 519 Juniper Dr, Boardman, OR.  A commercial database query revealed that Fernando Escobedo MALDONADO is an alias for Fernando ESCOBEDO and that the aforementioned Oregon address is also associated with Fernando ESCOBEDO.  Based on my training and experience, I know that drug traffickers often subscribe to telephone service using false names and/or other individuals' names to avoid detection by law enforcement.

19. Pursuant to an administrative subpoena issued on September 18, 2019, agents learned that telephone number 916-968-8093 (J. LOPEZ-ZAMORA PHONE #1), a number in contact with the ESCOBEDO PHONE, was subscribed to Kevin LOPEZ, 7475 24th St, Sacramento, CA.  However, a commercial database query regarding LOPEZ was inconclusive.  A money remitter database query regarding J. LOPEZ-ZAMORA PHONE #1 indicated that Jose ZAMORA listed J. LOPEZ-ZAMORA PHONE #1 to send a wire transfer of funds on August 2, 2019.  The wire transfer was for $1,400 to a person in Culiacan, Mexico.  A Sacramento County law enforcement database query indicated that Jose LOPEZ-ZAMORA, also known as Jose ZAMORA, had drug related criminal history in CA, was convicted of drug charges, and sentenced to three years in prison on July 24, 2015.

20.  On September 23, 2019, agents showed CS-1 a 2018 CA DMV photo of Sandro ESCOBEDOCORIA.  According to criminal history records, Sandro ESCOBEDO CORIA is an alias for Sandro ESCOBEDO; the criminal history records for Sandro ESCOBEDO also show the same date of birth as the DMV records for Sandro ESCOBEDOCORIA.  CS-1 positively identified Sandro ESCOBEDOCORIA (aka Sandro ESCOBEDO) as the individual who sold CS-1 the counterfeit oxycodone pills on September 13, 2019 at the 1321 Main Avenue residence.

21.  On October 16, 2019, an agent provided CS-1 with a 2015 booking photo of Jose LOPEZ-ZAMORA and CS-1 positively identified J. LOPEZ-ZAMORA as the individual who supplied the counterfeit oxycodone pills to Sandro ESCOBEDO, which were then sold to CS-1 at the 1321 Main Avenue residence on September 13, 2019.

22.  A review of cellular telephone toll records for the ESCOBEDO PHONE, used by Sandro ESCOBEDO, indicated contact with J. LOPEZ-ZAMORA PHONE #1, used by J. LOPEZ-ZAMORA, during August and September 2019.  Toll analysis revealed that the ESCOBEDO PHONE and J. LOPEZ-ZAMORA PHONE #1 were in contact approximately 92 times from August 20 to September 23, 2019.  On September 13, 2019, the date of the controlled purchase operation, the ESCOBEDO PHONE and J. LOPEZ-ZAMORA PHONE #1 were in contact approximately seven times between 1:04PM and 2:29PM.  Based on surveillance observations coupled with CS-1 statements, it is believed that J. LOPEZ-ZAMORA likely arrived at the 1321 Main Avenue residence on September 13, 2019 at approximately 2:30PM.

***On February 6, 2020, CS-1 purchased approximately 90 counterfeit oxycodone tablets containing fentanyl from Williams and UM#1, while J. LOPEZ-ZAMORA was present; Agents identify 4190 Sierra Vista Avenue, Sacramento, CA as a stash location.***

23.  On February 6, 2020, a controlled purchase operation was conducted by the DEA in Sacramento, CA resulting in CS-1 purchasing approximately 90 counterfeit oxycodone pills containing fentanyl from an unidentified Hispanic male adult ("UM#1").  CS-1 arranged for the purchase with Williams via social media communications, and Williams brokered the transaction and accompanied CS-1 during the controlled purchase from UM#1.  CS-1 observed J. LOPEZ-ZAMORA in the residence where the transaction occurred holding a bag of approximately 1,000 pills.

24.  During the controlled purchase operation, CS-1 stated that Williams directed and accompanied CS-1 to the residence located at 4190 Sierra Vista Avenue, Sacramento, CA for the purpose of purchasing approximately 100 oxycodone pills.  At approximately

1:36PM, an agent observed CS-1 and Williams arrive in tandem and park separate vehicles on Sierra Vista Avenue and 42nd Avenue near the 4190 Sierra Vista Avenue residence.  Immediately thereafter, an agent observed Williams get into CS-1's vehicle, and then CS-1 drove and parked at the nearby 4190 Sierra Vista Avenue residence.  Immediately thereafter, an agent observed CS-1 and Williams enter the 4190 Sierra Vista Avenue residence.  CS-1 stated that once they (CS-1 and Williams) were inside, CS-1 observed an unidentified Hispanic male adult, subsequently identified as Loth Fabian Rodriguez, situated on a couch with what appeared to be "weed" (marijuana) and "Norco's" (hydrocodone tablets) in plain view.  CS-1 stated that they (CS-1 and Williams) then encountered UM#1 in the kitchen area of the residence where blue pills were visible on a countertop.  CS-1 stated that s/he then counted out money to purchase pills, while UM#1 counted out 100 blue pills.  CS-1 stated that Williams then took 10 pills for himself (Williams) as payment for brokering the deal and then gave the remaining 90 pills to CS-1.  CS-1 stated that Williams then crushed one of the pills on the countertop and snorted it.  CS-1 stated that UM#1 cautioned Williams to only snort half of a pill because they contained fentanyl.

25.  Shortly after CS-1 and Williams entered the 4190 Sierra Vista Avenue residence, at approximately 1:38PM, an agent observed a grey vehicle arrive and park near the corner of 42nd Avenue and Sierra Vista Avenue.  Surveillance was later able to obtain the license plate of the vehicle that arrived to be 7AUJ407, which a CA DMV check revealed was a 2013 Ford registered to Mark A. Mondragon, 7572 Delta Point Way, Sacramento, CA 95823 (Mondragon's known address).  Immediately thereafter, an agent observed three male adults exit the grey Ford and enter the front door of the 4190 Sierra Vista Avenue residence.  CS-1 stated that while they (CS-1, Williams, and UM#1) were in the kitchen area of the 4190 Sierra Vista Avenue residence by the countertop, a tall Hispanic male adult, whom CS-1 recognized from the prior controlled purchase operation with Williams at the 1321 Main Avenue residence on September 13, 2019, entered the kitchen area along with approximately two or three other unidentified Hispanic male adults. (Agents subsequently reviewed video footage obtained during the controlled purchase operation from within the 4190 Sierra Vista Avenue residence which revealed that J. LOPEZ-ZAMORA was the individual that CS-1 recognized from the prior controlled purchase operation).  CS-1 stated that at one point while inside of the 4190 Sierra Vista Avenue residence, CS-1 observed J. LOPEZ-ZAMORA with a Ziploc bag containing approximately 1,000 pills.  At approximately 1:47PM, an agent observed CS-1 and Williams come out of the 4190 Sierra Vista Avenue residence and depart in CS-1's vehicle.  The pills that CS-1 purchased, which had M-30 logos imprinted on them consistent with oxycodone pills, were later submitted to a DEA laboratory for analysis and a single pill was analyzed and found to contain fentanyl and acetaminophen.

26. Further review of the video footage obtained from the controlled purchase operation at the 4190 Sierra Vista Avenue residence revealed an individual laying on the couch within the Sierra Vista residence after CS-1 and Williams arrived, matching the statements made by CS-1. The video footage also revealed the same individual sitting on the couch when CS-1 and Williams departed. Several still shots from the video footage were captured of the aforementioned individual on the couch, and based upon a comparison to mugshots of Loth Fabian Rodriguez, this individual was positively identified to be Rodriguez. Based upon the video footage and CS-1 statement, Rodriguez was already at the Sierra Vista residence with pills before CS-1 and Williams arrived to conduct the transaction.

27. Further review of the video footage resulted in still shots of Jose LOPEZ-ZAMORA who arrived at the Sierra Vista residence (after CS-1 and Williams) as a passenger in the grey Ford registered to Mondragon, as well as still shots of Mondragon who also entered the residence along with J. LOPEZ-ZAMORA.

28. On July 26, 2020, at approximately 5:13PM, I viewed live pole camera footage at 4190 Sierra Vista Avenue, Sacramento, CA and observed a silver Honda SUV arrive and park on 42nd Street in front of the residence. Immediately thereafter (while zoomed in on the vehicle), I observed an individual standing at the passenger side window of the vehicle. Immediately thereafter (while zooming back out), I observed the vehicle depart while the individual walked towards and then entered the residence. Based on my training and experience, I believe this brief exchange was consistent with a hand-to-hand narcotics transaction.

29. On July 27, 2020, at approximately 2:11PM, physical surveillance was established at the residence located at 4190 Sierra Vista Avenue, Sacramento, CA. At approximately 2:50PM, I observed an unidentified Hispanic male adult (H/M/A), later determined to be UM#1, arrive in a black Chrysler sedan, bearing CA license plate number 8JSR366, and park on Sierra Vista Blvd in front of the residence. Immediately thereafter, I observed UM#1 exit the vehicle and then enter the front door of the residence. A subsequent CA DMV check revealed that the vehicle was a 2015 model registered to Samantha Rodriguez, 4190 Sierra Vista Ave, Sacramento, CA 95820. At approximately 2:55PM, I observed UM#1 exit the front door of the residence with a dog and walk around with it in the front yard. Immediately thereafter, SA Tony Tran drove by the residence and observed UM#1 and positively identified him to be the same individual who previously sold CS-1 and Williams approximately 100 counterfeit oxycodone pills containing fentanyl on February 6, 2020 at the 4190 Sierra Vista Blvd residence, based upon a comparison to still shots of video footage taken during the controlled purchase operation. Shortly thereafter, I observed UM#1 reenter the front door of the residence. At approximately 4:40PM, I observed UM#1 exit the front door of the residence and walk

out to a silver GMC SUV which was parked on 42nd Street in front of the residence. Immediately thereafter, I observed UM#1 conduct a hand-to-hand exchange with the driver of the vehicle. Immediately thereafter, I observed the vehicle depart and then UM#1 reentered the front door of the residence. Based on my training and experience, I believe UM#1 likely conducted a narcotics transaction with the driver of the GMC SUV.

30.   On December 29, 2020, at approximately 3:17PM, I viewed live pole camera video footage at the 4190 Sierra Vista Avenue residence and observed the black Chrysler sedan, bearing CA license plate number 8JSR366, parked on 42nd Street directly next to the residence (which is located on the southwest corner of Sierra Vista Avenue and 42nd Street).

31.   Based upon these surveillance observations, I believe that UM#1 resides at 4190 Sierra Vista Avenue, Sacramento, CA and continues to distribute controlled substances from this stash location.

### *On March 10, 2020, CS-1 purchased approximately 290 counterfeit oxycodone tablets containing fentanyl from Williams, Ahmed Imbabi, and Jose AGUILAR SAUCEDO.*

32.   On March 10, 2020, a controlled purchase operation was conducted by the DEA in Sacramento, CA resulting in CS-1 purchasing approximately 290 counterfeit oxycodone pills containing fentanyl for $4,000 from a Hispanic male adult known by the alias "Chito," who was subsequently identified as Jose AGUILAR SAUCEDO, as explained below. CS-1 was introduced to Chito by Ahmed "Pablo" Imbabi, and CS-1 was introduced to Imbabi by Christopher Williams. CS-1, Williams, and Imbabi were all present together during the controlled purchase from Chito. The pills that CS-1 purchased, which had M-30 logos imprinted on them consistent with oxycodone pills, were later submitted to a DEA laboratory for analysis and a single pill was analyzed and found to contain fentanyl and acetaminophen.

33.   During the controlled purchase operation, CS-1 stated that Williams directed and accompanied CS-1 to a location (in Gold River, CA) to pick up Imbabi, after which Imbabi directed and accompanied CS-1 and Williams to a residence located in Sacramento, CA (identified as 4316 34th Avenue) where they all met with "Chito" (i.e., AGUILAR SAUCEDO) for the purpose of purchasing approximately 300 oxycodone pills. After CS-1 arrived with Imbabi and Williams, AGUILAR SAUCEDO got into the backseat of CS-1's vehicle and gave 100 pills to Williams, after which CS-1 gave $1,000 in officially advanced government funds to AGUILAR SAUCEDO. Williams then counted the 100 pills and AGUILAR SAUCEDO directed CS-1 to pay him (AGUILAR SAUCEDO) the remaining $3,000 for the additional 200 pills, but CS-1 refused without

11

first getting the remaining 200 pills.  AGUILAR SAUCEDO then exited CS-1's vehicle and walked over to a grey GMC Yukon (CA license plate 7WUX983), registered to Rafael R. Orozco, 8528 Bellamy Way, Sacramento, CA) to get the rest of the pills.[2]  AGUILAR SAUCEDO returned to CS-1's vehicle, got back into the backseat, and then gave the remaining 200 pills to Williams by pouring the pills into the same baggie which already contained the original 100 pills.  CS-1 then paid the remaining $3,000 in officially advanced government funds to AGUILAR SAUCEDO, and AGUILAR SAUCEDO then gave $1,000 to Williams.  Williams then counted all of the pills and took 10 of the pills for his (Williams') cut, in addition to the $1,000 that AGUILAR SAUCEDO paid Williams.  Afterwards, surveillance observed AGUILAR SAUCEDO and Imbabi both get out of the backseat of CS-1's vehicle and walk to the grey GMC Yukon.

34.   Following the deal, surveillance observed CS-1 drop off Williams and Imbabi at 1750 Wright Street, Sacramento, CA, after which Williams and Imbabi departed in a silver Toyota Corolla.  Surveillance was then briefly maintained on the silver Toyota Corolla and a task force agent positively identified Imbabi as the front passenger in the vehicle based upon a comparison to Imbabi's CA DMV photo.

35.   It should be noted that after the deal CS-1 mistakenly identified "Chito" as Jose Edgar Aguilar based upon a comparison to an open source Facebook photo with no identifiers listed on it.  After a traffic stop on May 18, 2020, agents determined that "Chito" is Jose AGUILAR SAUCEDO, as described below.  An agent subsequently texted the CS a booking photograph of AGUILAR SAUCEDO with no identifiers.  The CS identified AGUILAR SAUCEDO as "Chito" and acknowledged that his/her previous identification of "Chito" from the social media photograph of Aguilar was mistaken.

***On April 14, 2020, CS-1 purchased approximately 500 counterfeit oxycodone tablets containing fentanyl from Jose AGUILAR SAUCEDO.***

36.   On April 14, 2020, a controlled purchase operation was conducted by the DEA in Sacramento, CA resulting in CS-1 purchasing approximately 500 counterfeit oxycodone pills containing fentanyl from AGUILAR SAUCEDO.  CS-1 arranged the transaction directly with AGUILAR SAUCEDO via social media communications.  The pills that CS-1 purchased, which had M-30 logos imprinted on them consistent with oxycodone pills, were later submitted to a DEA laboratory for analysis and found to weigh 54.8 grams net weight and to contain fentanyl, acetaminophen and xylazine.

---

[2] The vehicle was described by CS-1 to be a burgundy Suburban but was determined by surveillance and DMV records to be a grey GMC Yukon; both descriptions are dark colors and similar models of vehicles.

37. During the controlled purchase operation, AGUILAR SAUCEDO directed CS-1 to meet AGUILAR SAUCEDO again at the same location on "34" (4316 34th Avenue, Sacramento, CA), which AGUILAR SAUCEDO indicated to CS-1 was AGUILAR SAUCEDO's family's house. At approximately 1:54PM, at the direction of and as observed by agents, CS-1 parked his/her vehicle on the street under a large tree directly in front of the 4316 34th Avenue residence. At approximately 2:11PM, surveillance observed a black vehicle (later determined to be a black 2008 Toyota Scion) arrive and park in the driveway at the 4316 34th Avenue residence. Immediately thereafter, surveillance observed an adult male (later identified by CS-1 to be AGUILAR SAUCEDO, aka "Chito") exit the driver's seat of the black Scion, walk to CS-1's vehicle, and enter the front passenger seat of CS-1's vehicle. At approximately 2:14PM, surveillance observed AGUILAR SAUCEDO exit CS-1's vehicle, walk back to the black Scion and drive away. Shortly thereafter, surveillance observed the license plate of the black Scion to be 6YVS157. A subsequent CA DMV check revealed that the black Scion was registered to Maria Alvina Lopez, 7618 Amherst St, Apt 1, Sacramento, CA 95832. At approximately 2:33PM, surveillance observed the black Scion arrive and park across the street from the residence located at 7381 Pritchard Road, Sacramento, CA, a suspected stash house accessed by AGUILAR SAUCEDO. Immediately thereafter, surveillance observed AGUILAR SAUCEDO exit the black Scion and walk to the open garage of the 7381 Pritchard Road residence; about 20 minutes later, surveillance saw multiple adult males inside the open garage of the residence.

38. CS-1 stated that AGUILAR SAUCEDO entered the front passenger side of CS-1's vehicle holding clear plastic bags containing counterfeit oxycodone pills. CS-1 stated that CS-1 observed another individual who remained inside of the black Scion during the transaction. CS-1 stated that CS-1 paid AGUILAR SAUCEDO $5,000 in officially advanced government funds for 500 counterfeit oxycodone pills (a price of $10 per pill). CS-1 stated that during the exchange, AGUILAR SAUCEDO told CS-1 that he (AGUILAR SAUCEDO) could lower the price per pill to $8 if CS-1 could buy in larger quantities. CS-1 also stated that AGUILAR SAUCEDO further indicated that he (AGUILAR SAUCEDO) has a source in Mexico that could get "bars" (Xanax, a schedule IV controlled substance) for $2 per tablet if CS-1 purchased by the "boat" (1,000 pill quantities).

*__In May 2020, a suspected stash house at 7381 Pritchard Road is identified and Severo Reyna and Rafael Orozco are identified as criminal associates of AGUILAR SAUCEDO.__*

39. On May 5, 2020, United States Magistrate Judge Allison Claire of the Eastern District of California authorized activation of GPS "Ping" intercepts on telephone number 279-222-

6292 ("AGUILAR SAUCEDO PHONE #1"), used by AGUILAR SAUCEDO, for a period of 30 days.  GPS ping data from the phone revealed that AGUILAR SAUCEDO resided at the Whispering Pines Apartments located at 7610 Amherst Street, Sacramento, CA.[3]

40.   On May 12, 2020, from approximately 3:05PM until at least 4:05PM, GPS pings showed AGUILAR SAUCEDO PHONE #1 at a suspected stash house at 7381 Pritchard Road, Sacramento, CA.  During this time, physical surveillance observed a white Nissan sedan bearing CA license plate number 8ROZ764 (the "AGUILAR SAUCEDO NISSAN") parked on the street in front of the residence.  AGUILAR SAUCEDO has been observed using the AGUILAR SAUCEDO NISSAN on multiple occasions during this investigation, including on August 13, 2020, when he sold approximately 300 fentanyl-laced counterfeit oxycodone pills to a confidential source from the vehicle, as detailed below.  At approximately 4:14PM, surveillance observed the AGUILAR SAUCEDO NISSAN depart the 7381 Pritchard Road residence driven by a Hispanic male adult.  At approximately 4:17PM, I observed the AGUILAR SAUCEDO NISSAN stopped at a red light at the northbound intersection of Power Inn Rd and Elder Creek Rd.  While stopped at the light directly behind the AGUILAR SAUCEDO NISSAN, I observed the driver looking frequently in his rear view mirrors back towards me.  I then observed the AGUILAR SAUCEDO NISSAN make an abrupt maneuver into the left-hand turn lane and barely make the stale green-arrow light while turning westbound onto Elder Creek Road; I recognized that this driving behavior was consistent with counter-surveillance tactics and physical surveillance was no longer maintained on the vehicle.  A few minutes later, at approximately 4:20PM, the GPS ping on AGUILAR SAUCEDO PHONE #1 showed the phone had moved away from the 7381 Pritchard Road to a location in the general direction that the AGUILAR SAUCEDO NISSAN was last seen driving towards, coinciding with physical surveillance observations.  At approximately 4:35PM, the GPS ping showed the phone in the same general area of south Sacramento and, at approximately 4:50PM, the GPS ping showed that AGUILAR SAUCEDO PHONE #1 had returned to the 7381 Pritchard Road residence.  At approximately 5:09PM, surveillance observed the AGUILAR SAUCEDO NISSAN parked on the street across from the 7381 Pritchard Road residence, coinciding again with GPS pings on AGUILAR SAUCEDO PHONE #1.  Based on my training, experience with this investigation, authorized GPS pings, and physical surveillance observations, I believe that AGUILAR SAUCEDO likely conducted a drug transaction using the AGUILAR SAUCEDO NISSAN, given his erratic driving behavior and short turnaround trip from and back to the suspected stash house at 7381 Pritchard Road, where AGUILAR SAUCEDO had

---

[3] 7618 Amherst Street, where AGUILAR SAUCEDO lives in Unit  #4, is one of several buildings within the larger Whispering Pines Apartments complex located at 7610 Amherst Street.  Due to the accuracy radius of the ping data, the GPS pings by themselves established only that AGUILAR SAUCEDO was residing in the vicinity of the Whispering Pines Apartments complex, but not the specific building or unit in which he resides.

previously went after selling CS-1 approximately 500 counterfeit oxycodone pills containing fentanyl on April 14, 2020.

41.  On May 18, 2020, CHP officers stopped the AGUILAR SAUCEDO NISSAN for speeding in Sacramento, CA.  AGUILAR SAUCEDO was in the front seat and provided officers with a California ID issued to Jose Luis AGUILAR SAUCEDO, which also listed an address of 3991 67th St, Sacramento, CA 95820, which is the same address as the registered owner address of the AGUILAR SAUCEDO NISSAN.  GPS pings on AGUILAR SAUCEDO PHONE #1 showed that the phone was in the same area as the traffic stop during that same time period.  Additionally, two telephone numbers were written in the top margin of the CHP vehicle report, which were AGUILAR SAUCEDO PHONE #1 and 916-693-9592 (later identified as AGUILAR SAUCEDO PHONE #2, as described below).  Based on the information from this traffic stop, agents positively identified "Chito," the known user of AGUILAR SAUCEDO PHONE #1, to be AGUILAR SAUCEDO. The driver of the AGUILAR SAUCEDO NISSAN was identified as Rafael Orozco and the other passengers as Severo Reyna and Joshua Cabanillas.  Reyna and Cabanillas were later indicted for distributing approximately 100 counterfeit oxycodone pills containing fentanyl about 1.5 hours before the traffic stop as part of a larger indictment arising from a separate FBI investigation.  *See United States v. Cabanillas, et al.,* No. 2:20-cr-112-JAM (E.D. Cal.). (NOTE: On May 8, 2020, the FBI conducted a controlled purchase of approximately 53 counterfeit oxycodone pills containing fentanyl from Cabanillas and Reyna in Woodland, CA; Orozco drove Cabanillas and Reyna to the deal.  On May 18, 2020, the FBI conducted a controlled purchase of approximately 100 counterfeit oxycodone pills containing fentanyl from Cabanillas and Reyna in Woodland, CA; Orozco drove Cabanillas, Reyna and AGUILAR SAUCEDO to the deal.)

42.  On June 3, 2020, at approximately 11:30PM, I conducted drive-by surveillance at the residence located at 7381 Pritchard Road, Sacramento, CA and observed the following vehicle parked on the property behind the driveway next to the garage:

   i.   Gray pickup truck, bearing CA license plate number 49436S1; a CA DMV check revealed that the vehicle was a 2007 Chevrolet, registered to Martha Perez or Eric Perez Alvarez, 8152 Valley Green Dr, Sacramento, CA 95823.

43.  On January 7, 2021, I conducted drive-by surveillance of the residence located at 7381 Pritchard Road, Sacramento, CA and observed the following vehicles:

    i.      Parked in the driveway was a teal 2007 Chevy Silverado, bearing CA license plate 8K67921, registered to Enrique PerezAlvarez, 7675 Lakewood Park Dr, Sacramento, CA 95828.

    ii.     Parked behind a fence next to the garage was a 1991 Chevy truck, bearing CA license plate 8Y64756, registered to Enrique Rafael Perez, 8152 Valley Green Dr, Sacramento, CA 95823.

***In late May 2020, AGUILAR SAUCEDO agreed to sell 5,000 – 7,000 counterfeit oxycodone pills to CS-1 and multiple interdiction operations were unsuccessfully attempted; Identification of stash location at 8528 Bellamy Way, Sacramento, CA.***

44. On May 20, 2020, DEA directed CS-1 to contact AGUILAR SAUCEDO via FaceTime Video to discuss the purchase of approximately 7,000 counterfeit oxycodone pills for a price of $5 per pill (which AGUILAR SAUCEDO had previously offered to sell to CS-1 the week before via social media communications).  Later on the same date, CS-1 communicated with AGUILAR SAUCEDO via FaceTime Video, and afterwards sent DEA two video recordings from the FaceTime calls between CS-1 and AGUILAR SAUCEDO, and also two screenshots of the telephone number utilized by AGUILAR SAUCEDO for both FaceTime calls, which was 916-693-9592 (AGUILAR SAUCEDO PHONE #2) – the same number as listed on the aforementioned CHP vehicle report (along with AGUILAR SAUCEDO PHONE #1) from the traffic stop of the AGUILAR SAUCEDO NISSAN two days earlier on May 18, 2020.  CS-1 stated that CS-1 initially tried to FaceTime call AGUILAR SAUCEDO on AGUILAR SAUCEDO PHONE #1 but the call did not go through, and then AGUILAR SAUCEDO FaceTime called CS-1 back from AGUILAR SAUCEDO PHONE #2.  AGUILAR SAUCEDO later clarified to CS-1 that he used both numbers but that AGUILAR SAUCEDO PHONE #2 was assigned to an iPhone which enabled him to FaceTime call on it.  A review of the FaceTime call recordings revealed that AGUILAR SAUCEDO agreed to sell CS-1 approximately 5,000 pills (5 "boats") for $6 per pill the following week.  During the call, AGUILAR SAUCEDO also stated that these pills would be better than the last pills that AGUILAR SAUCEDO sold to CS-1, in reference to the prior controlled purchase on April 14, 2020.

45. On May 27, 2020, in the presence of agents, CS-1 made multiple videos of CS-1 flashing $35,000 in Officially Advanced Funds to facilitate the ongoing negotiations for the purchase of approximately 5,000-7,000 counterfeit oxycodone pills.  CS-1 then sent one or more of the videos to AGUILAR SAUCEDO via Snapchat.  (NOTE: On the same date, CS-1 forwarded me a thread of text messages from the night before between CS-1 and AGUILAR SAUCEDO, using AGUILAR SAUCEDO PHONE #1, during which AGUILAR SAUCEDO agreed to sell CS-1 5,000 pills for $30,000.)

46. At approximately 12:53PM, an authorized pen register on AGUILAR SAUCEDO
    PHONE #1 revealed that an outgoing call was completed to telephone number 916-430-
    0171; this was the first outgoing call made by AGUILAR SAUCEDO after CS-1 sent the
    money flash video(s) to AGUILAR SAUCEDO via Snapchat.  (NOTE: T-Mobile
    telephone number 916-430-0171 is subscribed to Enrique Perez Alvarez, 8152 Valley
    Green Drive, Sacramento, CA and was activated in October 2015; according to a
    Sacramento County law enforcement database, the number is associated with Eric Perez
    Alvarez, 7381 Pritchard Road, Sacramento, CA, who has a criminal history
    which includes charges for firearms and narcotics violations.)

47. At approximately 1:32PM, CS-1 recorded a call with AGUILAR SAUCEDO PHONE #1
    during which AGUILAR SAUCEDO agreed to meet with CS-1 later on the same date to
    conduct the aforementioned drug transaction.  At approximately 1:37PM, the authorized
    pen register on AGUILAR SAUCEDO PHONE #1 revealed an incoming call from
    telephone number 916-430-0171 (associated with Perez Alvarez), followed by
    an outgoing call to the same number at approximately 1:38PM.  At approximately
    1:44PM, surveillance observed the AGUILAR SAUCEDO NISSAN arrive and park at
    the suspected stash house at 7381 Pritchard Road, Sacramento, CA; surveillance had
    observed the vehicle depart AGUILAR SAUCEDO's apartment complex about 20
    minutes earlier.  Immediately after arriving at 7381 Pritchard Road, surveillance observed
    the Hispanic male driver and sole occupant of the AGUILAR SAUCEDO NISSAN, later
    identified as AGUILAR SAUCEDO based on a comparison to a body camera still shot
    from the May 18, 2020 traffic stop, exit the vehicle and walk towards the garage at the
    residence.  At approximately 2:09PM, AGUILAR SAUCEDO walked from the garage to
    the window of the AGUILAR SAUCEDO NISSAN and then back to the garage.  At
    approximately 2:11PM, CS-1 recorded a call with AGUILAR SAUCEDO PHONE #1
    during which CS-1 requested that AGUILAR SAUCEDO pick up 7,000 pills (in southern
    California) and then sell the pills to CS-1 for $5 per pill; prior to this call, CS-1 stated
    that AGUILAR SAUCEDO had notified CS-1 that AGUILAR SAUCEDO did not have
    the promised pills in hand after all and would now have to travel to southern California to
    pick up the pills and would be back by approximately 9:00PM to deliver the pills to CS-
    1.  At approximately 2:13PM, surveillance saw AGUILAR SAUCEDO walk from the
    garage of 7381 Pritchard Road while appearing to talk on a cellular telephone.  At
    approximately the same time, CS-1 recorded a call with AGUILAR SAUCEDO PHONE
    #1 during which AGUILAR SAUCEDO stated that he would only be able to pick up
    5,000 pills (in southern California) which could then be sold to CS-1 for $6 per pill, to
    which CS-1 agreed.  Surveillance observed the AGUILAR SAUCEDO NISSAN depart
    7381 Pritchard Road at approximately 2:38PM and travel to 3991 67th Street,
    Sacramento, CA (the address on AGUILAR SAUCEDO's California ID card and the

address to which the AGUILAR SAUCEDO NISSAN is registered).  At approximately
3:11PM, the authorized pen register on AGUILAR SAUCEDO PHONE #1 revealed
another outgoing call to telephone number 916-430-0171 (associated with Perez
Alvarez), and then another incoming call from the same number at approximately
3:13PM.  At approximately 3:14PM, surveillance saw the AGUILAR SAUCEDO
NISSAN arrive back at 7381 Pritchard Road and AGUILAR SAUCEDO exited the
vehicle and walked towards the residence.  The GPS pings on AGUILAR SAUCEDO
PHONE #1 coincided with the AGUILAR SAUCEDO NISSAN's movements away from
and back to 7381 Pritchard Road during this time.

48.    At approximately 4:23PM, surveillance observed the AGUILAR SAUCEDO NISSAN
       with one occupant (later determined to be AGUILAR SAUCEDO based upon GPS pings
       coinciding with surveillance observations of the AGUILAR SAUCEDO NISSAN) depart
       7381 Pritchard Road in tandem with a black Lexus sedan, which had just arrived, and a
       Ford Flex.  A subsequent DMV check revealed that the black Lexus (CA 7VEF211) was
       registered to Jaime Castro (a known alias for Jaime Castro Lazcano).

49.    Shortly thereafter, the AGUILAR SAUCEDO NISSAN accelerated at a high rate of
       speed on eastbound Interstate 80 near the Madison Avenue exit, and surveillance was no
       longer able to be maintained on the vehicle; surveillance recognized this driving behavior
       to be consistent with counter-surveillance tactics.  At approximately 5:50PM, the
       authorized GPS ping on AGUILAR SAUCEDO PHONE #1 indicated that the location of
       the phone was unattainable, consistent with the device being turned off.  At
       approximately 6:40PM, CS-1 notified an agent that AGUILAR SAUCEDO had
       communicated with CS-1 via Snapchat and indicated that the "Feds" were on him
       (AGUILAR SAUCEDO) and that he had thrown his phone in the "river."  This is
       consistent with counter-surveillance tactics and mirrors the fact that GPS pings were no
       longer attainable on AGUILAR SAUCEDO PHONE #1.

50.    At approximately 11:30PM, CS-1 notified an agent that AGUILAR SAUCEDO had
       communicated with CS-1 via Snapchat and asked if CS-1 had already got the "blues"
       (counterfeit oxycodone pills) to which CS-1 responded that s/he had not.  AGUILAR
       SAUCEDO then indicated that he could supply the pills to CS-1 the next day.

51.    On May 28, 2020, at approximately 3:47PM, CS-1 notified an agent that AGUILAR
       SAUCEDO had communicated with CS-1 via Snapchat and indicated that he was going
       to the "trap" (stash location) located off of Florin Road to check on the pills, which I
       believe was likely a reference to 8528 Bellamy Way, Sacramento, CA.  At approximately
       4:04PM, CS-1 received another Snapchat message from AGUILAR SAUCEDO which
       indicated that he had the "5" (five boats, or 5,000 pills) for CS-1.  At approximately

18

8:25PM, I received a recording of a FaceTime Video depicting multiple bags of blue pills which AGUILAR SAUCEDO had just sent to CS-1 (who then sent it to another agent). At approximately 8:51PM, surveillance observed multiple individuals standing outside by the AGUILAR SAUCEDO NISSAN, which had been parked at the 8528 Bellamy Way residence for over an hour and a half.  At approximately 9:11PM, I received a screenshot of Snapchat communications between CS-1 and AGUILAR SAUCEDO (which CS-1 had just sent to another agent) in which AGUILAR SAUCEDO directed CS-1 to come to "8520 Bellamy way" to conduct the drug transaction[4]; AGUILAR SAUCEDO further stated that his "driver" would then follow CS-1 back to the "freeway" afterwards (in order to provide security for CS-1).  CS-1 responded that s/he would only meet AGUILAR SAUCEDO near the Florin Road exit off of Highway 99, not at the Bellamy Way residence, to which AGUILAR SAUCEDO had responded that he would have to check with his driver.  At approximately 9:35PM, surveillance saw a plum Pontiac that had recently been parked at 8528 Bellamy Way arrive at a Chevron convenience store a couple blocks away; the driver was identified as Rafael Orozco and the passenger appeared to be Severo Reyna. From approximately 9:38PM to 9:55 pm, the tracking device on the AGUILAR SAUCEDO NISSAN showed the vehicle leave 8528 Bellamy Way, travel to 4316 34th Avenue, where it stopped momentarily, and then return to 8528 Bellamy Way.  Based on my training and experience, I believe this quick turnaround trip, coupled with AGUILAR SAUCEDO stating he would have to check with his driver about conducting the drug transaction away from the Bellamy Way residence, is consistent with counter-surveillance tactics used to assess the level of law enforcement in the area to determine if it was feasible to leave the residence with the drugs in the vehicle.  Shortly thereafter, AGUILAR SAUCEDO notified CS-1 via Snapchat communications that AGUILAR SAUCEDO would not transport the pills away from the Bellamy Way location to meet with CS-1, and that CS-1 would have to come to the Bellamy Way location to conduct the transaction, to which CS-1 refused.

52.   On May 29, 2020, at approximately 6:54PM, I received a video from another agent which CS-1 indicated had been sent to CS-1 a few minutes earlier by AGUILAR SAUCEDO via Snapchat; the video showed multiple bags of blue pills and displayed the caption "Yeah bruh stop playing with me."

53.   On August 4, 2020, at approximately 10:15AM, I conducted physical surveillance at the residence located at 8528 Bellamy Way, Sacramento, CA during the installation of a pole camera in the immediate vicinity.  At approximately 10:30AM, I observed an individual whom I believed at the time to be Rafael Orozco walk from the front door area of the

---

[4] Based on my training and experience, I know drug traffickers will often provide an address to a nearby location (such as 8520 Bellamy Way) when arranging meetings in an effort to prevent identification of the actual stash location.

residence out to the street carrying a baggie upright in the palm of his hand.  (NOTE: Although this individual appeared to me to be Orozco at the time, I did not notice his signature "rat-tail" hairstyle and noted that he had apparently cut it off.  However, on September 2, 2020, when FBI arrested Reyna while Orozco was present, Orozco did still have the "rat-tail" hairstyle according to photos provided to me by FBI.  Given that Orozco did still have the "rat-tail" hairstyle just four weeks later, I am unsure whether the individual I observed on August 4, 2020 was in fact Orozco.  Accordingly, I refer to him as UM#2.)  I then observed UM#2 walk up to the driver's side of a dark colored Dodge Durango with no front license plate which had just arrived minutes earlier and parked on Bellamy Way on the opposite side of the street directly in front of the 8528 Bellamy Way residence.  Immediately thereafter, I observed the driver's side door of the Dodge Durango open and then UM#2 appeared to access the inside of the baggie and lean into the vehicle to possibly conduct an exchange.  Immediately thereafter, I observed UM#2 walk back to the front door area of the 8528 Bellamy Way residence while carrying the baggie upright in the palm of his hand.  Immediately thereafter, I observed the Dodge Durango depart the area (but I was unable to observe the back license plate of the vehicle).  Based on my training and experience, this brief meeting was consistent with a drug transaction.  At approximately 10:45AM, I observed UM#2 and an unidentified juvenile walk from the 8528 Bellamy Way residence to a red pick-up truck (which had a shell covering over the truck bed) which was parked across the street from the residence.  Immediately thereafter, I observed UM#2 get into the driver's seat of the red truck and the juvenile get into the front passenger seat.  Immediately thereafter, I observed the red truck depart the area (but I was unable to observe the license plate of the vehicle).

54.	On August 6, 2020, at approximately 6:45AM, I viewed live pole camera footage at the 8528 Bellamy Way residence and observed the red truck parked in the same position across the street from the residence.  Immediately thereafter, I zoomed in via the pole camera and captured a photo of the license plate of the red truck, which was 6SZU268.  A subsequent CA DMV check revealed that the red truck was a 1995 model GMC registered to Rafael Orozco, 8528 Bellamy Way, Sacramento, CA 95828.  (NOTE: Agents have also identified another individual named Rafael Orozco Rodriguez, who is also believed to reside at the 8528 Bellamy Way residence.)

55.	On November 20, 2020, surveillance observed multiple vehicles registered to Rafael Orozco parked at the 8528 Bellamy residence, including a Jeep Compass bearing CA license plate number 6ASU504, and the grey GMC Yukon (CA 7WUX983) which was involved in the previously detailed controlled purchase from AGUILAR SAUCEDO on March 10, 2020.  Additionally, surveillance also observed a Ford Explorer, bearing CA license plate number 6GGM623, which has a suspended registration.

56.   On January 7, 2021, I viewed live pole camera footage at the 8528 Bellamy Way residence and observed the same grey GMC Yukon (7WUX983) parked on the street in front of the residence.

57.   Based upon all of the aforementioned surveillance observations, I believe that the residence located at 8528 Bellamy Way, Sacramento, CA is a stash location and distribution point for controlled substances.

***On August 13, 2020, CS-2 purchased approximately 300 counterfeit oxycodone tablets containing fentanyl from AGUILAR SAUCEDO and Jose Edgar Aguilar; 7618 Amherst Street, Apt #4, Identified as AGUILAR SAUCEDO's Residence.***

58.   On July 22, 2020, CS-1 provided me with a screenshot of a Snapchat message from AGUILAR SAUCEDO in which he provided a new telephone number of 916-281-8551 ("AGUILAR SAUCEDO PHONE #3).  Earlier on the same date, agents had directed CS-1 to contact AGUILAR SAUCEDO to solicit his new phone number for the purpose of telephonically introducing another DEA Confidential Source ("CS-2").  After providing the new number to me, CS-1 also informed me that AGUILAR SAUCEDO tentatively agreed to deal with CS-1's referral (CS-2).

59.   On August 11, 2020, at approximately 11:25PM, CS-2 placed a recorded call to AGUILAR SAUCEDO PHONE #3, under the direction of agents.  During this call, AGUILAR SAUCEDO agreed to sell CS-2 two hundred (200) "darks" (dark blue counterfeit M-30 oxycodone tablets) for $7 per pill.  On August 12, 2020, at approximately 5:12PM, CS-2 placed another recorded call to AGUILAR SAUCEDO PHONE #3, under the direction of agents.  During this call, AGUILAR SAUCEDO agreed to sell CS-2 200 "darks" (dark blue) and 200 "lights" (light blue), for a total of 400 pills; AGUILAR SAUCEDO and CS-2 agreed to conduct the transaction the next day in south Sacramento.

60.   It should be noted that CS-2 is working with law enforcement for monetary compensation.  CS-2 has criminal history that includes multiple convictions, including felony convictions for burglary, vehicle theft, and receipt of stolen property and a conviction for dissuading a witness by threat or force.  Agents have been able to independently corroborate much of the information provided by CS-2 related to the drug trafficking activities of AGUILAR SAUCEDO and the other targets of this investigation through physical surveillance, audio and video recordings, and other information.  I am not aware of CS-2 providing false or misleading information during this

investigation.  For these reasons, I believe the information provided by CS-2 to be reliable.

61.  On August 13, 2020, during a call with CS-2 on AGUILAR SAUCEDO PHONE #3, AGUILAR SAUCEDO agreed to sell CS-2 200 of the "dark blues" and 100 of the "light ones" (total of 300 blue M-30 pills) for "two racks" ($2,000) and to meet at the Home Depot located on "Florin" to conduct the transaction.

62.  Later that day, at approximately 3:12PM, surveillance saw AGUILAR SAUCEDO pick up a Hispanic male adult, later identified by CS-2 to be Jose Edgar Aguilar, in the AGUILAR SAUCEDO NISSAN at a residence in south Sacramento to which AGUILAR SAUCEDO had driven from his residence.  The AGUILAR SAUCEDO NISSAN then traveled to the Home Depot parking lot at 4641 Florin Road and parked next to CS-2's vehicle.  CS-2 got into the AGUILAR SAUCEDO NISSAN, where he purchased approximately 300 counterfeit oxycodone pills from AGUILAR SAUCEDO for $2,000; the pills were contained within three separate clear plastic baggies of approximately 100 pills each, one of which had light blue pills and the other two had darker blue pills.  The pills were later submitted to a DEA laboratory for analysis and a single light blue pill and a single darker blue pill were both analyzed and each was found to contain fentanyl and acetaminophen.  CS-2 stated that AGUILAR SAUCEDO told CS-2 that he (AGUILAR SAUCEDO) could get as many pills as CS-2 needed and was willing to drive to Chico to sell CS-2 pills.

63.  At approximately 3:33PM, surveillance observed the AGUILAR SAUCEDO NISSAN arrive and park at AGUILAR SAUCEDO's residence located at 7618 Amherst Street, Sacramento, CA.  Immediately thereafter, surveillance observed the driver of the AGUILAR SAUCEDO NISSAN (AGUILAR SAUCEDO) exit the vehicle and walk towards AGUILAR SAUCEDO's residence and out of view.  At approximately 3:38PM, surveillance observed AGUILAR SAUCEDO walk back from the residence and reenter the driver seat of the AGUILAR SAUCEDO NISSAN and depart the area.

64.  On January 5, 2021, a CHP officer conducted a ruse hit-and-run inquiry at 7618 Amherst Street, Apartments 1 & 4, Sacramento, CA located within the Whispering Pines Apartments complex, related to the black Toyota Scion (6YVS157).  During this inquiry, the CHP officer made contact with Jasmine Ortega (AKA: Jasmine Ortega-Lopez) at Apartment 4, who confirmed that she resided there with her son.  Ortega further stated to the CHP officer that her mother (Maria Alvina Lopez, the registered owner of the black Toyota Scion) resided in Apartment 1; the black Toyota Scion was not parked at the apartments during the inquiry.  (NOTE: The AGUILAR SAUCEDO NISSAN is registered to Jasmine Ortega at 3991 67th St, Sacramento, CA.  During the May 18, 2020

traffic stop of AGUILAR SAUCEDO described above, officers noted that 3991 67th St, Sacramento, CA was the address listed on AGUILAR SAUCEDO's California ID card.)

65.   On January 11, 2021, DEA received tenant information for 7618 Amherst Street, Apartments 1 & 4, Sacramento, CA via an administrative subpoena which indicated that Jasmine Ortega, age 21, resided in Apartment 4 with her 3-year old juvenile dependent who bore the last name Aguilar, and that Maria Lopez Lepe, age 53, resided in Apartment 1 with two teenage juvenile dependents.  Later on the same date, DEA conducted an open source query of Ortega's Facebook page and observed a photograph of a toddler with a comment underneath which stated "Hi little Chito/beautiful baby booosss!"  Based on the foregoing, I believe that Ortega is the mother of AGUILAR SAUCEDO's 3-year old son, who has the last name AGUILAR ("little Chito"), and that the three of them live together at 7618 Amherst Street, Apartment 4.  Although only Ortega and the three-year old son are listed on the tenant records, I know from training and experience that drug traffickers often omit their names from residential records in an effort to evade law enforcement.

66.   I believe that AGUILAR SAUCEDO (AKA: "Chito") resides in 7618 Amherst Street, Apartment 4, Sacramento, CA, based upon all of the following: (1) surveillance observations of AGUILAR SAUCEDO accessing the hallway that leads to 7618 Amherst Street, Apartments 1 & 4, Sacramento, CA (apartments which are both located on the ground level on opposite sides of the hallway), (2) authorized GPS Ping data which indicated that AGUILAR SAUCEDO resided in the vicinity of the Whispering Pines Apartments complex, (3) surveillance observations and vehicle tracker data showing that both vehicles utilized by AGUILAR SAUCEDO were usually parked at the apartment complex during nighttime hours (the AGUILAR SAUCEDO NISSAN and the Toyota Scion), (4) tenant information which indicated that AGUILAR SAUCEDO's suspected paramour Jasmine Ortega resides in Apartment 4 with a juvenile dependent bearing the last name AGUILAR (and the open source photo on Ortega's Facebook page of a toddler referred to as "little Chito"), (5) vehicle registration information for the AGUILAR SAUCEDO NISSAN in the name of Jasmine Ortega and address listed on AGUILAR SAUCEDO's California ID card, and (6) Ortega-Lopez's statement that her mother resided in Apartment 1 along with tenant information which indicated that Maria LOPEZ LEPE resided there, I believe that AGUILAR SAUCEDO (AKA: "Chito") resides in 7618 Amherst Street, Apartment 4, Sacramento, CA.

**_On August 19, 2020, an undercover officer purchased approximately 400 counterfeit oxycodone tablets containing fentanyl from Jose LOPEZ-ZAMORA._**

67.   On August 19, 2020, at approximately 8:30AM, surveillance at J. LOPEZ-ZAMORA's residence located at 8357 Yermo Way, Sacramento, CA observed the a blue 2009 Nissan

Maxima bearing CA license plate number 8LGG074 (the "J. LOPEZ-ZAMORA NISSAN") and a gold 2000 Honda sedan bearing CA license plate number 4HDX937 (the "J. LOPEZ-ZAMORA HONDA") parked there.

68.   At approximately 1:03PM, surveillance observed an undercover officer (the "UC") arrive and park within the La Favorita Taqueria parking lot located at 3023 W. Capital Ave, West Sacramento, CA in order to wait for J. LOPEZ-ZAMORA.

69.   At approximately 1:45PM, surveillance observed the J. LOPEZ-ZAMORA HONDA arrive and park within the La Favorita Taqueria parking lot near the UC's vehicle. Immediately thereafter, surveillance observed an adult male wearing a black shirt and grey pants (later positively identified by the UC to be J. LOPEZ-ZAMORA based upon a comparison to a booking photo and an open source social media photo of J. LOPEZ-ZAMORA with no identifiers listed) walk from the J. LOPEZ-ZAMORA HONDA and meet with the UC.  Immediately thereafter, surveillance observed the J. LOPEZ-ZAMORA HONDA reposition in the parking lot, indicating that there was another occupant who had arrived in the vehicle along with J. LOPEZ-ZAMORA.  At approximately 1:50PM, surveillance observed J. LOPEZ-ZAMORA finish meeting with the UC and walk back to the J. LOPEZ-ZAMORA HONDA.

70.   Immediately thereafter, the UC notified me that the deal was done and that there was a black Chevrolet Silverado pickup truck parked in the lot which was associated with J. LOPEZ-ZAMORA, and that J. LOPEZ-ZAMORA had told the UC that an individual within the truck had an "AR" (ArmaLite Rifle; commonly referred to as an assault rifle) pointed at the UC during the deal.

71.   Immediately thereafter, surveillance observed the UC's vehicle and then the J. LOPEZ-ZAMORA HONDA depart the area.  Shortly thereafter, surveillance observed the J. LOPEZ-ZAMORA HONDA arrive and park in the southern most parking space within the Skylark Mobile Home park located at 3205 W. Capital Ave, West Sacramento, CA. At approximately 1:54PM, surveillance observed a passenger (J. LOPEZ-ZAMORA) exit the J. LOPEZ-ZAMORA HONDA along with the driver, who was wearing dark shorts and a dark shirt and was carrying a red backpack; both individuals entered a yellow trailer parked in space #12 (later determined to be the residence of Christian ROMERO, as detailed below).  At approximately 1:56PM, surveillance saw a black pickup truck with a shiny toolbox in the bed area parked outside of the yellow trailer, and saw a male individual wearing a dark t-shirt and jeans exit the truck.  At approximately 1:57PM, surveillance observed J. LOPEZ-ZAMORA and other the original occupant of the LOPEZ-ZAMORA HONDA, who was still carrying a red backpack, along with a third individual wearing a red shirt, all walk back to the LOPEZ-ZAMORA HONDA and

appear to converse with one another near the trunk of the vehicle.  At approximately
2:01PM, surveillance observed a fourth individual, who was also wearing a red shirt, join
the other three individuals who all then appeared to converse with one another near the
trunk of the LOPEZ-ZAMORA HONDA.  At approximately 2:07PM, surveillance
observed all four individuals get into the LOPEZ-ZAMORA HONDA and depart the
area.  At approximately 2:18PM, surveillance observed the LOPEZ-ZAMORA HONDA
arrive and park next to a silver Chevrolet Camaro at a McDonalds restaurant located
at 200 Richards Blvd, Sacramento, CA.  Immediately thereafter, surveillance
observed the smaller of the red shirted passengers exit the LOPEZ-ZAMORA HONDA
and get into the silver Camaro for less than a minute before exiting and reentering the
LOPEZ-ZAMORA HONDA, which then departed the area.  Based on my training and
experience, this brief meeting in another vehicle was consistent with a drug transaction.
At approximately 2:33PM, surveillance observed the LOPEZ-ZAMORA HONDA arrive
and park near the residence located at 2550 Norwood Avenue, Sacramento, CA, where an
individual wearing a dark shirt and pants approached the LOPEZ-ZAMORA HONDA
and then walked away again shortly thereafter.  2550 Norwood Avenue, Sacramento, CA
is the subscriber address of telephone number 916-692-6238.  During the wiretap of
**Target Telephone 1** in October to December 2020, described below, agents intercepted
numerous calls and texts in which J. LOPEZ-ZAMORA ordered marijuana from the user
of 916-692-6238.  Based on those intercepts and related surveillance observations, I
believe the LOPEZ-ZAMORA HONDA stopped at 2550 Norwood Avenue to conduct a
marijuana transaction.  At approximately 2:36PM, surveillance saw the LOPEZ-
ZAMORA HONDA depart the area and then arrive and park at Kings Market, located at
400 El Camino Avenue, Sacramento, CA, about two minutes later.  Surveillance saw all
four individuals exit the LOPEZ-ZAMORA HONDA and enter Kings Market, and then
return to the LOPEZ-ZAMORA HONDA about ten minutes later.  An agent took digital
photographs of all four individuals; I positively identified the larger individual wearing a
red shirt to be Jaime Castro Lazcano based upon a comparison to a CA DMV
photograph; and the larger individual wearing a dark (black) shirt appeared to be J.
LOPEZ-ZAMORA but he was wearing a COVID mask partially covering his face.

72.   The UC stated that he paid J. LOPEZ-ZAMORA $4,000 in officially advanced
      government funds for 400 suspected counterfeit oxycodone pills (a price of $10 per pill).
      The pills that the UC purchased, which had M-30 logos imprinted on them consistent
      with oxycodone pills, were later submitted to a DEA laboratory for analysis and a single
      pill was analyzed and found to contain fentanyl and acetaminophen.

73.   On August 20, 2020, at approximately 3:27PM, the UC placed a recorded call to 916-
      896-8190 (**Target Telephone 1**), used by J. LOPEZ-ZAMORA.  During this call, the UC
      stated, "those blues fuckin' smack bro," referring to the potency of the pills J. LOPEZ-

ZAMORA sold to the UC the day before, and J. LOPEZ ZAMORA responded, "I told ya."  The UC then asked for the price on a "boat" (meaning 1,000 pills) and J. LOPEZ-ZAMORA responded, "a dollar or two at the most" and later stated "save you some couple dollars" (meaning that the initial transaction price of $10 per pill would be reduced by either one or two dollars, resulting in a lower price of $8-$9 per pill).  The UC and J. LOPEZ-ZAMORA then agreed on that price and a future transaction (with no set date).

***On September 4, 2020, the UC purchased approximately 1,000 counterfeit oxycodone tablets containing fentanyl from Christian Anthony ROMERO; the UC arranged the deal with J. LOPEZ-ZAMORA over Target Telephone 1; ROMERO's address is identified as 3205 W. Capitol Avenue, Space 12, West Sacramento, CA.***

74.   On September 2, 2020, at approximately 12:57PM, the UC placed an outgoing call to **Target Telephone 1**, used by J. LOPEZ-ZAMORA.  During this recorded call, the UC stated that he was "seeing what's up with the boat" and then stated, "you got that thing available?" (in reference to purchasing 1,000 pills).  J. LOPEZ-ZAMORA responded, "Yeah I do."  The UC and J. LOPEZ-ZAMORA then discussed prices for pills and J. LOPEZ-ZAMORA stated, "I got some for eight, and I got some nine, and I got some for ten" (in reference to the cost in dollars per pill) and then J. LOPEZ-ZAMORA stated, "they're all high quality."  J. LOPEZ-ZAMORA later stated that he was going to "leave to LA" (Los Angeles, California) and wanted to know if the UC was "cool with meeting one of my (J. LOPEZ-ZAMORA's) cousins" to conduct the transaction.  J. LOPEZ-ZAMORA later stated that he was "gonna give 'em to you uhh sealed ok" and then stated "'cause how they come from down there from TJ ok" (in reference to the packaging that the pills are smuggled in from Tijuana, Mexico) and then further stated "they got orange tape."  J. LOPEZ-ZAMORA then informed the UC that there will be some broken pills because they're taped too hard and that J. LOPEZ-ZAMORA will replace the broken pills next time.  J. LOPEZ-ZAMORA then stated, "the next run, the next twenty thousand they not gonna tape them that hard" (in reference to the next 20,000 pills that will be smuggled in from Mexico).

75.   At approximately 5:31PM, the UC received an incoming call from **Target Telephone 1**, used by J. LOPEZ-ZAMORA.  During this recorded call, J. LOPEZ-ZAMORA stated that since J. LOPEZ-ZAMORA was going to be in LA (Los Angeles) on Friday (September 4, 2020), "you could fuck with my cousin the one that was driving me the day" (in reference to the UC buying the pills from J. LOPEZ-ZAMORA's driver during the controlled purchase on August 19, 2020).  J. LOPEZ-ZAMORA then stated that he was going to give the UC a telephone number to call to set up the transaction.  J. LOPEZ-ZAMORA later stated that the pills he was going to supply to the UC "look like, like real

scripts," meaning that the pills are counterfeit but look like authentic pharmaceutical pills. J. LOPEZ-ZAMORA later stated, "same spot is perfect right there it's good it's not hot," meaning they could conduct the second transaction at the same location as the first transaction because there was no law enforcement presence there.

76.     On September 3, 2020, at approximately 2:06PM, the UC received an incoming call from **Target Telephone 1**, used by J. LOPEZ-ZAMORA. During this recorded call, J. LOPEZ-ZAMORA stated "I don't know if you gonna meet my cousin that was driving me or my cousin that was in the truck, remember I was in two cars, either or" (in reference to which of J. LOPEZ-ZAMORA's co-conspirators from the first transaction would meet with the UC during the second transaction). J. LOPEZ-ZAMORA later stated that he was either going to send "Tony" his "boy" or "J" his "cousin" to conduct the transaction with the UC.

77.     At approximately 6:12PM, the UC received an incoming text message from **Target Telephone 1**, used by J. LOPEZ-ZAMORA, which stated "Tony 9166675694" (which was the telephone number for Tony who would be delivering the pills on behalf of J. LOPEZ-ZAMORA the next day). A money remitter database was queried, and the results indicated that Christian Anthony ROMERO listed telephone number 916-667-5694 (the "ROMERO PHONE") to send wire transfers to subjects in Sinaloa, Mexico on April 15, 2020 and July 20, 2020. The address listed for ROMERO on the wire transfers was 3205 W. Capitol Ave, #12, West Sacramento, CA. Telephone toll record analysis revealed that the subscriber of telephone number 916-667-5694 was Christian ROMERO, 2214 Arden Way, Sacramento, CA, and that the ROMERO PHONE was in contact with J. LOPEZ-ZAMORA PHONE #1 approximately 228 times from August 26, 2019 to November 17, 2019; J. LOPEZ-ZAMORA PHONE #2 approximately 375 times from December 10, 2019 to August 11, 2020; and **Target Telephone 1** approximately 19 times from August 13 to August 19, 2020. Toll analysis also indicated that the ROMERO PHONE was in contact with 916-512-7643, subscribed to Jaime Castro, approximately 331 times from October 26, 2019 to December 8, 2019.

78.     On September 4, 2020, at approximately 11:49AM, the UC sent an outgoing text message to the ROMERO PHONE which asked if "we still good for that boat." At approximately 12:01PM, the UC received an incoming text message from the ROMERO PHONE which stated, "Yea around 1:30 at the Carl's Jr. By dolla store." At approximately 1:28PM, the UC sent a text message to the ROMERO PHONE which stated "I'm pullin Brodie." At approximately 1:29PM, the UC received a text message from the ROMERO PHONE which stated, "Ight I'll be there in 3 min wat car u in." At approximately 1:30PM, the UC responded, "Gold Nissan .. park next to me."

79.   At approximately 1:31PM, surveillance observed ROMERO emerge from the trailer associated with space #12 at the Skylark Mobile Home park located at 3205 W. Capital Ave, West Sacramento, CA (where J. LOPEZ-ZAMORA is known to frequent; where J. LOPEZ-ZAMORA's suspected drug trafficking associate Jaime Castro Lazcano is associated with space #21; and where ROMERO is associated with space #12, which was the trailer that J. LOPEZ-ZAMORA was observed entering after the controlled purchase on August 19, 2020).  ROMERO got into the left rear passenger seat of a black Acura sedan, which then traveled to and arrived at the parking lot near the Carl's Jr. restaurant at approximately 1:35PM and parked close to the UC vehicle occupied by the UC.  ROMERO got out of the black Acura and entered the front passenger seat of UC vehicle, where he sold the UC 1,000 counterfeit oxycodone pills for $9,000 in officially advanced government funds.  ROMERO then got back into the black Acura and returned to the trailer associated with space #12 at the Skylark Mobile Home park.

80.   The approximately 1,000 counterfeit oxycodone pills that the UC purchased from ROMERO were tightly wrapped in orange tape, just as J. LOPEZ-ZAMORA had described that they would be.  Agents submitted the counterfeit oxycodone pills to a DEA lab for analysis and a single pill was analyzed and found to contain fentanyl and acetaminophen.

***In October 2020, DEA is authorized to intercept wire and electronic communications to and from Target Telephone 1 used by Jose LOPEZ-ZAMORA; and in November 2020, DEA is authorized to intercept wire and electronic communications to and from Target Telephone 1 used by Jose LOPEZ-ZAMORA and Target Telephone 2 used by Luis LOPEZ ZAMORA.***

81.   On October 9, 2020, and November 10, 2020, the Honorable Morrison C. England, Jr., signed orders authorizing the DEA to intercept wire and electronic communications to and from **Target Telephone 1**, which was used by Jose LOPEZ-ZAMORA.  These orders also authorized activation of GPS "Ping" intercepts on **Target Telephone 1**.  On November 10, 2020, the Honorable Morrison C. England, Jr., also signed an order authorizing the DEA to intercept wire and electronic communications to and from **Target Telephone 2**, which was used by Luis LOPEZ ZAMORA.  It is believed that L. LOPEZ ZAMORA resided in Mexico throughout the period of authorized interceptions.

82.   The intercepted calls and text messages described below occurred both in Spanish and English.  Throughout this Affidavit, I have relied primarily on the Spanish-English translations and English transcriptions prepared by bilingual Spanish- and English-speaking contract monitors, as well as in some instances on summaries of calls prepared by the monitors.

*Intercepted calls on October 13, 2020 between Jose LOPEZ-ZAMORA and Sandro ESCOBEDO regarding ESCOBEDO selling 1,000-pill quantities of counterfeit oxycodone pills on behalf of J. LOPEZ-ZAMORA.*

83.  On October 13, 2020, at approximately 8:16PM, Jose LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from the ESCOBEDO PHONE, utilized by Sandro ESCOBEDO.  During this intercepted call, ESCOBEDO asked, "Hey, what kind of blues do you have right now?"  J. LOPEZ-ZAMORA responded, "I got different kinds, fool. Whichever you want, dude."  Later ESCOBEDO asked, "How much for those?"  J. LOPEZ-ZAMORA responded, "Even if you owe me. I need you to move them all, because if not you won't make enough to pay me."  ESCOBEDO responded, "No shit, nigga. Why do you think I'm trying to fucking sell a boat right now! How much for a boat?"  J. LOPEZ-ZAMORA responded, "I have some really pretty ones right now. They are blue, dude. Medium, dude. They are really good ones, dude. Honestly, you tell me how much they want to pay and we can split the profit. Fuck it."  ESCOBEDO responded, "All right, let me… I'll call you right back."

84.  Based on this intercepted call, I believe that ESCOBEDO was inquiring with J. LOPEZ-ZAMORA about prices for counterfeit oxycodone pills ("blues") and that LOPEZ-ZAMORA agreed to supply ESCOBEDO and split the profits on a future transaction with ESCOBEDO's customer.

85.  At approximately 8:18PM, J. LOPEZ-ZAMORA received another incoming call on **Target Telephone 1** from the ESCOBEDO PHONE, utilized by ESCOBEDO.  During this intercepted call, ESCOBEDO stated, "…if you, if you can send me a picture of each one of them. And then ah, and he doesn't wanna pay no more than six-fifty."  J. LOPEZ-ZAMORA responded, "At that price, dude, I can't sell you no more than six-fifty. Tell him we are going to send him a picture and we want seven. If he wants they…And I can give you one thousand dollars."  ESCOBEDO later stated, "this nigga…He probably won't do seven, bro cause' this nigga buys a boat like every two days. Like, he just told me, "I got two boats right now, but I'll buy a third one, I'm not tripping."  J. LOPEZ-ZAMORA responded, "Okay, tell, tell, tell the nigga to buy two boats for six-fifty. The quality that I have is fucking loud, fool," and later stated, "Or tell him I'll do it this time, for that price. And I'm only going to give you seven-fifty, fool."  ESCOBEDO responded, "I'm gonna tell him that six-fifty, but next round he needs to buy two, to get them at that price," and later stated, "Or I'll tell him seven and see what happens."  J. LOPEZ-ZAMORA responded, "Make it happen," and later stated, "And then, uh, this time you, you…I'ma just shoot you from my profits. You're only supposed to make five-hundred (500) right there."

86. Based on this intercepted call, I believe that J. LOPEZ-ZAMORA agreed to offer ESCOBEDO's customer 2,000 counterfeit oxycodone pills ("two boats") for a price of $6.50 per pill ("six-fifty") and that ESCOBEDO's customer distributes 1,000 pills every two days ("this nigga buys a boat like every two days").

87. On the same day, United States Magistrate Deborah Barnes of the Eastern District of California authorized activation of GPS "Ping" intercepts on the ESCOBEDO PHONE, used by ESCOBEDO, for a period of 30 days.

88. On October 15, 2020, United States Magistrate Judge Deborah Barnes of the Eastern District of California authorized the installation and activation of a tracking device on the J. LOPEZ-ZAMORA NISSAN, for a period of 45 days.

89. On October 16, 2020, at approximately 10:43PM, J. LOPEZ-ZAMORA received another incoming call on **Target Telephone 1** from the ESCOBEDO PHONE, utilized by ESCOBEDO.  During this intercepted call, J. LOPEZ-ZAMORA agreed to supply ESCOBEDO with 100 blues and deliver them to ESCOBDO around 11:15PM.

90. At approximately 11:37PM, court authorized vehicle tracking information indicated that the J. LOPEZ-ZAMORA NISSAN stopped near the address of 6913 Richeve Way, Sacramento, CA, around the time that J. LOPEZ-ZAMORA was supposed to be delivering pills to ESCOBEDO.  During approximately the same time, the authorized GPS Pings on the ESCOBEDO PHONE and **Target Telephone 1** indicated that the phones were in close proximity to each other and the J. LOPEZ-ZAMORA NISSAN.

91. On October 17, 2020, at approximately 3:15PM, physical surveillance was established in the vicinity of 6913 Richeve Way where the ESCOBEDO PHONE was pinging in the area.  At approximately 4:40PM, I observed a red Pontiac parked in the driveway of the residence located at 6905 Richeve Way, bearing CA license plate number 7DOE684, which according to a CA DMV check was registered to Fernando ESCOBEDO, 6905 Richeve Way, Sacramento, CA.  Additionally, I observed another vehicle parked in the driveway of 6905 Richeve Way, bearing Oregon license plate number 286GVR, which according to an OR DMV check was registered to Sandro ESCOBEDO, 520 Juniper Drive, Boardman OR.  Surveillance also observed a dark red Jeep parked on the street in front of the driveway of 6905 Richeve Way, bearing CA license plate number 7SPT512, which according to a CA DMV check was registered to Claudia DEMARTINEZ, 3824 Clay Street, Sacramento, CA.  At approximately 6:43PM, I observed an unidentified Hispanic male adult (H/M/A) wearing a black shirt and tan baseball cap walk from the front door area of the 6905 Richeve Way residence and access the Jeep.  At

approximately 7:15PM, I observed the Jeep depart from the residence.  At approximately 7:22PM, the GPS Ping on the ESCOBEDO PHONE had moved away from the vicinity of the 6905 Richeve Way residence in tandem with the Jeep while surveillance was maintained on the vehicle.  Immediately thereafter, surveillance observed the Jeep arrive and park at the "Seafood Ististas De Nayarit" restaurant located at 7216 Lindale Drive, Sacramento, CA.  Shortly thereafter, NET-5 Detective Carlos Mendoza entered the restaurant and positively identified ESCOBEDO to be one of the individual inside of the restaurant.  At approximately 7:28PM, while Det. Mendoza was still within close proximity to ESCOBEDO, I placed a blocked call to the ESCOBEDO PHONE which went straight to voicemail.  At the same time, Det. Mendoza observed ESCOBEDO appear to silence his phone.  At approximately 7:29PM, I placed another blocked call to the ESCOBEDO PHONE and heard a male's voice answer.  At the same time, Det. Mendoza observed ESCOBEDO answer his phone.  Shortly thereafter, I observed ESCOBEDO and the H/M/A eating within the outside dining area in front of the restaurant.  At approximately 8:20PM, I observed ESCOBEDO get into the front passenger seat of the Jeep while the H/M/A got into the driver's seat.  Immediately thereafter, I observed the Jeep depart the restaurant.

92. Based upon these intercepted calls, GPS Pings, vehicle tracker data, and surveillance observations, I believe that ESCOBEDO used the ESCOBEDO PHONE and resided at 6905 Richeve Way, Sacramento, CA, where ESCOBEDO took delivery of counterfeit oxycodone pills supplied by J. LOPEZ-ZAMORA.

93. On November 12, 2020, ESCOBEDO was arrested during a traffic stop by Roseville Police Department which resulted in the seizure of approximately 10 MDMA pills, suspected Xanax tablets, and approximately 20 "M-30" pills from ESCOBEDO.  When officers asked where ESCOBEDO lived, ESCOBEDO provided the 6905 Richeve Way, Sacramento, CA address.  ESCOBEDO subsequently bailed out of jail.

94. On December 2, 2020, Roseville Police Department executed a state search warrant on ESCOBEDO's residence located at 6905 Richeve Way, Sacramento, CA which resulted in the re-arrest of ESCOBEDO and the seizure of approximately 4.5 pounds of marijuana, a Glock "ghost" style handgun, and approximately 30 "M-30" pills (as well as additional broken pills).  ESCOBEDO remains in custody on the state charges.

***Intercepted calls on October 15-19, 2020 involving Jose LOPEZ-ZAMORA, Luis LOPEZ ZAMORA, Javier Hernandez and/or Rudi FLORES regarding a transaction for 1,000 pills in Manteca, CA; Agents identify 5241 Crystal Hill Way, Sacramento, CA, as a stash location overseen by Leonardo FLORES BELTRAN; Agents identify***

31

*3205 W. Capitol Ave, Space 38, West Sacramento, CA as Hernandez's address; Agents identify 425 Chablis Way, Manteca, CA as Rudi FLORES' residence.*

95.   On October 15, 2020, at approximately 6:20PM, Jose LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-621-7638 (**Target Telephone 2**) subscribed to Hipolito TorresGarcia, which is utilized by J. LOPEZ-ZAMORA's brother, Luis Felipe LOPEZ ZAMORA.  During this intercepted call, J. LOPEZ-ZAMORA stated, "Hey, I need, I need a band tomorrow, like at around twelve during the day."  J. LOPEZ-ZAMORA later stated, "I'm going to send the cousin with the one thousand with Leo, because Leo is going to work.  So he can take them to that dude in Manteca tomorrow."  Based on my training and experience with this investigation, including other intercepted calls, I believe J. LOPEZ-ZAMORA was telling L. LOPEZ ZAMORA that he needed 1,000 counterfeit oxycodone pills (a "band," common slang for 1,000, and "the one thousand") for his cousin (Javier Hernandez) to take from Leonardo FLORES BELTRAN's house to Rudi FLORES ("that dude in Manteca") in Manteca the next day.  Also during this intercepted call, L. LOPEZ ZAMORA asked about an altercation over money which had occurred the day before and J. LOPEZ-ZAMORA said that guns were displayed but that nothing happened.  Specifically, J. LOPEZ-ZAMORA stated, "We went and, and the dude came out—the dude's friend came out grabbing on to his waist, like if he were going to take out a gun and I took out the five (5)-seven (7), and I took off the safety [U/I] up top, and, and I told him, Hey, hey, what's up, what's up? Don't fucking move or I'll knock you down."

96.   At approximately 8:03PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 530-368-5271, utilized by Javier Hernandez.  During this intercepted call, J. LOPEZ-ZAMORA asked, "Do you [babbles], do you want to go to Manteca to [babbles] to do a delivery tomorrow?"  Hernandez later answered, "Oh! Yes dude."  J. LOPEZ-ZAMORA responded, "Okay, the issue is you have to come to Leo's house to grab the stuff today, because Leo works and this dude want them over there at two in the afternoon."  Hernandez responded, "…all right."

97.   At approximately 8:47PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 530-368-5271, utilized by Hernandez.  During this intercepted call, LOPEZ-ZAMORA stated, "I'm going to Leo's house in thirty minutes. Get there around nine twenty,"…. "Go in your mom's truck. Don't be going with your crappy car,"… "and also tomorrow go in the truck."  Hernandez responded, "All right."

98.   At approximately 8:49PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-368-5271, utilized by Hernandez.  This text message was in Spanish, but translated into English stated, "Send me the address please, dude."

99.  At approximately 9:12PM, J. LOPEZ-ZAMORA sent an outgoing text message on **Target Telephone 1** to 530-368-5271, utilized by Hernandez, which stated, "5250 Crystal Hill Way Sacramento, CA 95823 United States."

100.  At approximately 10:00PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from **Target Telephone 2**, utilized by L. LOPEZ ZAMORA.  During this intercepted call, J. LOPEZ-ZAMORA stated, "I'm going to give Leo the money. Because Leo is bringing me pills. I'm going to give Leo the money.  You ask Leo for the money."

101.  On October 16, 2020, at approximately 11:06AM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 530-368-5271, utilized by Hernandez.  During this intercepted call, J. LOPEZ-ZAMORA stated, "Get there at two. I give you mission, so you can make money when you have a chance dude. But you have to take advantage of what you make and don't just spend it on stuff.   If you want to do them when you have time and you can make more money because I could send you to do couple runs. You know? You know I pay you good, dude."  Hernandez responded, "Yeah."  J. LOPEZ-ZAMORA then stated, "But however you want to. Leave at one and be there at two, because that dude is very special. Do you understand?"  Hernandez responded, "All right."  J. LOPEZ-ZAMORA then stated, "That is it. We are set. Come to my house on your way back."  Hernandez responded, "All right."

102.  At approximately 2:29PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 530-368-5271, utilized by Hernandez.  During this intercepted call, Hernandez said in summary that he (the pill customer) was not at the Chevron, and J. LOPEZ-ZAMORA said he would call him (the pill customer).

103.  At approximately 2:29PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 209-605-5936, subscribed to Amerlix F. Lopez, which is used by Rudi Jean Carlos FLORES.  During this intercepted call, J. LOPEZ-ZAMORA stated, "Hey dude! The kid is there since two o'clock dude. I told him that [babbles] he is there at the Chevron dude."  FLORES later stated, "I am on my way there"… "I'll be right now over there with him."  J. LOPEZ-ZAMORA responded, "Hey dude! I sent you a, I sent you a really pretty one dude"… "I did not have time to go weight them last night, because the cousin arrived late. If they are short let me know dude. Okay?"  FLORES later stated, "Okay. I'll let you know if there are missing dude."

104.  At approximately 2:40PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 209-605-5936, used by FLORES.  During this intercepted call, J. LOPEZ-ZAMORA stated, "Did, did you get there already?"  FLORES responded,

"Yeah, yeah. I got it already." J. LOPEZ-ZAMORA responded, "Okay, did you see them or are you going to see them at the house?" FLORES responded, "Yes, I just saw them. I will count them tomorrow dude, because I am busy right now." J. LOPEZ-ZAMORA then talked about the quality of the pills and how he wanted FLORES' customers to be happy. FLORES then stated, "My Noc's are normal people dude. They fucking work every day and all the shit." J. LOPEZ-ZAMORA then admonished, "Just not let them text you, because one day one could go and the messages are there dude. Like that dude, like…"… "…like that the guys have fell here, two or three kids. Like that." FLORES then asked, "Oh, yeah?" J. LOPEZ-ZAMORA reiterated, "Yes dude. Do not let them text you. Tell them to not fucking text you. [U/I] you are going to be fucked." Based on my training and experience, I believe J. LOPEZ-ZAMORA was instructing FLORES not to communicate by text messages with his customers because if one died from an overdose, incriminating text messages could lead to FLORES being prosecuted for the deaths ("one day one could go and the messages are there"). I further believe J. LOPEZ-ZAMORA acknowledged that two or three people had overdosed and died in Sacramento from pills he distributed or from pills similar to those he distributes ("like that the guys have fell here, two or three kids").

105. At approximately 2:43PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-368-5271, utilized by Hernandez, which stated, "All good." I believe that in this text message Hernandez informed J. LOPEZ-ZAMORA that he had completed the delivery of the 1,000 pills to FLORES.

106. At approximately 2:49PM, J. LOPEZ-ZAMORA sent an outgoing text message on **Target Telephone 1** to 530-368-5271, utilized by Hernandez, which stated, "How far are you slide they." I believe J. LOPEZ-ZAMORA was instructing Hernandez to come to his house to deliver the drug proceeds ("slide they" being a typo for "slide thru," common slang for stop by) and asking how far away Hernandez was.

107. At approximately 3:26PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-368-5271, utilized by Hernandez, which stated, "B there in 5 u home." I believe Hernandez was informing J. LOPEZ-ZAMORA that he would arrive at his home in about 5 minutes.

108. At approximately 3:38PM, surveillance observed a silver Honda Civic, bearing CA license plate number 3XBJ248, park across the street from J. LOPEZ-ZAMORA's residence located at 8357 Yermo Way, Sacramento, CA. Surveillance then observed and positively identified Hernandez as he exited the driver's seat of the Honda, walked to the front door of 8357 Yermo Way, and then entered the residence. At approximately 3:51PM, surveillance observed Hernandez exit the 8357 Yermo Way residence and

depart in the Honda.  Surveillance then observed Hernandez go to a Golden 1 bank branch before traveling to the Skylark Mobile Home Park located at 3205 W. Capital Ave, West Sacramento, CA.  Hernandez's CA Driver's License address is 3205 W. Capital Ave, Space 38, West Sacramento, CA 95691.  A query of a money remitter database indicated that Hernandez was the sender a wire transfer of funds in September 2020.  The telephone number listed for Hernandez as the sender of a wire transfer of funds was 530-368-5271 with an address of 3205 West Capitol Ave 38.

109.  At approximately 3:41PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 209-605-5936, used by FLORES.  During this intercepted call, FLORES stated, "The fucking work came out really fucked up."  J. LOPEZ-ZAMORA later responded, "They come like that, because they are many thousands. I can [U/I] to the [U/I], so when you break them down just put the ones you don't like. And I, I, [babbles] will replace them."  FLORES responded, "Yeah. Dude, I got like thirty fucked up."  J. LOPEZ-ZAMORA responded, "Yeah. That, that's normal [U/I], since I, I don't check them."  FLORES later stated, "…there were like, like nine hundred, nine hundred and twenty. Around that."  J. LOPEZ-ZAMORA then asked, "And the rest damaged?"  FLORES responded, "Uhm. And there were some missing dude. There were some that were missing, you know."  J. LOPEZ-ZAMORA later stated, "So I will give back that shit to him and, and I am going to give you sixty (60) to complete de one thousand (1000).  But good ones and counted ones."  J. LOPEZ-ZAMORA later stated, "Yeah, but they arrive like that. They [babbles] send a lot those dudes. Twenty thousand, thirty thousand and they break in the road dude."  Based on my training and experience, I believe FLORES was informing J. LOPEZ-ZAMORA that he only received about 900-920 of the 1,000 pills he ordered from J. LOPEZ-ZAMORA and that about 30 were broken.  I believe J. LOPEZ-ZAMORA explained that some of the pills break in transit from Mexico and that he (J. LOPEZ-ZAMORA) receives large shipments of 20,000 – 30,000 pills at a time.

110.  Based upon these intercepted calls and surveillance observations, I believe that J. LOPEZ-ZAMORA supplied FLORES with 1,000 counterfeit oxycodone pills which were delivered by Hernandez in Manteca, CA.

111.  On January 5, 2021, surveillance agents went to the Skylark Mobile Home Park at 3205 W. Capital Ave, West Sacramento, CA.  Parked in an unmarked parking space near trailer #38 (Hernandez's trailer), agents observed a silver 1997 Honda Civic, CA license plate 3XBJ248, which is the same vehicle Hernandez was seen driving on October 16, 2020, when he delivered the pills to FLORES.

112.  On October 19, 2020, at approximately 1:05PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to order pizza for delivery to 5241 Crystal Hill Way.

113.  At approximately 1:40PM, surveillance was established at 5241 Crystal Hill Way, Sacramento, CA.  At approximately 2:52PM, surveillance observed a blue Chevrolet pickup truck, bearing CA license plate number 32899V1, arrive and park on the street in front of 5241 Crystal Hill Way.  Immediately thereafter, surveillance observed and positively identified Leonardo FLORES BELTRAN as he exited the truck.  At approximately 2:54PM, as FLORES BELTRAN approached the residence located at 5241 Crystal Hill Way, an agent placed a phone call to telephone number 916-591-3917, subscribed to "Leo."  At the same time, another agent observed FLORES BELTRAN pull something out of his pocket and look at it.  At approximately 2:55PM, an agent placed a second call to 916-591-3917 while FLORES BELTRAN rolled garbage cans from the curb-line back to the residence.  At the same time, another agent observed FLORES BELTRAN look at something in his hand as he walked towards the front door of the 5241 Crystal Hill Way residence.  FLORES BELTRAN answered his phone and told an agent that he had the wrong number.

114.  Based on my training and experience, I know that drug traffickers often do not provide exact addresses for their stash locations and instead provide a neighboring address to avoid detection by law enforcement.  Based upon the intercepted call and surveillance observations described above, as well as further evidence discussed below, I believe that the true address for the stash location is 5241 Crystal Hill Way instead of 5250 Crystal Hill Way.  I further believe that "Leo" is Leonardo FLORES BELTRAN and that FLORES BELTRAN lives at 5241 Crystal Hill Way.  (NOTE: In conjunction with the seizure of approximately 7,727 counterfeit oxycodone pills containing fentanyl on December 5, 2020, which is further described below, several calls were intercepted regarding members of the LOPEZ-ZAMORA DTO going to Leo's house in order to hide from law enforcement, and for multiple days afterwards the authorized vehicle tracker on the LOPEZ-ZAMORA NISSAN indicated that the vehicle was frequently at or in the immediate vicinity of the 5241 Crystal Hill Way residence.)

115.  On November 20, 2020, surveillance observed the following vehicles at the 5241 Crystal Hill Way residence: (1) a Honda Accord bearing CA license plate number 6JXW131, registered to Rosario ROJO, 7809 Sinbad Court, Sacramento, California, (2) a Honda Civic bearing CA license plate number 8AME145, registered to Leonardo FLORESBELTRAN or Guadalupe ZAMORAROJO, 7551 32nd St, Sacramento, California 95822; (3) a Chevrolet Silverado bearing CA license plate number 32899V1,

registered to Evetzequiel FLORESBELTRAN or Edy CHAVEZ, 7551 32nd St, Sacramento, California 95822.

116. On December 15, 2020, surveillance was conducted at 425 Chablis Way, Manteca, CA, which is the subscriber address associated with telephone number 209-605-5936, subscribed to and utilized by Rudi FLORES.  Surveillance observed a grey Dodge Charger, bearing CA license plate number 8HTP712, parked on the street directly in front of the 425 Chablis Way residence.  A subsequent CA DMV check revealed that the vehicle was a 2019 Dodge registered to Amerilix Lopez or Rudi FLORES, 425 Chablis Way, Manteca, CA 95337.  (NOTE: Rudi FLORES' CA DMV driver license record also lists the address of 425 Chablis Way, Manteca, CA.)

117. On December 29, 2020, at approximately 4:00PM, surveillance observed Rudi FLORES exit the 425 Chablis Way residence, walk to the grey Dodge Charger (8HTP712) which was parked on the street in front of the residence, get into the driver's seat of the vehicle, and then drive away.

118. On December 30, 2020, at approximately 3:25PM, surveillance observed FLORES exit the 425 Chablis Way residence and walk to the grey Dodge Charger (8HTP712) which was parked on the street in front of the residence.  At approximately the same time, a Manteca Police Department Detective placed a call to telephone number 209-605-5936 while the detective could see FLORES holding a cellular telephone in his left hand.  At the same time, the detective saw and heard FLORES open the driver door to the grey Dodge Charger, and then the detective observed FLORES get into the driver's seat of the vehicle and shut the door.  The detective then heard a male voice (believed to be FLORES) say hello and ultimately FLORES told the detective that he had the wrong number.

119. Based on the foregoing, I believe that Rudi FLORES is the user of telephone number 209-605-5936 and that FLORES resides at 425 Chablis Way, Manteca, CA.

***Intercepted calls/texts on October 23, 25, 27 & November 14, 2020 involving Jose LOPEZ-ZAMORA, Joaquin SOTELO VALDEZ, Javier Hernandez and/or Robert Frandsen regarding transactions for approximately 200, 420 & 290 pills in Yuba City, CA; Agents identify 1182 Franklin Avenue, Yuba City, CA, as Frandsen's residence.***

120. On October 23, 2020, wire interceptions over **Target Telephone 1** indicated that J. LOPEZ-ZAMORA directed Joaquin SOTELO VALDEZ (utilizing telephone number 916-857-6572, subscribed to Pablo Lopez) to collect drug proceeds and front another 200

pills to a sub-distributor in Yuba City, CA, who utilized telephone number 530-514-6809 (later identified as Robert Frandsen, as further described below).

121. At approximately 8:40AM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-514-6809, utilized by Robert Frandsen, which stated, "Wutz good bro, I got that for u." Based on my training and experience with this investigation, I believe Frandsen was informing J. LOPEZ-ZAMORA that he had drug proceeds for him.

122. At approximately 1:16PM, J. LOPEZ-ZAMORA sent outgoing text messages on **Target Telephone 1** to 916-857-6572, utilized by Joaquin SOTELO VALDEZ, which stated (when translated from Spanish to English), "Yuba is ready" and "Take another 200 for him." I believe that in these text messages J. LOPEZ-ZAMORA was informing SOTELO VALDEZ that Frandsen ("Yuba") was ready for him to pick up drug proceeds and that J. LOPEZ-ZAMORA also directed SOTELO VALDEZ to take another 200 pills to front to Frandsen. At approximately 2:16PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 916-857-6572, utilized by Joaquin SOTELO VALDEZ, which stated (when translated from Spanish to English), "It is done."

123. At approximately 2:32PM, J. LOPEZ-ZAMORA sent outgoing text messages on **Target Telephone 1** to 916-857-6572, utilized by Joaquin SOTELO VALDEZ, which stated (when translated from Spanish to English), "Send 1000 to Gordo first," "Dude," and "Then you go." I believe that in these text messages, J. LOPEZ-ZAMORA directed SOTELO VALDEZ to send $1,000 to L. LOPEZ ZAMORA (Gordo).

124. At approximately 2:56PM, J. LOPEZ-ZAMORA sent outgoing text messages on **Target Telephone 1** to 530-514-6809, utilized by Robert Frandsen, which stated, "My cousin on his way" and "Over there." At approximately 4:55PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-857-6572, utilized by Joaquin SOTELO VALDEZ.[5] During this intercepted call, SOTELO VALDEZ told J. LOPEZ-ZAMORA to tell him (Frandsen) that he (SOTELO VALDEZ) was outside, and J. LOPEZ-ZAMORA said okay. Immediately thereafter, at approximately 4:55PM, J. LOPEZ-ZAMORA sent an outgoing text message on **Target Telephone 1** to 530-514-6809, utilized by Robert Frandsen, which stated, "He's there." At approximately 4:57PM, surveillance observed the J. LOPEZ-ZAMORA NISSAN parked near Franklin Avenue in Yuba City and observed an unidentified Hispanic male adult (believed to be SOTELO

---

[5] The description of this Spanish-language call is based on a summary of its contents provided to me in English by a wire monitor contracted by DEA who is fluent in both Spanish and English. A full verbatim transcription and translation is not yet available.

VALDEZ) walk west on Franklin Avenue from the J. LOPEZ-ZAMORA NISSAN, but surveillance was unable to observe the exact location of where the transaction took place. At approximately 5:00PM, surveillance observed the individual believed to be SOTELO VALDEZ walk back to the LOPEZ-ZAMORA NISSAN and depart the area.

125. At approximately 5:50PM, surveillance observed the individual believed to be SOTELO VALDEZ inside of a money transfer service business called Discoteca Sanchez located at 5550 Franklin Blvd #110, Sacramento, CA (after the LOPEZ-ZAMORA NISSAN had been surveilled there); a surveillance officer inside of the business heard the individual tell an employee that he was trying to send money to someone.  At approximately 5:56PM, a surveillance officer called telephone number 916-857-6572 and then the surveillance officer from within the business observed the individual believed to be SOTELO VALDEZ answer the phone.  The surveillance officer within the business observed that the individual believed to be SOTELO VALDEZ was a Hispanic male adult wearing a black baseball style cap and a COVID mask.  At approximately 6:04PM, surveillance observed the individual believed to be SOTELO VALDEZ exit the business and depart in the LOPEZ-ZAMORA NISSAN.  Shortly thereafter, the LOPEZ-ZAMORA NISSAN was surveilled to the area of Yermo Way in Sacramento (in the vicinity of where LOPEZ-ZAMORA's residence is located), after which surveillance was terminated.

126. Based upon these intercepted calls and surveillance observations, I believe that SOTELO VALDEZ fronted 200 counterfeit oxycodone pills to Frandsen and also wire transferred $1,000 to L. LOPEZ-ZAMORA (Gordo) in Mexico, all under the direction of J. LOPEZ-ZAMORA.

127.  On October 25, 2020, surveillance was conducted in the area of Franklin Avenue (Yuba City) in an attempt to locate the residence for J. LOPEZ-ZAMORA's sub-distributor who utilized telephone number 530-514-6809.  Surveillance observed two vehicles parked at the residence located at 1182 Franklin Avenue, which was within the vicinity of where surveillance had previously observed the individual believed to be SOTELO VALDEZ walk to.  The first vehicle was a Dodge truck, bearing CA license plate number 54470U1; and the second vehicle was a Toyota sedan, bearing CA license plate number 8HFY114. CA DMV checks revealed that both vehicles were registered to Diana Frandsen, 1182 Franklin Avenue, Yuba City, CA.  NET-5 Detective Carlos Mendoza contacted Sutter County Sheriff's Office Dispatch and requested that telephone number 530-514-6809 be queried through their system, which resulted in the identification of a 911 call received from the number on February 11, 2017.  Sutter County Sheriff's Office Dispatch stated that they contacted an individual named Robert Frandsen at the number and he indicated that the 911 call was accidental.

128. On October 27, 2020, at approximately 2:44PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-514-6809, utilized by Robert Scott Frandsen, which stated, "I got that for u bro."  I believe that in this text message Frandsen informed J. LOPEZ-ZAMORA that he had the money to pay for the pills that J. LOPEZ-ZAMORA had fronted to him.

129. At approximately 3:36PM, J. LOPEZ-ZAMORA sent an outgoing text message on **Target Telephone 1** to 530-514-6809, utilized by Frandsen, which stated, "Okay. imah send you some more."  I believe that in this text message J. LOPEZ-ZAMORA informed Frandsen that he would send him more pills to distribute.

130. Immediately thereafter, at approximately 3:36PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 530-368-5271, utilized by Hernandez.  During this intercepted call, J. LOPEZ-ZAMORA stated, "Do you have a chance, have a chance to go to Yuba? There to Yuba."  Hernandez responded, "Yeah, dude."  J. LOPEZ-ZAMORA responded, "Ah, okay. Go to Yuba.  Tony is at his house."  Hernandez later asked, "Go to Tonys' house?" J. LOPEZ-ZAMORA responded, "If Tony is home, yeah and then he got some work for me. So just count them."  I believe that J. LOPEZ-ZAMORA was instructing Hernandez to go to ROMERO's ("Tony's") house to pick up pills to deliver to Frandsen ("Yuba") because ROMERO was storing pills ("work" – common slang for narcotics) for J. LOPEZ-ZAMORA there.  Hernandez responded, "Okay."  J. LOPEZ-ZAMORA then stated, "Take the fool all the good ones.  As many good ones, good ones that I have left."… "I have like thirty-eight grams so take all the dust to the side, save it for me."… "And all the ones—even if their chipped, they cool.  But if they are broken in halves, then put them to the side.  If they have a little ding on the side it is not a problem.  All the good ones, okay?"  Hernandez then agreed.  I believe J. LOPEZ-ZAMORA was instructing Hernandez to take all of the good pills from the 38 grams of pills he had at ROMERO's house, including any chipped pills but not any that were broken in half.

131. Based on these intercepted text messages and call, I believe that Frandsen had drug proceeds to pay to J. LOPEZ-ZAMORA ("I got that for u bro") and that J. LOPEZ-ZAMORA directed Hernandez to collect the money and front additional pills to Frandsen in Yuba City ("imah send you some more" and "take the fool all the good ones").

132. At approximately 4:30PM, surveillance was established at 1182 Franklin Avenue, Yuba City, CA in anticipation of the transaction between Hernandez and Frandsen.

40

133. At approximately 4:38PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-368-5271, utilized by Hernandez, which stated, "220." Based upon this intercepted text message, I believe that Hernandez was informing J. LOPEZ-ZAMORA that they had 220 pills at Tony's (ROMERO) to deliver to Frandsen.

134. At approximately 5:56PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-514-6809, utilized by Frandsen, which stated, "What time?" J. LOPEZ-ZAMORA responded, "He on his way."

135. At approximately 6:20PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-368-5271, utilized by Hernandez. This message was in Spanish and translated into English stated, "Tell him I am outside."

136. At approximately the same time, surveillance observed Hernandez's Honda Civic driving eastbound on Franklin Avenue towards Barrett Road. At approximately 6:21PM, surveillance observed Hernandez's Honda Civic arrive and park in the parking lot of Basaldua Check Cashing located at 318 North Barrett Road. Surveillance then observed Hernandez in the driver's seat of the Honda Civic which was also occupied by an unidentified female adult and an infant in a car seat. Shortly thereafter, surveillance observed Hernandez walking westbound on Franklin Avenue towards 1182 Franklin Avenue. Surveillance then observed Hernandez walk south across the street on Franklin Avenue further towards 1182 Franklin Avenue. Surveillance then observed Hernandez walk to the west side of the property on 1182 Franklin Avenue and try to conceal himself next to a white sedan that was parked in the driveway. Surveillance observed that on the west side of the 1182 Franklin Avenue property there was a wood gate that leads to the backyard of the residence.

137. At approximately 6:25PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 530-514-6809, utilized by Frandsen. During this intercepted call, J. LOPEZ-ZAMORA informed Frandsen that Hernandez was outside.

138. At approximately 6:26PM, surveillance observed a white male adult wearing a black shirt open the aforementioned wood gate at the 1182 Franklin Avenue residence. Surveillance then observed Hernandez walk into the backyard and stay for less than a minute before walking back out to the front yard using the same gate. Surveillance then observed Hernandez walk north on Franklin Avenue and back to his Honda Civic parked at Basaldua Check Cashing. Surveillance then observed Hernandez enter the Honda Civic and depart the area a short time later. Detetctive Mendoza later viewed a CA DMV photo of Robert Frandsen and positively identified him as the individual who opened the wood gate at the 1182 Franklin Avenue residence for Hernandez.

139. At approximately 6:30PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-368-5271, utilized by Hernandez, which stated, "Earn 420." At approximately 7:24PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-514-6809, utilized by Frandsen, which stated, "How many did u send?" In response, at approximately 7:24PM, J. LOPEZ-ZAMORA sent an outgoing text message on **Target Telephone 1** to 530-514-6809, utilized by Frandsen, which stated, "220 at 13 200 at 11." At approximately 7:26PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-514-6809, utilized by Frandsen, which stated, "Total 4800?" At approximately 7:33PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-514-6809, utilized by Frandsen, which stated, "My bad 220 threw me off. Thought it was 200."

140. Based upon these intercepted text messages and call, I believe that Hernandez fronted 420 pills ("Earn 420" and "220 at 13 200 at 11") to Frandsen at his residence located at 1182 Franklin Avenue, Yuba City, CA on behalf of J. LOPEZ-ZAMORA. I further believe that the total amount Frandsen owed J. LOPEZ-ZAMORA for these pills was $5,060 (220 pills at $13 per pill and 200 pills at $11 per pill).

141. On November 14, 2020, at approximately 2:34PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-514-6809, utilized by Robert Frandsen, which stated, "I got 4k for u right now." At approximately 3:03PM, J. LOPEZ-ZAMORA sent an outgoing text message on **Target Telephone 1** to 530-514-6809, utilized by Robert Frandsen, which stated, "That's good Imah go pick up." At approximately 3:07PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 530-514-6809, utilized by Robert Frandsen, which stated, "Ok ill be here." At approximately 3:14PM, J. LOPEZ-ZAMORA sent outgoing text messages on **Target Telephone 1** to 530-514-6809, utilized by Robert Frandsen, which stated, "Okay brother Thankyou imah send you new ones" and "Too." I believe that in these calls Frandsen informed J. LOPEZ-ZAMORA he had $4,000 in drug proceeds ("4k for u") for him to pick up and that J. LOPEZ-ZAMORA agreed to collect them and to send some new pills to Frandsen ("imah send you new ones … Too").

142. At approximately 3:14PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-857-6572, utilized by Joaquin SOTELO VALDEZ. During this intercepted call, J. LOPEZ-ZAMORA asked, "Do you want to do a run fool?" and later stated, "Go to Yuba, in the Mustang." SOTELO VALDEZ later asked, "How many do you want me to take?" J. LOPEZ-ZAMORA later stated, "Take down the convertible and go convertible. And take two hundred (200), take all the three hundred (300) that are

there. Fuck it, all of them."  SOTELO VALDEZ later asked, "The ugly ones too?"  J. LOPEZ-ZAMORA later responded, "Fuck it take them too," and later stated, "Take four (4)."  J. LOPEZ-ZAMORA later stated, "...watch out. Be on the lookout. Take them in your hands, and anything throw them out the window. Fuck it, if you see lights." SOTELO VALDEZ responded, "All right, then."  J. LOPEZ-ZAMORA later stated, "But go now fool, because he's ready. He's going to give you four thousand bucks ($4,000). He will be sending me four thousand ($4,000) okay?"  SOTELO VALDEZ responded, "All right."  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was directing SOTELO VALDEZ to deliver approximately 200-400 counterfeit oxycodone pills to Frandsen in Yuba City in J. LOPEZ-ZAMORA's black convertible Ford Mustang.  I further believe J. LOPEZ-ZAMORA instructed SOTELO VALDEZ to throw the pills out the window if he were to be pulled over by the police ("throw them out the window"… "if you see lights.")

143. At approximately 3:18PM, J. LOPEZ-ZAMORA sent an outgoing text message on **Target Telephone 1** to 530-514-6809, utilized by Robert Frandsen, which stated, "Imah send you 400."

144. At approximately 4:36PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-857-6572, utilized by Joaquin SOTELO VALDEZ.[6]  During this intercepted call, SOTELO VALDEZ told J. LOPEZ-ZAMORA to call that fool (Frandsen) to let him know that he (SOTELO VALDEZ) was there, and J. LOPEZ-ZAMORA said okay.

145. At approximately 4:37PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 530-514-6809, utilized by Robert Frandsen.  During this intercepted call, J. LOPEZ-ZAMORA stated, "I thought I had four, fuck I forgot I gave ten samples and I sell a hundred."  Frandsen responded, "Okay."

146. Based upon these intercepted calls and text messages, I believe that SOTELO VALDEZ fronted approximately 290 counterfeit oxycodone pills to Frandsen, and collected approximately $4,000 in drug proceeds from Frandsen, on behalf of J. LOPEZ-ZAMORA.

147. On January 8, 2021, surveillance observed one of the same vehicles parked at the residence at 1182 Franklin Avenue as surveillance had first observed on October 25,

---

[6] The description of this Spanish-language call is based on a summary of its contents provided to me in English by a wire monitor contracted by DEA who is fluent in both Spanish and English.  A full verbatim transcription and translation is not yet available.

2020: a Dodge truck (CA 54470U1), registered to Diana Frandsen, 1182 Franklin Avenue, Yuba City, CA.

***On October 27, 2020, surveillance is detected by Leonardo FLORES BELTRAN who then discards approximately 1,000 pills in a liquor store; J. LOPEZ-ZAMORA discusses the loss of his pills at length over Target Telephone 1 and concludes the pills were stolen by Jaime Castro Lazcano; Castro Lazcano's residence is identified as 3205 W. Capitol Avenue, Space 21, West Sacramento, CA.***

148.   On October 26, 2020, at approximately 7:30PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-591-3917, utilized by Leonardo FLORES BELTRAN.  During this intercepted call, J. LOPEZ-ZAMORA stated, "Oh tomorrow there with a boat for the fatty porno."  FLORES BELTRAN responded, "All right."  J. LOPEZ-ZAMORA then stated, "It's just that we are going to have to check them, really well. Because they are arriving ugly and…"  FLORES BELTRAN interjected, "No… now… now… I will be… I will be checking them all. I will count them hand by hand. Because we are losing a lot fool. A lot…"… "Too many pills." J. LOPEZ-ZAMORA responded, "Why are they sending them like that? Because everyone complained Manteca, Tony. No way they are all lying. All the same. I have the messages. Thirty short and thirty in pieces. That means that it's…" … "Gordo's fault from over there. It's not your fault."  FLORES BELTRAN responded, "No, well yeah…" … "tomorrow I will check them well."  (NOTE: A known alias for L. LOPEZ ZAMORA is "Gordo").

149.   Based upon this intercepted call, I believe that J. LOPEZ-ZAMORA was directing FLORES BELTRAN to deliver 1,000 pills ("a boat") to a sub-distributor the next day and to check the quality of the pills beforehand.  I further believe that J. LOPEZ-ZAMORA was informing FLORES BELTRAN that they were receiving too many complaints of broken pills from sub-distributors, including Rudi FLORES ("Manteca") and ROMERO ("Tony"), and that that the broken pills were the fault of his brother and source of supply in Mexico, L. LOPEZ ZAMORA ("Gordo's fault from over there").

150.   On October 27, 2020, at approximately 1:00PM, surveillance was established at 5241 Crystal Hill Way, Sacramento, CA.  Immediately thereafter, surveillance observed a blue colored pickup truck, bearing CA license plate number 32899V1, parked in the driveway of the residence; this is the same vehicle that surveillance previously observed Leonardo FLORES BELTRAN driving on October 19, 2020.  At approximately 3:00PM, surveillance observed a gold colored Mercury sedan, bearing CA license plate number 8GEB199, arrive and park across the street from the 5241 Crystal Hill Way residence. Surveillance then observed a Hispanic male adult (HMA) wearing a gray baseball cap,

black shirt, and dark jeans, exit the driver's side of the gold Mercury and walk to the 5241 Crystal Hill Way residence.  Approximately ten minutes later, surveillance observed the HMA open the garage door of the 5241 Crystal Hill Way residence and then open the hood of the blue truck.  Surveillance observed that the HMA appeared to be on the phone while looking under the hood of the truck, and then walked to inspect an area near one of the tires on the vehicle.  A few minutes later, surveillance observed the HMA walk in front of the residence while still using a cellular telephone and begin to pace around the sidewalk in front of the house while staring at the yard of the residence.

151. At approximately 4:46PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-591-3917, utilized by FLORES BELTRAN.  During this intercepted call, FLORES BELTRAN asked, "What you need?  What's up?  Fool, what, you want me to pull up, give you that thing or what's up?"  J. LOPEZ-ZAMORA responded, "…can you take it to, to the west, otherwise, I can send someone from the west to come get it, but the problem is that—fuck, I'm going to have to pay them."  FLORES BELTRAN responded, "All right, then, I'll take it over there;" and later stated, "I already counted them by hand and I already checked them."  J. LOPEZ-ZAMORA later asked, "Uh, at what time are you going to be in West Sac?"  FLORES BELTRAN responded, "I'm already on the way over there."  J. LOPEZ-ZAMORA later asked, "Hey dude, they're fine, you counted them one by one and there was none that were broken?"  FLORES BELTRAN responded, "No, dude.  These are good, dude."

152. At approximately 4:50PM, surveillance observed the HMA exit the residence, walk across the street to the gold Mercury sedan, and get into the driver's side of the vehicle; based upon intercepted calls described below, I believe that the HMA was FLORES BELTRAN.  Shortly thereafter, mobile surveillance was conducted on the gold Mercury after it departed the residence and eventually surveillance observed the vehicle parked in front of "Discount Cigarettes" located at 3017 W. Capital Ave, West Sacramento, CA.  Surveillance then observed a black Chrysler 300, bearing CA license plate number 8RSZ217, parked near the "La Favorita Taqueria" restaurant located at 3023 West Capitol Avenue, in West Sacramento, CA, which is located within the same strip mall as Discount Cigarettes.  Law enforcement database checks revealed that the black Chrysler 300 was registered to Jaime CastroLazcano, 3205 West Capital Avenue, 21, West Sacramento, CA.  At approximately 5:50PM, surveillance observed the black Chrysler 300 drive into the entrance of the Skylark Mobile Home Park located at 3205 West Capitol Avenue, West Sacramento, CA.

153. At approximately 5:52PM, J. LOPEZ-ZAMORA received an incoming text message on **Target Telephone 1** from 916-204-2354.  The message was in mixed English and Spanish, but translated fully into English stated, "It's me Leo answer."

154. At approximately 6:21PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 530-368-5271, utilized by Hernandez.  During this intercepted call, J. LOPEZ-ZAMORA stated, "Leo left one thousand candies here at the fucken liquor, dude.  Because some under covers were following him.  And I can't fucken find them."

155. At approximately 6:23PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 279-204-7650, utilized by Fatima BARBOZA (J. LOPEZ-ZAMORA's girlfriend).  During this intercepted call, J. LOPEZ-ZAMORA stated, "I have a problem.  Leo was being followed and, and left the pills here in the liquor store and I'm looking for them.  My buddies let me get into the fridges in West…" … "… and, and I can't find them." … "I am looking for the one thousand pills cousin lost." … "Leo lost one thousand pills and he left them in a fuckin liquor store."

156. At approximately 6:27PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-934-6203, utilized by Erika Gabriela ZAMORA ROJO (J. LOPEZ-ZAMORA's mother).  During this intercepted call, J. LOPEZ-ZAMORA stated, "Leo said that three trucks were following him and he left the fucking pills in the liquor and now he can find them."  ZAMORA ROJO later stated, "Well, they passed by here."  J. LOPEZ-ZAMORA then asked, "The three?"  ZAMORA ROJO then responded, "…well, I don't know which police, but they did pass."  J. LOPEZ-ZAMORA then stated, "Ah, Leo is calling me, hold on."

157. At approximately 6:27PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-204-2354, utilized by FLORES BELTRAN.  During this intercepted call, J. LOPEZ-ZAMORA stated, "…it is where the Modelos are, on the third from top to bottom.  And, and the second from top to bottom. There's nothing where the blacks are, dude.  I moved all the blacks ones and, and the ones that are next to Bud Lights.  All of them are Bud Lights and alka-seltzer and White Club. And this looks…" FLORES BELTRAN then stated, "I, I know. I know what I am telling you, fool.  That's where I left them, fool.  [U/I].  Unless somebody took them.  And I hope it wasn't the person that was following me, dude."  J. LOPEZ-ZAMORA later stated, "He says Jaime came dude.  Maybe Jaime found them."  FLORES BELTRAN responded, "Well, I told the fucker and the mother fucker says he didn't go for them"… "Dude, dude, dude. I clearly explained to Jaime where they were, but…"  J. LOPEZ-ZAMORA then responded, "Jaime found them, because, because this dude is saying that the fatty guy came, my buddy the fatty guy. Later."  FLORES BELTRAN then responded, "That is it. If that fucker grabbed them, he should not play around because I swear of God they are there, dude."

158.   On October 29, 2020, at approximately 8:14PM, J. LOPEZ-ZAMORA sent an outgoing
text message on **Target Telephone 1** to 916-512-7643, subscribed to Jaime Castro, 3205
W Capitol Ave, West Sacramento, CA, and utilized by Jaime Castro Lazcano, which
stated, "U got it or Wasup foo." I believe that in this text message J. LOPEZ-ZAMORA
was asking Castro Lazcano whether he had the stolen 1,000 pills.

159.   On October 31, 2020, at approximately 10:07AM, J. LOPEZ-ZAMORA placed an
outgoing call on **Target Telephone 1** 279-204-7650, utilized by Fatima BARBOZA.
During this intercepted call, J. LOPEZ-ZAMORA stated, "Leo beat up Jaime;" and later
stated, "So I went and got the video tape and that shit. And Jaime was the one who took
it…" Later, J. LOPEZ-ZAMORA spoke more about Leo beating up Jaime, stating "The,
the cousin broke his mouth. I stopped him when he was beating him. I got in the middle
and I received a hit from my cousin.  [U/I], dude."

160.   At approximately 3:37PM, J. LOPEZ-ZAMORA received an incoming call on **Target
Telephone 1** from 916-591-3917, utilized by FLORES BELTRAN.  During this
intercepted call, FLOREZ BELTRAN asked, "What did that fool tell you?  What did that
fool tell you?  What?  What is he going to want to do or what?"  J. LOPEZ-ZAMORA
then asked, "Whom?"  FLORES BELTRAN responded, "Jaime."  J. LOPEZ-ZAMORA
responded, "Nothing.  Well, what is he going to do?  Yeah, he's going to have to pay or
return it."

161.   CA DMV checks revealed that Castro lists 3205 W Capitol Ave, Space 21, West
Sacramento, CA as an address on his driver's license and multiple vehicles.  A
commercial database query also revealed that Castro's most recent address is 3205 W
Capitol Ave, Space 21, West Sacramento, CA.

162.   On January 5, 2021, surveillance agents went to the Skylark Mobile Home Park at 3205
West Capitol Avenue and observed two vehicles registered to Castro.  Parked in central
space #12 (the number for ROMERO's trailer) was the black Chrysler 300 (CA
8RSZ217), registered to Jaime CastroLazcano, 3205 West Capital Avenue, 21, West
Sacramento, CA.  Parked in central space #20 was a white 2009 Chevrolet Tahoe (CA
7BAV301), registered to Jaime CASTRO, 3205 W. Capital Ave, Spc 21, W. Sacramento,
CA.

163.   Later on January 5, 2021, a CHP officer conducted a ruse hit-and-run inquiry at the
Skylark Mobile Home Park located at 3205 West Capitol Avenue, West Sacramento, CA
related to Castro Lazcano's black Chrysler 300 (8RSZ217), which was parked there at the
time.  During this inquiry, the CHP officer made contact with Castro Lazcano, who
confirmed that he lived in space #21 within the trailer park.  Castro Lazcano also

identified the specific trailer he lives in, which is further described and depicted in Attachment A-8.  (NOTE: There are no visible numbers on the trailer identified as being space #21 within the Skylark Mobile Home Park, however it is situated between the trailers occupying spaces #18 and #22 which are both clearly marked.  During the ruse encounter, Castro Lazcano identified the unmarked trailer as being his residence and as being space #21.)

164.  Based on these intercepted calls and surveillance observations, I believe that FLORES BELTRAN observed surveillance units following him while he was delivering approximately 1,000 counterfeit oxycodone pills to West Sacramento, CA on behalf of J. LOPEZ-ZAMORA, which caused FLORES BELTRAN to panic and hide the pills in the beer aisle of a liquor store.  I further believe that J. LOPEZ-ZAMORA determined that Castro Lazcano then found and took the pills from the liquor store because J. LOPEZ-ZAMORA later claimed to have confirmed this via security video footage.

***On October 29, 2020, the UC purchased approximately 1,000 counterfeit oxycodone tablets containing fentanyl from Alejandro TELLO and J. LOPEZ-ZAMORA; TELLO's residence is identified as 7675 Manorside Drive, Sacramento, CA.***

165.  On October 21, 2020, at approximately 4:16PM, the UC received an incoming call from **Target Telephone 1**, used by J. LOPEZ-ZAMORA.  During this intercepted call, J. LOPEZ-ZAMORA agreed to sell the UC another 1,000 pills for $8.50 per pill or $8,500 ("eighty-five") the following week.  The UC also told J. LOPEZ-ZAMORA that the UC had been laying low because the pills that J. LOPEZ-ZAMORA sold to the UC last time had "dropped a few people" (caused overdoses).  (NOTE: This was a ruse by the UC).  J. LOPEZ-ZAMORA responded: "Nah!  It just depends to, to, to, to how many they're doing and shit, bro.  If they do too many, bro, I would, I would say yeah…"… "If they, if they take more than two that's, that's a risk for themselves.  It's like any drug, if you do too much, you know…"… "But, but, if they're good—it, it depends on percentage, bro. If it were just a couple people out of the all, then you know, you know they over did it, you know?"

166.  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was indicating that he evaluates the risk of overdoses from the pills he distributes by gauging the percentage of incidents per batch of pills, meaning that if only a couple of people out of 1,000 pills overdose, then he determines it to be the user's fault and does not attribute it to the pills being bad.

167.  On October 28, 2020, at approximately 6:04PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from the UC.  During this intercepted call, J.

LOPEZ-ZAMORA and the UC agreed to meet the next day to conduct the aforementioned transaction.  J. LOPEZ-ZAMORA also expressed concern over recent law enforcement activity at the previous meet location where the UC and J. LOPEZ-ZAMORA had met and J. LOPEZ-ZAMORA explained that one of his runners had been followed; specifically, J. LOPEZ-ZAMORA stated, "The only thing is that it's really hot over there.  They were tailing—there were a lot of undercovers over there dude, where we met the other time, the other time;" and later stated, "They put a tail on me, but, well, I don't move anything, you know."  I believe that J. LOPEZ-ZAMORA was explaining to the UC that he does not personally transport controlled substances ("I don't move anything") and instead relies on subordinates to do so, in order to minimize the risk that he will be caught with drugs and prosecuted.  J. LOPEZ-ZAMORA went on to state that he was going to switch up the meet location and send "a new kid that's trustworthy, one of my people" (to deliver the pills).  J. LOPEZ-ZAMORA later stated in reference to his drug runners, "…these fools are—all my people, they don't say shit, bro.  They, they— we're all soldiers, bro;" and "…The click I have is since I was a young, I'm almost twenty-si—I'm twenty six (26) years old, twenty-seven (27).  They've been my friends since I was ten (10) years old—eight (8) years old.   [U/I] you feel me?  They're selected homies, you know…" and "…it's a selected crew bro;" and "Yeah. [U/I] they're tested you know. These fools are tested, [babbles], they, they're legit…" and "… And they're proved [U/I] you actually send them [U/I] they come back with everything. Do you understand?"  I believe that J. LOPEZ-ZAMORA was telling the UC that his drug runners were experienced traffickers he trusted ("it's a selected crew"; "they're tested"; "they're legit") and that they would not say anything to law enforcement ("all my people, they don't say shit").  J. LOPEZ-ZAMORA later reiterated that he would not be at the deal, specifically stating, "If God wants we will meet when things are better. That fuck is getting hot;" and "And it is not good for you to see me in photos. [U/I] the less we the bosses see each other, the best."  I believe that J. LOPEZ-ZAMORA was saying that because of heavy law enforcement activity, it was best that he ("we the bosses") not come to the deal and that he would sell the pills through subordinates so law enforcement would not see him at the deal ("it is not good for you to see me in photos").

168.   At approximately 6:46PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-378-9750, subscribed to Eric TELLO, 7675 Manorside Dr, Sacramento, CA, and utilized by Alejandro TELLO.  During this intercepted call, J. LOPEZ-ZAMORA offered TELLO $300 to skip work the next day to "do a trip."  J. LOPEZ-ZAMORA further stated, "You're just going to drop off something to the guy." TELLO stated that he would let J. LOPEZ-ZAMORA know.

169.   On October 29, 2020, at approximately 12:05PM, the UC received an incoming call from **Target Telephone 1**, used by J. LOPEZ-ZAMORA.  During this intercepted call, the UC

agreed to meet J. LOPEZ-ZAMORA's runner "Alejandro" at the In-N-Out restaurant on Del Paso Road in Sacramento to conduct the transaction.  J. LOPEZ-ZAMORA stated that he would send the UC Alejandro's number.

170.  At approximately 12:40PM, J. LOPEZ-ZAMORA sent an outgoing text message on **Target Telephone 1** to the UC, which stated, "9163789750" (which was the telephone number for J. LOPEZ-ZAMORA's runner, Alejandro TELLO).  At approximately 1:00PM, surveillance was established at the KFC restaurant parking lot located at 2920 Del Paso Road, Sacramento, CA, which is located adjacent to the In-N-Out restaurant where the UC agreed to conduct the transaction with TELLO.  Shortly thereafter, the UC arrived and parked within the KFC parking lot to wait for TELLO.  At approximately 2:07PM, surveillance observed a black Ford Mustang and the J. LOPEZ-ZAMORA HONDA arrive and park in the vicinity of the UC's vehicle.  Surveillance then observed J. LOPEZ-ZAMORA exit the black Mustang and walk to the driver's side window of the UC's vehicle.  Shortly thereafter, surveillance observed Alejandro TELLO exit the J. LOPEZ-ZAMORA HONDA and walk towards the UC's driver side window and hand a light blue bottle to the UC.  At approximately 2:10PM, surveillance observed the UC depart the meet location.  Immediately thereafter, surveillance observed J. LOPEZ-ZAMORA walk to the black Mustang and retrieve a white bag and then walk to the J. LOPEZ-ZAMORA HONDA and give the bag to TELLO.  Shortly thereafter, J. LOPEZ-ZAMORA departed in the black Mustang in tandem with TELLO in the J. LOPEZ-ZAMORA HONDA.

171.  At approximately 2:38PM, surveillance observed the black Mustang arrive at the Skylark Mobile Home Park located at 3205 W. Capitol Avenue, West Sacramento, CA, (where ROMERO, Castro Lazcano, and Hernandez reside in spaces 12, 21 and 38, respectively).  Shortly thereafter, surveillance observed J. LOPEZ-ZAMORA exit the black Ford Mustang and walk to space 38 (the known residence of Hernandez), where J. LOPEZ-ZAMORA entered the gate and walked up to the front door of the trailer, after which J. LOPEZ-ZAMORA was no longer visible due to an awning above the doorway.

172.  At approximately 2:43PM, surveillance observed TELLO walk through the front gate of space 38.  Shortly thereafter, surveillance observed J. LOPEZ-ZAMORA and TELLO exit the gate of space 38.  Immediately thereafter, surveillance observed J. LOPEZ-ZAMORA and TELLO walk towards the black Ford Mustang and the J. LOPEZ-ZAMORA HONDA, which was now also parked near the Mustang within the trailer park.

173.  The UC stated that he purchased approximately 1,000 pills for $8,500 in officially advanced government funds from J. LOPEZ-ZAMORA and TELLO.  The UC further

stated that he paid J. LOPEZ-ZAMORA the funds and then TELLO delivered the pills contained in the blue bottle to the UC.  The UC positively identified TELLO from his CA DMV photo.  Agents submitted the counterfeit oxycodone pills to a DEA lab for analysis and a single pill was analyzed and found to contain fentanyl and acetaminophen.

174.  Queries of a Sacramento County law enforcement database revealed that Alejandro TELLO's address is listed as 7675 Manorside Dr, Sacramento, CA, and his CA DMV record also lists the same address.  A commercial database query also revealed that Alejandro TELLO's most recent address is 7675 Manorside Dr, Sacramento, CA.

175.  On November 20, 2020, surveillance observed a Toyota Tacoma, bearing CA license plate number 8S71563, parked at the 7675 Manorside Drive residence.  A CA DMV check revealed that the vehicle was registered to Alejandro TELLO, 7675 Manorside Drive, Sacramento, CA.

176.  On January 7, 2021, I conducted drive-by surveillance at the 7675 Manorside Drive residence and observed the same Toyota Tacoma (CA 8S71563) parked on the street in front of the residence.

***Intercepted calls/texts on November 2-3, 2020 involving Jose LOPEZ-ZAMORA and Margarito Cuyuch Sanchez regarding an attempted Xanax transaction in southern CA; Surveillance of LOPEZ-ZAMORA DTO utilizing suspected stash house at 7381 Pritchard Road for drug transactions.***

177.  On October 21, 2020, at approximately 3:14PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to the ROMERO PHONE, utilized by Christian "Tony" ROMERO.  During this intercepted call, J. LOPEZ-ZAMORA stated, "I'm over here at Guero's. But I'm not going to be mobile. Because I'm going to be smoking little blonde one."  ROMERO responded, "Okay. Well I could pull up… We could pull up to Guero's. He has the scale there, right?" J. LOPEZ-ZAMORA later responded, "Yeah." ROMERO responded, "Yeah. So, we good then"… "So, meet there then at Guero's?" J. LOPEZ-ZAMORA responded, "Yeah"… "That yes fool. Only that go there. I don't think he will be upset. That we are all going. Well, a whole bunch of fuckers, no?"  ROMERO responded, "Yes, we have a car full. But it's no problem. If you want, we can just go for the weed" … "If he makes a big deal." J. LOPEZ-ZAMORA responded, "Well I don't know about Guero. But I don't give a fuck. It's not my house."  ROMERO agreed.  J. LOPEZ-ZAMORA later stated, "I'll be there."  ROMERO then responded, "We just going to go get the weed. Real quick."

178. At approximately 3:28PM, the authorized tracking device on the J. LOPEZ-ZAMORA NISSAN indicated that the vehicle had arrived and parked in the driveway of the residence located at 7381 Pritchard Road, Sacramento, CA, a suspected stash location used by the LOPEZ-ZAMORA DTO.  Subsequently, the authorized GPS Ping on **Target Telephone 1** (utilized by J. LOPEZ-ZAMORA) indicated that the 7381 Pritchard Road residence was within the accuracy radius of the device, coinciding with the movements of the J. LOPEZ-ZAMORA NISSAN.

179. At approximately 3:48PM, surveillance observed a black Chrysler 300, bearing CA license plate number 8RSZ217, arrive at the 7381 Pritchard Road residence.  A CA DMV check revealed that the vehicle was registered to Jaime CastroLazcano, 3205 West Capitol Ave 21, W Sacramento, CA 95691.  Immediately thereafter, surveillance observed four Hispanic males exit the vehicle and walk towards the 7381 Pritchard Road residence.

180. At approximately 4:42PM, the authorized tracking device on the J. LOPEZ-ZAMORA NISSAN indicated that the vehicle departed the 7381 Pritchard Road residence.

181. At approximately 4:50PM, the authorized tracking device on the J. LOPEZ-ZAMORA NISSAN indicated that the vehicle arrived and parked in front of J. LOPEZ-ZAMORA residence located at 8357 Yermo Way, Sacramento, CA.

182. Based upon this intercepted call and surveillance observations, I believe that "Guero" lives at the 7381 Pritchard Road residence.  I further believe that ROMERO and most likely Castro (based upon the vehicle registration of the Chrysler 300) conducted a transaction ("He has the scale there") for marijuana ("We just going to go get the weed") at the 7381 Pritchard Road residence.

183. On November 2, 2020, at approximately 4:55PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to the ROMERO PHONE, utilized by ROMERO. During this intercepted call, J. LOPEZ-ZAMORA stated, "If you want we can go.  And just, and just buy twenty and I buy twenty.  And then…"… "…Margarito will, will just bring them to us.  He's…"… "…going to drop off money to Gordo."

184. At approximately 5:27PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-655-2405, utilized by Margarito Rubelino Cuyuch Sanchez.  During this intercepted call, J. LOPEZ-ZAMORA stated, "Hey, Margarito" … "…can you do me a favor?" … "When you drop off the money, well, can you stop at a gas station?  So they can—they're going to give you some Xanax.  They aren't going to give you any blues, so, it's just regular shit.  Medicine for me, for my platoon, and not for sale.  So, can I

send you…" … "…can I give you three hundred dollars, and, and, and like, and the gas back, and you know, some food?  Just for picking up and bringing it…" … "… Can I give you three hundred dollars, for twenty bottles?  They're small, they're hella small." … "I'll give you four hundred dollars, fuck it."  Cuyuch Sanchez responded, "All right, sounds good, bro."

185.   I believe that in these calls, J. LOPEZ-ZAMORA was arranging for Cuyuch Sanchez to travel to southern California to deliver drug proceeds to L. LOPEZ ZAMORA ("Margarito … going to drop off money to Gordo").  I further believe that he arranged for Cuyuch Sanchez to pick up Xanax pills during this trip ("When you drop off the money, … can you stop at a gas station?  … they're going to give you some Xanax.").

186.   At approximately 8:22PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-655-2405, utilized by Cuyuch Sanchez.  During this intercepted call, Cuyuch Sanchez stated that he was going to leave the next day at 5:00AM and arrive at around noon (believed to be in reference to southern California).  J. LOPEZ-ZAMORA then instructed Cuyuch Sanchez to meet the "guy" on the way back in Valencia (CA) at a gas station on "Magic Mountain Boulevard" (believed to be in reference to picking up the Xanax pills).

187.   On November 3, 2020, at approximately 2:10PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-655-2405, utilized by Cuyuch Sanchez.  During this intercepted call, J. LOPEZ-ZAMORA stated, "These dudes are going to let me know right now if they are going to be able to meet you there or not.  If not, just bring the money back."  Cuyuch Sanchez responded, "Okay, then.  I'm just going to keep heading towards the… I'm just going to keep driving then."

188.   At approximately 6:35PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-655-2405, utilized by Cuyuch Sanchez.  During this intercepted call, Cuyuch Sanchez stated that he was about to pass Stockton (CA) and asked if he should go to J. LOPEZ-ZAMORA's house (apparently to return J. LOPEZ-ZAMORA's money because the Xanax deal had fallen through).  J. LOPEZ-ZAMORA responded, "I'm here at Guero's.  Pull up to Guero's."  Cuyuch Sanchez then asked, "At Guero's house?"  J. LOPEZ-ZAMORA then confirmed, "Yeah."

189.   At approximately 7:00PM, surveillance was established at the 7381 Pritchard Road residence in anticipation of Cuyuch Sanchez's arrival, based upon the aforementioned intercepted calls and surveillance observations which indicated that this residence was associated with Guero.  During approximately the same timeframe, the authorized GPS Ping on **Target Telephone 1** (utilized by J. LOPEZ-ZAMORA) indicated that the 7381

Pritchard Road residence was within the accuracy radius of the device. Immediately thereafter, surveillance observed a black Ford Mustang, bearing CA license plate number 8RYY558, parked in the driveway at the 7381 Pritchard Road residence. (NOTE: This is the same vehicle that J. LOPEZ-ZAMORA drove during the controlled purchase operation with the UC on October 29, 2020.)

190. At approximately 7:28PM, surveillance observed a red Ford, bearing CA license plate number 8RNL296, arrive and park in the driveway at the 7381 Pritchard Road residence. A CA DMV check revealed that the vehicle was registered to Margarito R. Cuyuch Sanchez, 3305 Mensch Ct B, Carmichael, CA 95608. Immediately thereafter, surveillance observed a male individual exit the driver's seat of the vehicle and walk to the residence. At approximately 7:31PM, surveillance observed the red Ford depart from the 7381 Pritchard Road residence.

191. Based upon these intercepted calls and surveillance observations, I believe Cuyuch Sanchez traveled to southern California to deliver money to an associate of L. LOPEZ ZAMORA (Gordo) on behalf of J. LOPEZ-ZAMORA to pay for pills distributed by the LOPEZ-ZAMORA DTO. I further believe that J. LOPEZ-ZAMORA gave Cuyuch Sanchez money to purchase Xanax pills (a Schedule IV controlled substance) during this trip but the Xanax deal fell through. I believe that J. LOPEZ-ZAMORA instructed Cuyuch Sanchez to return the money for the failed Xanax purchase to him at 7381 Pritchard Road ("Guero's house") and shortly thereafter Cuyuch Sanchez arrived at 7381 Pritchard Road and met with J. LOPEZ-ZAMORA there to return the money. I believe this further corroborates that the 7381 Pritchard Road residence is utilized by J. LOPEZ-ZAMORA to conduct drug trafficking activities.

***On November 18, 2020, approximately 1 pound of methamphetamine was seized from Jason LEE during a traffic stop; Jose LOPEZ-ZAMORA supplied the methamphetamine to LEE while Jaime Castro Lazcano was present at J. LOPEZ-ZAMORA's residence located at 8357 Yermo Way, Sacramento, CA; this transaction was negotiated over Target Telephone 1.***

192. On November 15, 2020, at approximately 6:10PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 530-721-6657, subscribed to "TRACFONE", and utilized by Jason LEE. During this intercepted call, LEE stated "I think I'm going to need some, some blues and, and, and some water." J. LOPEZ-ZAMORA responded, "How many—I gotta check on the water. I got blues, I gotta check water." J. LOPEZ-ZAMORA further stated, "I gotta see how much we got because last time we had only eight (8) but you want me to check?" LEE then responded, "Yup and how, how—and let me know how much." J. LOPEZ-ZAMORA responded, "I'll give you a cool price, bro."

and later stated, "It's gonna be, it's gonna be below three (3). You know, like twenty-nine (29) or so." LEE responded, "let me know." J. LOPEZ-ZAMORA then asked, "When?" LEE responded, "So—Huh? I'm trying, shit, I'm trying to do it now. So, so, I need to know what the price is." J. LOPEZ-ZAMORA later stated, "… if you're ready now I'll make, I'll make a call." LEE then stated, "Yeah, that's why I'm trying to get the numbers together so I can get all the you know…" J. LOPEZ-ZAMORA later asked, "You want one (1) water, one (1) case?" LEE answered, "Yeah, if the price is right and it's all good." J. LOPEZ-ZAMORA then stated, "It's going to be twenty-nine (29), if we have them, bro." LEE said, "Alright, alright." Based on this intercepted call, I believe that LEE was arranging to purchase one pound ("one"; "one case") of methamphetamine ("water") for $2,900 ("twenty-nine") from J. LOPEZ-ZAMORA. Additionally, I also believe that LEE is a sub-distributor of counterfeit oxycodone tablets ("blues") for J. LOPEZ-ZAMORA and that J. LOPEZ-ZAMORA told LEE that he currently had counterfeit oxycodone pills ("blues") he could supply to LEE.

193.   On November 16, 2020, at approximately 12:04PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 530-721-6657, utilized by LEE. During this intercepted call, J. LOPEZ-ZAMORA stated, "We got waters, yeah but I don't know, I don't when you're going to come. We don't have many, we only have like three (3)." LEE then stated, "Okay, it might be today. I gotta take this rental car back and see if I could get a different one." J. LOPEZ-ZAMORA then stated, "Yeah cuz a—I got it and then as soon—when you tell me you're going to come, then I'll go get it. I don't want to have it with me, I'm alone." LEE responded, "Oh, okay. Alright, that's cool" and then "I'm, I'm going to get ready to go take, I'm going to get ready to go take this other rental car back now and then I'll call you." J. LOPEZ-ZAMORA then stated, "I got you, I got you a nice one." LEE then said, "Alright, cool. I'll be there." J. LOPEZ-ZAMORA then stated, "So, so uh fucking put it together. Ima grab it when—as soon as you tell me that you're on your way." Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was informing LEE that he (J. LOPEZ-ZAMORA) had access to three pounds ("three") of methamphetamine ("waters") to sell to LEE, and that LEE was arranging to secure a rental vehicle to utilize during this future drug transaction with J. LOPEZ-ZAMORA.

194.   At approximately 7:29PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 530-721-6657, utilized by LEE. During this intercepted call, J. LOPEZ-ZAMORA stated, "Look, listen, so, uncle is leaving to Mexico the day after tomorrow. So you need to come tomorrow, if you are going to come for that." LEE said, "Okay." J. LOPEZ-ZAMORA then stated, "If not I am just going to have the blues." LEE responded, "No, I'll come." Based on this intercepted call, I believe that J. LOPEZ-ZAMORA's source of supply for methamphetamine ("uncle") was leaving to Mexico in the next couple of days and that in order for J. LOPEZ-ZAMORA to supply

methamphetamine he would need to sell it to LEE within that timeframe.  Furthermore, I believe that J. LOPEZ-ZAMORA was informing LEE that if LEE didn't come soon than J. LOPEZ-ZAMORA would only have counterfeit oxycodone pills ("blues") to supply to LEE.

195.   On November 17, 2020, at approximately 1:42PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 530-721-6657, utilized by LEE.  During this intercepted call, LEE stated that he was in Herlong (north of Reno, Nevada on California side) and was trying to come today but a fire had shut down the freeway.  J. LOPEZ-ZAMORA later stated, "…I'll get them today and then I'll just save them for you but I don't want to hold it too long…"  LEE said that he could probably come tonight once the freeway opens.  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA agreed to hold the methamphetamine to sell to LEE once the freeway opened, allowing LEE to travel to Sacramento from the Reno area, but told LEE he did not want to personally hold on to the methamphetamine very long.

196.   At approximately 1:49PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 530-721-6657, utilized by LEE.  During this intercepted call, LEE stated, "…It's gone be either tonight or in the morning…" and later "…when I get to Reno ima go to the airport, grab me a truck and then I'm going to head that way…" and later "…I can go get a rental at the airport all the way up until like damn near ten (10) or eleven (11) o'clock but it's early right now.  Depends on when they open up this freeway, I'll be able to move."  Based on this intercepted call, I believe that LEE was planning to rent a vehicle at the Reno airport to travel down to Sacramento either that night or the next morning for the purpose of purchasing methamphetamine from J. LOPEZ-ZAMORA.

197.   On November 18, 2020, at approximately 1:12PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 530-721-6657, utilized by LEE.  During this intercepted call, LEE stated, "Where you at?  I'm here."  J. LOPEZ-ZAMORA responded, "Okay, come to my house."  Based on this intercepted call, I believe that LEE was informing J. LOPEZ-ZAMORA that LEE had arrived in Sacramento (for the purpose of buying methamphetamine) and that J. LOPEZ-ZAMORA then instructed LEE to come to J. LOPEZ-ZAMORA's house (located at 8357 Yermo Way, Sacramento, CA) to conduct the transaction.

198.   At approximately 1:30PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 530-721-6657, utilized by LEE.  During this intercepted call, J. LOPEZ-ZAMORA asked, "Hey, how long you going to take to get to the pad, bro?"  LEE responded, "I'm about like ten (10) minutes away."  J. LOPEZ-ZAMORA later stated, "Okay, I'll wait for you here because I got…"  Based on this intercepted call, I believe

that LEE was indicating that he would arrive at J. LOPEZ-ZAMORA's house ("pad") in approximately ten minutes where J. LOPEZ-ZAMORA agreed to wait (to sell methamphetamine to LEE).

199. At approximately 1:35PM, surveillance observed (via pole camera video) a light colored Jeep with a dark top arrive and park directly in front of J. LOPEZ-ZAMORA's residence located at 8357 Yermo Way, Sacramento, CA.  Surveillance then observed (via pole camera video) LEE exit the Jeep and walk towards the front door of the 8357 Yermo Way residence.  At approximately 1:44PM, physical surveillance observed the CA license plate number of the Jeep to be 8NOY822 and confirmed that the Jeep was white in color with a black top.  (NOTE: A later CA DMV check revealed that the Jeep was a rental vehicle registered to PV Holding Corp, 5721 W. 96th Street, Los Angeles, CA.  A later inquiry into the identity of the renter of the Jeep revealed that LEE had rented the vehicle on the same day in Reno, Nevada.)  At approximately the same time, physical surveillance also observed a black Chrysler 300, bearing CA license plate number 8RSZ217, parked in the driveway of J. LOPEZ-ZAMORA's 8357 Yermo Way residence. (NOTE: A CA DMV check revealed that the vehicle was registered to Jaime CastroLazcano, 3205 West Capitol Ave 21, W Sacramento, CA 95691.)  At approximately the same time, physical surveillance also observed LEE standing next to the Jeep while J. LOPEZ-ZAMORA and Jaime Castro Lazcano were standing in the driveway of the 8357 Yermo Way residence, while all three individuals were conversing with one another.  Shortly thereafter, physical surveillance observed LEE enter the driver's seat of the Jeep.  Shortly thereafter, physical surveillance was continued on the Jeep after the vehicle had departed from the 8357 Yermo Way residence.

200. At approximately 2:01PM, Sacramento County Sheriff's deputies conducted a traffic stop on the Jeep in Sacramento at the request of DEA based upon the aforementioned probable cause developed from wiretap intercepts coupled with surveillance observations. During the traffic stop, deputies identified LEE as the driver of the vehicle based upon LEE's CA driver's license.  During a probable cause search of the Jeep, deputies located a brown paper bag containing a Ziploc baggie further containing a white crystalline substance in the center console of the vehicle.  Deputies then seized the suspected controlled substance as evidence and then cited and released LEE.  The suspected controlled substance was later submitted to a DEA laboratory for analysis and determined to weigh 446.5 grams net weight and to contain approximately 442 grams of pure methamphetamine.

201. Based upon the aforementioned intercepted calls, surveillance observations, and seizure, I believe that J. LOPEZ-ZAMORA supplied approximately one (1) pound of crystal methamphetamine to LEE on November 18, 2020 in Sacramento, CA.

202.  Following the seizure on November 18, 2020, at about 11:56 p.m. that night, agents
       intercepted a call between LEE and **Target Telephone 1**, used by J. LOPEZ-ZAMORA,
       in which they agreed that J. LOPEZ-ZAMORA would have one of his drivers deliver
       "1,000" to LEE (in Reno/Sparks, Nevada) the next day.  Based on my training and
       experience with this investigation, including other intercepted calls, I believe that LEE
       ordered "1,000" counterfeit oxycodone M-30 pills, likely containing fentanyl, from J.
       LOPEZ-ZAMORA.

203.  Based on subsequent intercepted calls, agents determined that J. LOPEZ-ZAMORA sent
       the unidentified user of telephone number 916-606-0243 ("UM0243") as his driver to
       meet with LEE in Reno/Sparks on November 19, 2020, in order to deliver the 1,000 pills
       LEE ordered.  (Agents have tentatively identified UM0243 as Eric Tello.)  At about 8:37
       p.m. on November 19, 2020, shortly after UM0243 informed LOPEZ-ZAMORA he was
       about to arrive, LEE talked to J. LOPEZ-ZAMORA on **Target Telephone 1** while using
       UM0243's phone.  In this intercepted call, LEE told J. LOPEZ-ZAMORA that law
       enforcement stopped him, searched the car, and seized the "shit" (i.e. the
       methamphetamine seized from LEE the day before).  LEE said that there must be a "rat"
       in J. LOPEZ-ZAMORA's inner circle because the police did not ask any questions and
       seemed to know exactly what they were looking for in his vehicle.  LEE speculated the
       seizure could be part of a bigger investigation, possibly the "Feds," because J. LOPEZ-
       ZAMORA's house had not been raided.  J. LOPEZ-ZAMORA stated that he understood
       LEE and that if he had any idea who it (the rat/snitch) could be, he would "come pick
       them up and take them in the trunk."   I believe J. LOPEZ-ZAMORA was saying that if
       he found out one of his guys was a law enforcement informant, he would have the
       informant killed ("in the trunk").

204.  On November 22, 2020, at approximately 4:59PM, J. LOPEZ-ZAMORA received an
       incoming call on **Target Telephone 1** from (530) 721-9528, used by LEE.  (In a call the
       day before, on November 21, 2020, LEE called J. LOPEZ-ZAMORA from (530) 721-
       9528 and told him it was his (LEE's) new number.)  In this intercepted call, LEE and J.
       LOPEZ-ZAMORA again discussed the traffic stop of LEE and again concluded that
       someone must have snitched to law enforcement because, according to LEE, the deputies
       had no probable cause to search his vehicle.  LEE urged J. LOPEZ-ZAMORA to get a
       new phone and disagreed when J. LOPEZ-ZAMORA said he believed his phone ("line")
       was not being tapped (was "clean").  LEE and J. LOPEZ-ZAMORA then discussed at
       length who they believed might be the snitch; both agreed that the suspected snitch was
       likely Jaime Castro Lazcano ("Fat Boy").  J. LOPEZ-ZAMORA told LEE that when
       Jaime (Castro Lazcano) stole 1,000 "blues" from him and tried to say he did not have
       them, his cousin (FLORES BELTRAN) punched him (Castro Lazcano) like 50 times and
       that he (Castro Lazcano) was bleeding.  LOPEZ-ZAMORA and LEE also discussed how

the day after the seizure, LEE had ordered "blues."  I believe based on training and experience that "blues" was a reference to counterfeit oxycodone M-30 pills, likely containing fentanyl, and a reference to the 1,000 pills that LEE ordered and that UM0243 drove to the Reno/Sparks area on November 19, based on intercepted calls.

205.   On November 24, 2020, at approximately 4:28PM, LEE again called J. LOPEZ-ZAMORA on **Target Telephone 1** from (530) 721-9528.  In this intercepted call, LEE said he wanted to find out who "did that shit" and stated "I want their head!"  Based on my training and experience with this investigation, I believe LEE was stating that he wanted to find out who the suspected informant was who he believed set up the November 18, 2020 traffic stop and methamphetamine seizure (who "did that shit") because he (LEE) wanted to have the informant killed ("I want their head").

206.   On December 1, 2020, at approximately 7:45PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 530-721-9528, utilized by LEE.  During this intercepted call, LEE stated, "We always gonna need bro because"… "I'm coming over there right now (laughing)"… "hey I'm parking the car in San Diego and I'm walking over motherfucker (laughing)."  Based on this intercepted call, I believe that LEE was referring to leaving his car in San Diego and walking across the U.S. border into Mexico ("walking over") to stay with J. LOPEZ-ZAMORA's brother (L. LOPEZ ZAMORA) there, to possibly evade law enforcement in light of the recent methamphetamine seizure and belief they were under heightened law enforcement scrutiny as discussed in multiple intercepted calls.

*__On November 26, 2020, approximately 11,000 counterfeit oxycodone tablets containing fentanyl (1.198 kilograms) were seized from Margarito Cuyuch Sanchez during a traffic stop in Galt, CA.__*

207.   On November 19, 2020, United States Magistrate Judge Carolyn K. Delaney of the Eastern District of California authorized the installation and activation of a tracking device on a 2018 Red Ford, bearing CA license plate number 8LYD200, utilized by Margarito Cuyuch Sanchez (the CUYUCH SANCHEZ RED FORD), for a period of 45 days.  On the same date, United States Magistrate Judge Carolyn K. Delaney of the Eastern District of California authorized the installation and activation of a tracking device on a 2013 Black Ford, bearing CA license plate number 8RNL296, utilized by Margarito Cuyuch Sanchez (the CUYUCH SANCHEZ BLACK FORD), for a period of 45 days.

208.   On November 22, 2020, at approximately 5:48PM, L. LOPEZ ZAMORA received an incoming call on **Target Telephone 2** from 916-591-3917, utilized by FLORES

BELTRAN.[7]  During this intercepted call, L. LOPEZ ZAMORA expressed concern that they were losing business from sub-distributors Jaime (Castro Lazcano), Manteca (Rudi FLORES), and Tony (ROMERO), because these sub-distributors could buy pills cheaper elsewhere and Roro (J. LOPEZ-ZAMORA) refused to lower the price.  L. LOPEZ ZAMORA indicated that Tony (ROMERO) used to move 4,000 – 5,000 a week but now was only moving 1,000 (implying he was getting pills from another source).  Later during the call, FLORES BELTRAN asked when that dumb ass was leaving, and L. LOPEZ ZAMORA responded early tomorrow morning around five (5:00AM).  FLORES BELTRAN then asked about Junior, and L. LOPEZ ZAMORA said that he was sending him (Junior) early too.  FLORES BELTRAN then asked if he (FLORES BELTRAN) was giving the money to the fucker, and L. LOPEZ ZAMORA said yes to Margarito.  L. LOPEZ ZAMORA then said that the fucker (Margarito) wanted to be paid more because L. LOPEZ ZAMORA told him (Margarito) that it was going to be fifteen thousand ($15,000), but L. LOPEZ ZAMORA told him (Margarito) to fuck off.  L. LOPEZ ZAMORA then stated that Tio said to only pay him (Margarito) four percent (4%) and that L. LOPEZ ZAMORA was paying too much to have money taken down.  FLORES BELTRAN later asked if L. LOPEZ ZAMORA was sending fifteen thousand ($15,000), and L. LOPEZ ZAMORA said yes and was sending eleven thousand (11,000) candies.  FLORES BELTRAN later asked if it was eleven (11) total, and L. LOPEZ ZAMORA said yes.  FLORES BELTRAN then asked how much it was going to be then, and L. LOPEZ ZAMORA said it was fifteen (15) for just the candies.  FLORES BELTRAN later asked again if it was fifteen thousand dollars ($15,000) for just the candy, and L. LOPEZ ZAMORA said yes.  FLORES BELTRAN later said that he would give it ($15,000) to him (Margarito).  Based on this intercepted call, I believe that L. LOPEZ ZAMORA was directing FLORES BELTRAN to give $15,000 in drug proceeds to Margarito Cuyuch Sanchez to transport from Sacramento for delivery to Junior in southern California for the purchase of 11,000 counterfeit oxycodone pills (11,000 candies) originating from Mexico.

209.    At approximately 3:30PM, L. LOPEZ ZAMORA received an incoming call on **Target Telephone 2** from 916-591-3917, utilized by FLORES BELTRAN.  During this intercepted call, FLORES BELTRAN asked, "…did fucking Junior get there already?"  L. LOPEZ ZAMORA responded, "Well, he has not called but he said he would get there in half an hour."  FLORES BELTRAN later asked, "Ah, is everything okay or what?"  L. LOPEZ ZAMORA responded, "Everything is good, everything is good" and then "It's about time the deal happened."  FLORES BELTRAN then asked, "When are you thinking about sending him?" and later stated "Because remember that it's Thanksgiving,

---

[7] The description of this Spanish-language call is based on a summary of its contents provided to me in English by a wire monitor contracted by DEA who is fluent in both Spanish and English.  A full verbatim transcription and translation is not yet available.

dude." L. LOPEZ ZAMORA asked, "When." FLORES BELTRAN responded, "On Thursday and on Friday no one works, everyone is off." L. LOPEZ ZAMORA then asked, "Ah, and is border, border patrol closed as well?" FLORES BELTRAN responded, "Not necessarily but, but a lot of people are going out this weekend. A lot of people will be coming in and leaving." L. LOPEZ ZAMORA responded, "I am going to tell Junior that I think that, that day is perfect. He can say that he is going over there with his aunts or uncles." FLORES BELTRAN then said, "Yeah, Thanksgiving is Thursday." L. LOPEZ ZAMORA then said, "Yeah, that's bad ass then" and then asked "Does, does that day sound good?" FLORES BELTRAN responded, "Thursday, yes." L. LOPEZ-ZAMORA then said, "Ah, well we will lean towards that day then." Based on this and other intercepted calls and vehicle tracking data from the Cuyuch Sanchez RED FORD, I believe that "Junior" collected drug proceeds from Cuyuch Sanchez in Santa Ana, CA and was now en route to deliver the money to L. LOPEZ ZAMORA (Junior "would get there in half an hour") in Mexico, who would then purchase counterfeit oxycodone pills for later importation into the United States. I further believe that L. LOPEZ ZAMORA and FLORES BELTRAN planned to have "Junior" transport the purchased counterfeit oxycodone pills from Mexico into the United States on Thanksgiving Day because it was a public holiday and they believed that there would be less law enforcement scrutiny at the border.

210. On November 26, 2020 (Thanksgiving Day), at approximately 4:55AM, the data from the authorized tracking device on the CUYUCH SANCHEZ BLACK FORD indicated that the vehicle had departed from Cuyuch Sanchez's known residence and shortly thereafter began traveling southbound from the Sacramento area, arriving at Cabrillo Park in Santa Ana, CA at approximately 11:46AM. Based on this vehicle tracker data, and intercepted calls, I believe that Cuyuch Sanchez traveled from Sacramento to Santa Ana to meet "Junior" in order to pick up approximately 11,000 counterfeit oxycodone pills which originated from Mexico and were supplied by L. LOPEZ ZAMORA. At approximately 2:35PM, the data from the authorized tracking device on the CUYUCH SANCHEZ BLACK FORD indicated that the vehicle had departed from Cabrillo Park in Santa Ana, CA and thereafter began traveling northbound (back towards Sacramento).

211. At approximately 8:15PM, the CUYUCH SANCHEZ BLACK FORD was traffic stopped for speeding by a California Highway Patrol (CHP) officer while traveling northbound on Highway 99 at the Mingo Road exit in Galt, CA. Pursuant to the traffic stop, CHP identified the driver of the CUYUCH SANCHEZ BLACK FORD to be Margarito Cuyuch Sanchez, via his CA driver's license. CHP then utilized a narcotics detection canine to conduct an exterior sniff of the CUYUCH SANCHEZ BLACK FORD, which resulted in positive alerts to the closed driver's side door and then to the front seat area when the door was opened by the officer. Pursuant to these positive alerts, officers

conducted a physical search of the vehicle which resulted in the discovery of a blue shirt tied together that was located on the right rear floor board within the vehicle.  Upon further inspection within the tied shirt, officers discovered six (6) clear plastic wrapped packages containing approximately 11,000 blue colored counterfeit oxycodone pills. CHP then seized the pills and later transferred custody of the pills to DEA for evidence and analysis.  CHP then issued a citation to Cuyuch Sanchez, who was then released from the scene.  Based on this seizure and aforementioned intercepted calls, I believe that L. LOPEZ ZAMORA supplied approximately 11,000 counterfeit oxycodone pills for importation into the United States and delivery to Cuyuch Sanchez, and that the pills were ultimately intended for distribution in the Sacramento, CA area by J. LOPEZ-ZAMORA, FLORES BELTRAN, and other members of the LOPEZ-ZAMORA DTO. The pills, which weighed approximately 1.198 kilograms, were later submitted to a DEA lab for analysis and a single pill was analyzed and found to contain fentanyl and acetaminophen.

212. At approximately 9:40PM, L. LOPEZ ZAMORA placed an outgoing call on **Target Telephone 2** to **Target Telephone 1**, utilized by J. LOPEZ-ZAMORA.  During this intercepted call, L. LOPEZ ZAMORA stated, "Margarito called me" … "He said that they took all of my candies while he was putting gas in Stockton."  J. LOPEZ-ZAMORA then asked, "Are you serious?" … "Who?"  L. LOPEZ ZAMORA responded, "He said that he does not know.  That, that a white car arrived without plates and they [Babbles] were, were asking for the keys to the car.  That, that, that they found the stuff and left." Based on this intercepted call, I believe that L. LOPEZ ZAMORA was informing J. LOPEZ-ZAMORA that according to Cuyuch Sanchez (Margarito), all of the counterfeit oxycodone pills ("candies") had been stolen in Stockton, CA while Cuyuch Sanchez had stopped to pump gas.  I further believe that this call corroborates that L. LOPEZ ZAMORA and J. LOPEZ-ZAMORA conspired to import from Mexico the approximately 11,000 counterfeit oxycodone pills which were seized during the aforementioned traffic stop from Cuyuch Sanchez on Thanksgiving Day.

213. Approximately 10:16PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-910-8115, utilized by Cuyuch Sanchez.  During this intercepted call, J. LOPEZ-ZAMORA told Cuyuch Sanchez, "Whatever happened bro. If you help me find the work. You're good, if not you're gonna pay me, the fucken work. Cause that's fucken dumb ass shit. You don't have paperwork, you're not in jail, you're just gonna pay me the work. I'm, I'm pull up me and Leo. And we [U/I] [Audio glitch] to you right now. And I called Sleepy already, and Mateo, And all them fucken niggas bro. Whoever is involved with this shit. I'ma [PH] fucken kill them!"  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was threating to kill Cuyuch Sanchez if he was involved in the disappearance of the 11,000 pills.

214. On November 27, 2020, at approximately 4:26PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-910-8115, utilized by Cuyuch Sanchez. During this intercepted call, J. LOPEZ-ZAMORA directed Cuyuch Sanchez to "crash one" of his (Cuyuch Sanchez's) cars so that Cuyuch Sanchez can make a fraudulent insurance claim in order to pay J. LOPEZ-ZAMORA back for the missing pills. J. LOPEZ-ZAMORA informed Cuyuch Sanchez that he had to pay back the cost of the 11,000 pills, $20,000, and that he (J. LOPEZ-ZAMORA) was not charging Cuyuch Sanchez $55,000 (i.e., the value of the pills had they been able to sell them).

215. On November 28, 2020, at approximately 3:53PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 209-605-5936, utilized by Rudi FLORES. During this intercepted call, J. LOPEZ-ZAMORA stated, "I'm just tryin' to find out, if if, see if they, if they, if if we could find the people that took them." FLORES responded, "Oh, okay, okay." J. LOPEZ-ZAMORA then told FLORES to "ask around." FLORES later stated, "I'm gonna ask right now as a matter of fact." Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was directing FLORES to attempt to find out who stole the pills from Cuyuch Sanchez so that they could retaliate against them, and FLORES agreed to ask around.

***On December 5, 2020, approximately 7,727 suspected counterfeit oxycodone tablets (847 grams) containing fentanyl were seized from Alejandro TELLO during a traffic stop in Sacramento, CA; Joaquin SOTELO VALDEZ was driving a tandem vehicle with Jose LOPEZ-ZAMORA which was also traffic stopped.***

216. On December 3, 2020, at approximately 11:37AM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-591-3917, utilized by FLORES BELTRAN.[8] During this intercepted call, J. LOPEZ-ZAMORA said that Margartio (Cuyuch Sanchez) was going to drive but Alejandro (TELLO) would do the stuff. J. LOPEZ-ZAMORA said that Margarito would not get paid, and FLORES BELTRAN agreed. J. LOPEZ-ZAMORA said that Margarito still owed the money. J. LOPEZ-ZAMORA said that he (Margarito) had a license and Alejandro did not, that way they would not risk the money. J. LOPEZ-ZAMORA said to have that idiot (Margarito) drive and to have Alejandro put everything away. J. LOPEZ-ZAMORA said to have Alejandro dictate the stops and where to put gas. FLORES BELTRAN said to have Alejandro see them, because the other one (Margarito) was an idiot. FLORES BELTRAN said to have him (Alejandro) call via FaceTime so that J. LOPEZ-ZAMORA could see them. Based

---

[8] The description of this Spanish-language call is based on a summary of its contents provided to me in English by a wire monitor contracted by DEA who is fluent in both Spanish and English. A full verbatim transcription and translation is not yet available.

on this intercepted call, I believe that J. LOPEZ-ZAMORA and FLORES BELTRAN were planning to send Cuyuch Sanchez and TELLO to southern California to pick up another load of counterfeit oxycodone pills, and that Cuyuch Sanchez would drive while TELLO would be responsible for actually picking up the pills (would do the stuff) and concealing the pills (put everything away) within the load vehicle.

217.   At approximately 12:42PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-591-3917, utilized by FLORES BELTRAN.[9]  During this intercepted call, J. LOPEZ-ZAMORA said that his cousins in Phoenix had skittles that they could deliver to LA (Los Angeles).  J. LOPEZ-ZAMORA said he told them (cousins) to lower the price to 2.10 instead of 2.40.  FLORES BELTRAN asked if they were good.  J. LOPEZ-ZAMORA said yes and that his dad sent a picture.  FLORES BELTRAN said that if J. LOPEZ-ZAMORA wanted to then yes.  J. LOPEZ-ZAMORA said that he (dad) was calling Phoenix to see if they (cousins) lowered them (prices).  J. LOPEZ-ZAMORA said that he (Margarito) wanted to leave tomorrow at five in the morning (5:00AM) and that Alejandro already knew.  J. LOPEZ-ZAMORA said he talked to his dad and they were pretty, white, shiny, and bad ass.  J. LOPEZ-ZAMORA said they he would send the money with the guys (Cuyuch Sanchez and TELLO).  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was negotiating to purchase counterfeit oxycodone pills for a price of $2.10-$2.40 per pill from a supplier in Phoenix who would deliver the pills to Los Angeles to be picked up by Cuyuch Sanchez and TELLO the next day.  I further believe that J. LOPEZ-ZAMORA's father (Guadalupe LOPEZ ROJAS) was facilitating this transaction directly with the Phoenix based supplier on behalf of J. LOPEZ-ZAMORA.

218.   At approximately 5:32PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to Mexico telephone number +52-6672339444, utilized by Guadalupe LOPEZ ROJAS (who is known to be the father of J. LOPEZ-ZAMORA).[10]  During this intercepted call, LOPEZ ROJAS said that he called Jesusito and 17,000 bucks gave 7,727 at 2.2.  Based on this intercepted call, I believe that LOPEZ ROJAS was informing J. LOPEZ-ZAMORA that the Phoenix supplier (Jesusito) would sell 7,727 counterfeit oxycodone pills for $17,000 which equated to $2.20 per pill.  I further believe that this intercepted call corroborates that LOPEZ ROJAS negotiated and facilitated this transaction on behalf of J. LOPEZ-ZAMORA.  (NOTE: A money remitter database query revealed that Mexican telephone number 6672339444 was associated with Guadalupe

[9] The description of this Spanish-language call is based on a summary of its contents provided to me in English by a wire monitor contracted by DEA who is fluent in both Spanish and English.  A full verbatim transcription and translation is not yet available.

[10] The description of this Spanish-language call is based on a summary of its contents provided to me in English by a wire monitor contracted by DEA who is fluent in both Spanish and English.  A full verbatim transcription and translation is not yet available.

LOPEZ ROJAS, Address: Culiacan, Sinaloa, Mexico, who was the recipient of multiple wire transfers in 2020. Specifically, on August 11, 2020, Joaquin Alberto SOTELO VALDEZ sent a wire transfer of funds to LOPEZ ROJAS in the amount of $1,089 using telephone number 916-640-9543 (J. LOPEZ-ZAMORA PHONE #2); and on March 19, 2020, SOTELO VALDEZ sent a wire transfer of funds to LOPEZ ROJAS in the amount of $600 using J. LOPEZ-ZAMORA PHONE #2.)

219. At approximately 7:53PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from +52-6672339444, utilized by LOPEZ ROJAS.[11] During this intercepted call, LOPEZ ROJAS told a third party (who had answered the phone and indicated that J. LOPEZ-ZAMORA was listening) that Jesusito was going in person for everything to go well and so that nothing goes bad. LOPEZ ROJAS said that he (Jesusito) was going to take care of the delivery of the candies. LOPEZ ROJAS said that he (Jesusito) would leave in the morning and would be over there by 11:00. LOPEZ ROJAS then requested the number of the person who would be going. J. LOPEZ-ZAMORA said that he would give LOPEZ ROJAS the number. LOPEZ ROJAS said that Jesusito would call the person so that they could arrange things. Based on this intercepted call, I believe that LOPEZ ROJAS was indicating that the Phoenix based supplier (Jesusito) would be traveling to Los Angeles the next morning, arriving at approximately 11:00AM, to facilitate the delivery of the counterfeit oxycodone pills (candies) to TELLO and that LOPEZ ROJAS would arrange for Jesusito and TELLO to communicate directly by providing Jesusito with TELLO's phone number once J. LOPEZ-ZAMORA gives the number to LOPEZ ROJAS.

220. On December 4, 2020, at approximately 4:42AM, the data from the authorized tracking device on the CUYUCH SANCHEZ BLACK FORD indicated that the vehicle had departed from an area near Cuyuch Sanchez's known residence and eventually began traveling southbound from the Sacramento, arriving in the Los Angeles area at approximately 11:18AM. Based on this vehicle tracker data, coupled with the aforementioned intercepted calls, I believe that TELLO traveled from Sacramento to Los Angeles to meet Jesusito in order to pick up approximately 7,727 counterfeit oxycodone pills on behalf of J. LOPEZ-ZAMORA, and that this transaction was negotiated by LOPEZ ROJAS. (Subsequent intercepted calls and surveillance observations made clear that Cuyuch Sanchez did not make the trip with TELLO as originally planned; rather, TELLO traveled to Los Angeles in the CUYUCH SANCHEZ BLACK FORD, but without Cuyuch Sanchez.)

---

[11] The description of this Spanish-language call is based on a summary of its contents provided to me in English by a wire monitor contracted by DEA who is fluent in both Spanish and English. A full verbatim transcription and translation is not yet available.

221. At approximately 11:32AM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to +52-6672339444, utilized by LOPEZ ROJAS.[12]  During this intercepted call, J. LOPEZ-ZAMORA asked LOPEZ ROJAS if Jesustio could have everything ready when his buddy (TELLO) arrives so that he can just pick up and return, and LOPEZ ROJAS said he would ask him (Jesusito).  J. LOPEZ-ZAMORA told LOPEZ ROJAS that the dude (TELLO) would have to see them and J. LOPEZ-ZAMORA was not going to let him (TELLO) give money without seeing them.  LOPEZ ROJAS said that J. LOPEZ-ZAMORA could trust Jesusito and that he (Jesusito) came personally so that they did not give bad stuff.  J. LOPEZ-ZAMORA asked if he (Jesusito) went all the way from the sun (Phoenix) to over there (Los Angeles), and LOPEZ ROJAS said yes to guarantee they were what he (Jesusito) got.  LOPEZ ROJAS told J. LOPEZ-ZAMORA to tell the kid (TELLO) to give him (Jesusito) the money if he (Jesusito) asked for it.  J. LOPEZ-ZAMORA responded that the kid (TELLO) would want to see the work (pills).  LOPEZ ROJAS said that it was guaranteed.  J. LOPEZ-ZAMORA said that the dude (TELLO) would get to his (J. LOPEZ-ZAMORA's) aunt's house in about 40 minutes.  LOPEZ ROJAS said to trust him (Jesusito) and that they (Jesusito and TELLO) would agree in how to make the deal.  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA and LOPEZ ROJAS were arranging for TELLO and Jesusito to conduct the transaction for approximately 7,727 counterfeit oxycodone pills at J. LOPEZ-ZAMORA's aunt's house located in the Los Angeles area.

222. At approximately 3:30PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 279-204-7650, utilized by Fatima BARBOZA (J. LOPEZ-ZAMORA's girlfriend).[13]  During this intercepted call, J. LOPEZ-ZAMORA said that he had to go on an emergency trip to Los Angeles because Gordo (L. LOPEZ ZAMORA) said that dumbass (TELLO) was being followed by some trucks and he (TELLO) cannot bring J. LOPEZ-ZAMORA's things.  J. LOPEZ-ZAMORA said he was going to have to go and switch cars and come back in the other empty car with Joaquin (SOTELO VALDEZ).  J. LOPEZ-ZAMORA said that he was going to be back in the middle of the night.  J. LOPEZ-ZAMORA said that he just found out and had to go otherwise his things were not going to arrive and that was another $20,000 in the trash again.  J. LOPEZ-ZAMORA said he was going to drive on the way, and the cousin (SOTELO VALDEZ) would drive on the way back, and they were not going to sleep and would arrive back at 4:00AM.  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was indicating that TELLO was being followed by surveillance in Los Angeles (followed by

---

[12] The description of this Spanish-language call is based on a summary of its contents provided to me in English by a wire monitor contracted by DEA who is fluent in both Spanish and English.  A full verbatim transcription and translation is not yet available.

[13] The description of this Spanish-language call is based on a summary of its contents provided to me in English by a wire monitor contracted by DEA who is fluent in both Spanish and English.  A full verbatim transcription and translation is not yet available.

some trucks) and for that reason J. LOPEZ-ZAMORA and SOTELO VALDEZ were making an emergency trip to Los Angeles to switch cars with TELLO and then drive back the empty car so that TELLO could transport the load of pills (things) back to Sacramento in the switched out load car without being detected by law enforcement. (NOTE: At the time of this intercepted call, DEA – Los Angeles surveillance units were following TELLO in the CUYUCH SANCHEZ BLACK FORD.)

223.  At approximately 5:53PM, L. LOPEZ ZAMORA placed an outgoing call on **Target Telephone 2** to 916-934-6203, utilized by Erika Gabriela ZAMORA ROJO.  During this intercepted call, L. LOPEZ ZAMORA asked, "Listen, do you know if I can get another chip for this phone?"  ZAMORA ROJO responded, "Mmm… I don't know son, you already have that phone. The problem is the chips have nothing to do son. It's the same shit, it's the same e-mail, everything.  I change the chip all the time and it's the same shit. I always hear voices and hear…" … "I have changed it several times. It's not the chip, it's the phones."  L. LOPEZ ZAMORA later stated, "Once the three of them get back, we will see… we all have to change numbers" … "The phone and everything…"  ZAMORA ROJO responded, "Everything son, it has to be…."  L. LOPEZ ZAMORA then stated, "I'm going to smash this shit, I mean I'm just going to report it lost, I'm going to clean it up and then I'm going to sell it here."  ZAMORA ROJO responded, "Yes."  L. LOPEZ ZAMORA then stated, "If I get another one, they can take one for me, so I can have another one over there."  ZAMORA ROJO responded, "Mmm…Yeah."  L. LOPEZ ZAMORA then stated, "Because I don't want to have this number."  Based on this intercepted call, I believe that L. LOPEZ-ZAMORA and ZAMORA ROJO were planning to change their phones after J. LOPEZ-ZAMORA, SOTELO VALDEZ and TELLO got back from Los Angeles ("once the three of them get back") in order to avoid detection by law enforcement.

224.  At approximately 10:16PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 279-800-5603, which was temporarily being utilized by Alejandro TELLO.  During this intercepted call, TELLO stated, "We're gonna catch that car on fire."  J. LOPEZ-ZAMORA responded, "Yeah (laughing)."  Based on this intercepted call, I believe that TELLO and J. LOPEZ-ZAMORA were planning to burn the CUYUCH SANCHEZ BLACK FORD when they got back to Sacramento after the drug run.

225.  At approximately 10:22PM, the data from the authorized tracking device on the CUYUCH SANCHEZ BLACK FORD indicated that the vehicle began traveling northbound away from Los Angeles.  As the CUYUCH SANCHEZ BLACK FORD traveled back towards Sacramento, the data from the authorized tracking device coincided with the authorized GPS pings on **Target Telephone 1** (utilized by J. LOPEZ-

ZAMORA).  Based on the vehicle tracker data and GPS pings, I believe that J. LOPEZ-ZAMORA had arrived in Los Angeles, switched out the cars, and was now traveling back to Sacramento.

226.    On December 5, 2020, at approximately 2:47AM, surveillance observed the CUYUCH SANCHEZ BLACK FORD traveling northbound on Interstate-5 passing through Lathrop, CA while closely following a silver Chrysler 300, bearing CA license plate number 8RDY090 (determined to be registered to Fatima Annahi BarbozaCruz, 8357 Yermo Way, Sacramento, CA, based on a CA DMV check).  Surveillance observed that the Chrysler 300 and the CUYUCH SANCHEZ BLACK FORD were driving in tandem at a high rate of speed, with the CUYUCH SANCHEZ BLACK FORD driving directly behind the Chrysler 300 in the fast lane.

227.    At approximately 3:15AM, the Chrysler 300 was traffic stopped for speeding by a California Highway Patrol (CHP) officer while traveling northbound on Interstate-5 at the Hood Franklin Road exit in Elk Grove, CA.  Pursuant to the traffic stop, CHP identified the driver of the Chrysler 300 to be Alejandro TELLO, via his CA identification card; TELLO indicated that he did not have a driver's license.  CHP then utilized a narcotics detection canine to conduct an exterior sniff of the Chrysler 300 which resulted in a positive alert to the right rear passenger's seat and floorboard through the open right rear passenger door.  Pursuant to the positive alert, officers conducted a physical search of the vehicle, which resulted in the discovery of eight (8) clear plastic baggies containing approximately 7,727 blue counterfeit oxycodone pills which were located within the trunk of the vehicle, concealed behind the lining on the left side of the trunk.  CHP then seized the pills and later transferred custody of the pills to DEA for evidence and analysis.  CHP then issued a citation to TELLO, who was then released from the scene, but the Chrysler 300 was impounded due to TELLO not having a driver's license.  Based on this seizure and aforementioned intercepted calls, I believe that LOPEZ ROJAS facilitated the supply of approximately 7,727 counterfeit oxycodone pills to TELLO in Los Angeles on behalf of J. LOPEZ-ZAMORA, and that the pills were intended for distribution in the Sacramento, CA area.

228.    The pills were subsequently submitted to the DEA lab for analysis and found to weigh 847.3 grams net weight; a single pill was analyzed and found to contain fentanyl and acetaminophen.

229.    At approximately 3:19AM, just four minutes after CHP pulled over TELLO, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-934-6203, utilized by Erika Gabriela ZAMORA ROJO (J. LOPEZ-ZAMORA's mother).  During this intercepted call, SOTELO VALDEZ told ZAMORA ROJO to "Get ready, because they

pull that guy over" and then to "go to my room. Grab a backpack… the backpack." J. LOPEZ-ZAMORA then stated, "Put all the shit in a backpack." ZAMORA ROJO responded, "I told… I told you before you left to do all of that, but you don't listen" and then: "All right, so tell me what should I grab from your room?" SOTELO VALDEZ responded, "There is a red backpack, go inside the closet and on the bottom where the shoes are, there is a bag and you are going to see a scale and the candies and all of that stuff," and then: "Yes, than you'll also see a whatchamacallit? You'll see the toy, you know where the toy is at on the bed." ZAMORA ROJO responded, "Yes, I know that one…" J. LOPEZ-ZAMORA then stated, "And mine mom, mine" and then "Mine, under the bed and the charger in the box in the drawer.  Mom, I'll see you at Leo's?" and then, "All right then, aright. I'ma see you, just grab the chargers and that shit." ZAMORA ROJO later asked, "Is that all Junior has there?" SOTELO VALDEZ responded, "No, the box too. It's on top of the gun and all of that." ZAMORA ROJO then asked, "Ugh… What do you mean it's on top of the gun?" SOTELO VALDEZ then responded, "It's on top in the closet there in [/UI] it is." J. LOPEZ-ZAMORA then stated, "All right, mom, I'll see you at Leo's and bring the pink slip from the three-hundred (300)."  Based on this intercepted call, I believe that SOTELO VALDEZ and J. LOPEZ-ZAMORA are notifying ZAMORA ROJO that TELLO had been pulled over in the Chrysler 300 by the police and are also instructing ZAMORA ROJO to clean out all of the contraband from the house and meet them at FLORES BELTRAN's (Leo's) because they feared law enforcement would search 8357 Yermo Way (where ZAMORA ROJO, J. LOPEZ-ZAMORA, and SOTELO VALDEZ all live) after seizing the pills from the vehicle TELLO was driving.  Specifically, I believe SOTELO VALDEZ directed ZAMORA ROJO to go to his room and collect pills ("candies"), a "scale" for weighing drugs, and his "gun" (also referred to as the "toy"), to which ZAMORA ROJO responded, "Yes, I know that one." J. LOPEZ-ZAMORA then directed ZAMORA ROJO to collect his gun and magazines (the "chargers") as well as the pink slip for the vehicle TELLO was driving (the "pink slip from the three-hundred") in order to conceal evidence from law enforcement tying him to the seizure of pills from TELLO.

230. At approximately 3:24AM, the CUYUCH SANCHEZ BLACK FORD was traffic stopped for speeding by a California Highway Patrol (CHP) officer while traveling northbound on Interstate-5 at the Cosumnes River Blvd exit in Sacramento, CA. Pursuant to the traffic stop, CHP identified the driver of the Chrysler 300 to be Joaquin SOTELO VALDEZ, and the only other passenger to be J. LOPEZ-ZAMORA, neither of whom had driver licenses.  CHP then cited and released SOTELO VALDEZ, along with J. LOPEZ-ZAMORA, and the CUYUCH SANCHEZ BLACK FORD was impounded because no occupant of the vehicle had a driver's license.

231. At approximately 3:36AM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-934-6203, utilized by ZAMORA ROJO.  During this intercepted call, J. LOPEZ-ZAMORA stated, "They also pulled us over."  ZAMORA ROJO responded, "Oh my son…."  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was informing his mother, ZAMORA ROJO, that he and SOTELO VALDEZ had also been stopped by the police.

232. At approximately 3:46AM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-934-6203, utilized by ZAMORA ROJO.  During this intercepted call, J. LOPEZ-ZAMORA stated, "They were really concentrated in that car. Hopefully they do not concentrate as much on the other car."  ZAMORA ROJO responded, "I do not give a shit for the black car. They can [U/I] but the other one."  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was informing ZAMORA ROJO that the police were really concentrating on the CUYUCH SANCHEZ BLACK FORD and he was hoping that the police would not concentrate as much on the silver Chrysler 300, to which ZAMORA ROJO agreed.

233. At approximately 3:46AM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-934-6203, utilized by ZAMORA ROJO.  During this intercepted call, J. LOPEZ-ZAMORA stated, "They took the car from us, they were so focused on the green car that we had where we [U/I] [Coughs]" … "So, hopefully they don't search him but…"  ZAMORA ROJO responded, "Hopefully not."  J. LOPEZ-ZAMORA then stated, "Otherwise everything is fucked."  ZAMORA ROJO later stated, "But you don't listen, whenever I fucking tell you something.  You don't fucking listen."  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was informing ZAMORA ROJO that the police towed the CUYUCH SANCHEZ BLACK FORD ("they took the car from us") and that he hoped the police would not search the Chrysler 300 that TELLO was driving ("hopefully they don't search him"), to which ZAMORA ROJO agreed ("Hopefully not"), because if they did and found the pills they would be in serious trouble ("Otherwise everything is fucked").

234. At approximately 12:30PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-934-6203, utilized by ZAMORA ROJO.  During this intercepted call, J. LOPEZ-ZAMORA told ZAMORA ROJO to "Talk to the uncle and tell him that I need some movement now."  ZAMORA ROJO responded, "I already told him, let's see if he answers me. I sent him a WhatsApp."  J. LOPEZ-ZAMORA responded, "I'll talk to you… Once I get there, I'll talk to you in person. But I just need to talk to him."  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was directing ZAMORA ROJO to talk to a source of supply for counterfeit oxycodone pills ("uncle") about getting

more pills ("I need some movement now") and that ZAMORA ROJO had already made the request ("I already told him").

235.   At approximately 1:48PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from Mexico phone number 52-667-233-9444, used by Guadalupe LOPEZ ROJAS.  During this intercepted call, J. LOPEZ-ZAMORA stated, "They cracked this dude yesterday too on the way back. I went to change cars and shit and they pulled him over in my car and shit, and they took all the shit" … "Yeah, they took all the shit, the car that he took, the other guy… remember the time when the eleven-thousand fell through? The cops pulled him over and he is snitching. We used his car since he owed us money, I told him; 'Lend us your car mother fucker.'  So we used it, so the same thing happened. They followed this guy on the same car all the way there.  So I thought to go at night time and change cars with him. So, I went to change the car. So I came in the black car and they pulled my car over first with the doggie, and they brought the K-9 and then they pulled me over five (5) minutes later, at the next exit… boom… that's it. So, I just had enough time to call my mom, to get out of there and get everything out."  LOPEZ ROJAS responded, "Fuck! So that guy is getting like that then?"  J. LOPEZ-ZAMORA responded, "I'm gonna go get his tongue cut off fuck it."  Later J. LOPEZ-ZAMORA stated, "I told the uncle if I could gather some money and they could do me the favor and he said he will do me the favor to give me something" … "To give me one, since I already lost fifty-thousand dollars this week, dad. Everything I had." Later, LOPEZ-ZAMORA stated, "I'm going to try to come up with money to be able to get about four-thousand (4,000)."  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA was telling LOPEZ ROJAS about the 7,727 pill seizure from TELLO ("they pulled him over in my car and shit, and they took all the shit").  I further believe J. LOPEZ-ZAMORA told LOPEZ ROJAS that he believed the 11,000 pills that Cuyuch Sanchez lost were in fact seized by the police (and not stolen as Cuyuch Sanchez had told them) and that Cuyuch Sanchez was now working as an informant and that is why TELLO was being followed in the CUYUCH SANCHEZ BLACK FORD ("remember the time when the eleven-thousand fell through?  The cops pulled him over and he is snitching.").  I believe  that J. LOPEZ-ZAMORA then told LOPEZ ROJAS that he was going to retaliate against Cuyuch Sanchez by having his tongue cut off ("go get his tongue cut off").  I further believe that J. LOPEZ-ZAMORA told LOPEZ ROJAS that his uncle agreed to supply more pills to keep J. LOPEZ-ZAMORA going ("he will do me the favor to give me something") and that J. LOPEZ-ZAMORA hoped to put together enough money to buy 4,000 pills.

236.   On Sunday, December 6, 2020, at approximately 11:22PM, J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from 916-857-6572, utilized by SOTELO VALDEZ.  During this intercepted call, J. LOPEZ-ZAMORA stated, "…last

night I met a girl and came to the house" … "There's nothing here."  SOTELO VALDEZ later stated, "We just need to take out the 'balines' and that's it."  J. LOPEZ-ZAMORA responded, "Yeah dude, later on, right now, how many days? It's been like two (2) days right? Two days had to pass by, and they already did."  SOTELO VALDEZ responded, "No [U/I] would be like by tomorrow dude" … "We just have to take out the 'balines' and we're Gucci fool."  J. LOPEZ-ZAMORA then asked, "For sure. Where is that shit?"  SOTELO VALDEZ responded, "They are there, on the bottom in the room, in, in a bag. Do you want me to go and pick you up there?"  J. LOPEZ-ZAMORA responded, "I am going to stay here, I told my lady to come here."  SOTELO VALDEZ responded, "Okay, so then I'll go over there. Do you want me to go over there and go, go take the things to my cousins?"  J. LOPEZ-ZAMORA responded, "Take them dude and uh, just come back if you want."  SOTELO VALDEZ responded, "All right."  J. LOPEZ-ZAMORA responded, "So that there's nothing here."  Based on this intercepted call, I believe that J. LOPEZ-ZAMORA and SOTELO VALDEZ were arranging to remove ammunition ("balines") from their residence because they believed that law enforcement would raid their house the next day (which was the Monday following the seizure of approximately 7,727 pills over the weekend).

237. Following the two traffic stops on December 5, 2020, the authorized GPS Pings on **Target Telephone 1** (utilized by J. LOPEZ-ZAMORA) revealed that the device was located in an area near FLORES BELTRAN's (Leo's) residence (located 5241 Crystal Hill Way, Sacramento, CA) during nighttime hours on December 5-7, 2020 (with an accuracy radius at times of approximately 1,410 meters), but thereafter pings stopped and/or were infrequent indicating that J. LOPEZ-ZAMORA stopped using the phone. These pings initially corroborated that J. LOPEZ-ZAMORA likely stayed at FLORES BELTRAN's temporarily to avoid law enforcement after the traffic stops, in line with intercepted calls discussing the same.

238. Between the period of approximately December 6-18, 2020, data from the authorized tracking device on the LOPEZ-ZAMORA NISSAN revealed that the vehicle was frequently at or near FLORES BELTRAN's residence (located at 5241 Crystal Hill Way, Sacramento, CA), but thereafter the vehicle was frequently at or near J. LOPEZ-ZAMORA's residence located at 8357 Yermo Way, Sacramento, CA.  This data further corroborates that J. LOPEZ-ZAMORA likely stayed at FLORES BELTRAN's residence temporarily to avoid law enforcement after the traffic stops, in line with intercepted calls and GPS Pings on **Target Telephone 1**.  Furthermore, based upon this data from the authorized tracking device on the LOPEZ-ZAMORA NISSAN, I believe that J. LOPEZ-ZAMORA has resumed residency at 8357 Yermo Way, Sacramento, CA.

*Additional Evidence of Erika Gabriela ZAMORA ROJO's involvement in Drug Trafficking and Money Laundering*

239. On October 25, 2020, at approximately 1:32 p.m., J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from **Target Telephone 2**, used by L. LOPEZ ZAMORA. During the call, J. LOPEZ-ZAMORA asked: "What did pops tell you about my washed one?" I believe J. LOPEZ-ZAMORA was asking L. LOPEZ ZAMORA what their dad ("pops") told L. LOPEZ ZAMORA about a shipment of cocaine ("washed one") that J. LOPEZ-ZAMORA was awaiting. L. LOPEZ ZAMORA responded that he ("pops") told L. LOPEZ ZAMORA "that he was going to tell them to … do it for him." L. LOPEZ ZAMORA continued that "hopefully they get it here by … Well, it's close." Later, J. LOPEZ-ZAMORA stated, "if they fall, well, I'll pay you for them again" and L. LOPEZ ZAMORA responded, "No, they'll touch down." Based on this and other intercepted calls, I believe L. LOPEZ ZAMORA and LOPEZ ROJAS are both in Mexico and were facilitating the importation of a load of approximately a half kilogram of flavored/washed cocaine from Mexico into the United States for J. LOPEZ-ZAMORA, which (based on intercepted calls and surveillance observations) Cuyuch Sanchez ultimately delivered to ROMERO's residence on November 18, 2020. I also believe J. LOPEZ-ZAMORA told L. LOPEZ ZAMORA that he would bear the loss if the shipment was seized by law enforcement ("if they fall … I'll pay you for them") and that L. LOPEZ ZAMORA assured J. LOPEZ-ZAMORA they would not be seized ("they'll touch down").

240. On October 26, 2020, at approximately 10:52 p.m., J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from Mexico phone number 52-667-233-9444, used by Guadalupe LOPEZ ROJAS. During the call, they discussed when "they" (an unknown third party) would "cross it" and J. LOPEZ-ZAMORA said if the "cross" was not before Saturday, he would send Junior "over there." J. LOPEZ-ZAMORA then stated, "He doesn't get nervous. The guy passes the check point laughing." He concluded, "honestly dad, I'm already desperate. I'm just going to do it that way. If I lose it, I lose it. … I need the work here." LOPEZ ROJAS then told J. LOPEZ-ZAMORA to wait another day to decide because "[a]ccording to these fuckers, they are crossing frequently." I believe that in this call J. LOPEZ-ZAMORA and LOPEZ ROJAS were discussing arrangements to transport a load of approximately one-half a kilogram of flavored/washed cocaine ("work" – which I know is common slang for narcotics) across the border ("cross it"). I believe J. LOPEZ-ZAMORA said he would send a runner, Junior, to the location of the cocaine in Mexico ("over there") if the supplier did not get it across the border soon.

73

241. On October 29, 2020, at approximately 4:43 p.m., J. LOPEZ-ZAMORA received an incoming call on **Target Telephone 1** from Mexico phone number 52-667-233-9444, used by LOPEZ ROJAS.  During the call, LOPEZ ROJAS stated, "The girls are crossing tomorrow.  The fruit will be over there by Saturday.… I think you can come get them on Saturday.  I'll confirm for you."  J. LOPEZ-ZAMORA then asked, "Are they going to be in a safe place?" and LOPEZ ROJAS responded, "Yes, it's in one of their homes, in a safe place."  J. LOPEZ-ZAMORA stated, "Thank you, Dad.  I'll send you the receipt… right now, so you can go take the money out now right now."  I believe that in this call, LOPEZ ROJAS told J. LOPEZ-ZAMORA that the shipment of flavored cocaine ("girls," "fruit") would cross the border the next day and could be picked up the following day (Saturday) from a stash house in the United States controlled by the source of supply ("one of their homes").  I believe J. LOPEZ-ZAMORA then promised to send money to LOPEZ ROJAS right away in connection with the shipment.

242. At approximately 4:45PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-934-6203, utilized by Erika Gabriella ZAMORA ROJO.  During this intercepted call, ZAMORA ROJO asked, "What happened son?"  J. LOPEZ-ZAMORA responded, "Hey, send my dad [Background: voices] two hundred (200) bucks please.  And I will give them to you."  ZAMORA ROJO responded, "All right then."  J. LOPEZ-ZAMORA then stated, "All right, only because he's going to coordinate the work on Saturday."  ZAMORA ROJO then responded, "Hmmm, according to him."  I believe in this call J. LOPEZ-ZAMORA directed ZAMORA ROJO to send $200 to LOPEZ ROJAS in Mexico to facilitate the importation of cocaine ("work") on Saturday ("because he's going to coordinate the work on Saturday").

243. At approximately 4:52 p.m., J. LOPEZ-ZAMORA received an MMS message on **Target Telephone 1** from 916-934-6203, utilized by ZAMORA ROJO (J. LOPEZ-ZAMORA's mother), which depicted a receipt for $200 listing the name of Guadalupe LOPEZ ROJAS (J. LOPEZ-ZAMORA's father).  Based upon the this intercepted MMS message, coupled with the intercepted calls detailed above, I believe that J. LOPEZ-ZAMORA facilitated a wire transfer to LOPEZ ROJAS, via ZAMORA ROJO, in conjunction with the shipment of flavored cocaine being sent from Mexico to the United States.

244. Later that day, at approximately 6:48 p.m, J. LOPEZ-ZAMORA received another incoming call on **Target Telephone 1** from Mexico phone number 52-667-233-9444, used by LOPEZ ROJAS.  In the call, LOPEZ ROJAS confirmed that "it" had arrived and that he "already went for it" "where your mother sent me."  I believe LOPEZ ROJAS was confirming that he had picked up the money that J. LOPEZ-ZAMORA's mother, ZAMORA ROJO, had sent to him.

245. On November 5, 2020, at approximately 4:34PM, J. LOPEZ-ZAMORA placed an outgoing call on **Target Telephone 1** to 916-934-6203, utilized by ZAMORA ROJO. During this intercepted call, J. LOPEZ-ZAMORA directed ZAMORA ROJO to "[o]pen the door for Chucky and give him that. And give him a gram of 'parrot,' that's under my jeans in the corner, up in my closet.  A gram of 'parrot.'"  ZAMORA ROJO responded, "All right then."  J. LOPEZ-ZAMORA then told ZAMORA ROJO, "And you give him the pills."  Based on this intercepted call, I believe that ZAMORA ROJO was distributing cocaine ("give him a gram of parrot") and counterfeit oxycodone pills ("give him the pills") on behalf of J. LOPEZ-ZAMORA to Javier Hernandez ("Chucky").

## AFFIANT'S EXPERIENCE REGARDING ITEMS TO BE SEIZED

246. Based on my training and experience and on consultations with other federal, state and local law enforcement personnel, I believe the following to be true:

247. Persons involved in the distribution of controlled substances often maintain at their residences, outbuildings, secondary residences, businesses, and vehicles, quantities of controlled substances, as well as paraphernalia for manufacturing, use, packaging, and distribution of controlled substances.  Drug traffickers also maintain records relating to their trafficking activities in these same places.  These records include personal calendars, address/telephone books, and papers reflecting the names, addresses, pager, telephone, and fax numbers relating to their drug trafficking associates.  These records can be in written form.  Drug traffickers also keep stored messages and telephone numbers relating to their trafficking activities within electronic devices.  Further, drug traffickers often keep photographs and audio/video recordings depicting themselves and their associates, as well as their assets and controlled substances.  They may also keep electronic equipment used for counter surveillance including scanners, cameras, monitors, and anti-bugging devices.

248. Premises and vehicles used by individuals involved in drug dealing usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premise or property.

249. Persons involved in the distribution of controlled substances often maintain records and ledgers listing their trafficking activities in these same places.  These records are kept to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances.  After drugs are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers and co-conspirators.  These records are often maintained

not only on paper, but also as electronic or digital data in the form of computer hardware and software.

250.  Individuals involved in drug trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business.  Individuals involved in drug trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs.  To achieve some of the aforementioned objectives, I am aware that drug distributors will often, among other methods, have a courier transport drugs or drug proceeds or ship controlled substances/drug proceeds through the mail or by common carrier.  Evidence related to the identities of these co-conspirators are often maintained in these locations.

251.  Individuals involved in drug trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going drug business.  In addition, assets generated by their drug business are typically kept on-hand by drug dealers to avoid detection by authorities and/or reporting requirements.  Individuals involved in drug trafficking often attempt to legitimize the source of these profits.  In order to do this, they attempt to secrete, transfer and conceal the money by, among other way: (a) Placing assets in names of nominees to avoid detection, while still maintaining control of the assets; (b) Laundering money through what appears to be a legitimate business or businesses; (c) Hiding money in their homes, safes, or safety deposit boxes; and (d) Using money to buy assets which are hard to trace by law enforcement.  Records of these transactions are often found in the aforementioned locations.

252.  Additionally based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic trafficking acquire personal and real property with their narcotic proceeds, and maintain evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from drug trafficking activities.  These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records.  Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations.

253.  Individuals involved in drug dealing often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

254. Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions.  These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution.  Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises or in the vehicles to be searched, as indicated in Attachment B.

255. Individuals involved in drug trafficking often conceal evidence of their involvement in vehicles and outbuildings in order to prevent detection and seizure by law enforcement conducting lawful search warrants at residences.  Therefore I am requesting permission to search all outbuildings located at each of the locations requested.

256. Your affiant further believes that persons involved in the distribution of drugs will store items, further described in Attachment B, which is incorporated herein by reference, and that those items are used by drug traffickers in furtherance of their drug trafficking, or are obtained by drug traffickers as a result of their drug trafficking.

257. Based on my training, experience and conversations with other experienced agents, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income.  These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "front" in an attempt to legitimize and conceal their activities and the use of "off-shore" banking in an attempt to break the paper trail.  These and other schemes are commonly referred to as "money laundering".

258. Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences.  Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

259. Persons engaged in drug trafficking and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control.  These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records.  Records of this kind are also often stored on computer media.

260. Persons engaged in drug trafficking and/or money laundering often maintain such records or long period of time, particularly when they are involved in ongoing criminal conduct over a long period of time.  Based on my experience and review of United States v. Greany, 929 F.2d 523 (9th Cir. 1991), where there is evidence that the criminal activity is long-term ongoing criminal activity, it is more likely that evidence will be kept for long periods of time.  In addition, based on United States v. Angulo-Lopez, 791 F. 2d 1394, 1399 (9th Cir. 1986), I believe that evidence of a continuous pattern of drug dealing may be found where the drug dealers reside.

261. There are many reasons why criminal offenders maintain evidence for long periods of time.  The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and relevance when considered in light of other evidence.  The criminal offender may no longer realize he/she still possesses the evidence.

262. Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc.  Records of such instruments are routinely maintained at the individual's residence or place of business.

263. The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been created or stored.

## CONCLUSION AND REQUEST TO SEAL

264. This Affidavit contains information regarding potential targets, which if unsealed may jeopardize the very information sought to be gained by these search warrants. In light of the ongoing nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, I request that this affidavit and the resulting search and arrest warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and a copy of the search and arrest

warrants and an inventory of any items seized that will be left at the locations of the
execution of the search warrants.

265.  I also hereby request that search warrants be issued for the locations described in
      Attachments A-1 through A-12 and to seize the items described in Attachment B.

266.  I swear, under the penalty of perjury, that the foregoing information is true and correct to
      the best of my knowledge, information, and belief.


   /s/ Matthew Clayton
_____

Matthew Clayton
Special Agent
Drug Enforcement Administration

                               11
Sworn and Subscribed to me telephonically on January __, 2021.

Hon. Kendall J. Newman
United States Magistrate Judge


Approved as to form:

 /s/ David Spencer_____
David W. Spencer
Assistant United States Attorney

# Attachment A-1

### 8357 Yermo Way, Sacramento, California

Location to be searched: 8357 Yermo Way, Sacramento, California is a two-story residence located on the north side of Yermo Way.  The exterior of the residence has green wood siding with white trim and a black composite roof.  The front door of the residence has a white security door and the numbers 8357 are east of the garage door on the siding.  A photo of the residence is below.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.

The place to be searched also includes the following vehicles,: (1) a Honda Accord bearing CA license plate number 4HDX937; (2) a Ford Mustang bearing CA license plate number 8RYY558, registered to Erika Gabriela ZAMORA ROJO, 8357 Yermo Way, Sacramento, California, 95828; and (3) a blue 2009 Nissan Maxima bearing CA license plate number 8LGG074.



# Attachment A-2

## 3205 West Capitol Avenue, #12, West Sacramento, California

Location to be Searched: 3205 West Capitol Avenue, #12, West Sacramento, California is a mobile home single-family residence situated within the Skylark Mobile Home Park.  The closest intersection to the west of the mobile home park is Sutter Street.  Skylark Mobile Home Park is "U" shaped with a separate entrance from and exit to West Capitol Avenue.  Space #12 is located in the southwest corner of the mobile home park.  The main body of the trailer is tan with yellow trim.  The trailer has red tin roofing.  When facing the trailer, there is a brown wooden fence surrounding the left side of the trailer.  The number "12" is affixed to the outside of the trailer just to the right of the wooden fence.  Photos of the trailer are below.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.



# Attachment A-3

## 7675 Manorside Drive, Sacramento, California

<u>Location to be searched</u>**:** 7675 Manorside Drive, Sacramento, California is a single-story residence located on east side of Manorside Drive.  The exterior of the residence has pink stucco with white trim and the roof is brown composite.  The front door of the residence has a black security door and the numbers 7675 are on a white wood post on the south side of the door.  A photo of the residence is below.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.

The place to be searched shall also include the following vehicle: (1) a Toyota Tacoma bearing CA license plate number 8S71563, registered to Alejandro TELLO, 7675 Manorside Drive, Sacramento, California.



# Attachment A-4

## 7381 Pritchard Road, Sacramento, California

Location to be searched: 7381 Pritchard Road, Sacramento, California is a single-story residence located on east side of Pritchard Road.  The exterior of the residence has white stucco with green trim and a brown composite roof.  The front door of the residence has a white security door and the numbers 7381 are on a mail box that is located on the north side before you enter the driveway.  A photo of the residence is below.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.

The place to be searched also includes the following vehicles: (1) a gray 2007 Chevrolet pickup truck, bearing CA license plate number 49436S1; (2) a teal 2007 Chevy Silverado, bearing CA license plate 8K67921; and (3) a 1991 Chevy truck, bearing CA license plate 8Y64756.



# Attachment A-5

## 8528 Bellamy Way, Sacramento, California

Location to be searched: 8528 Bellamy Way, Sacramento, California is a single-story residence located on west side of Bellamy Way.  The exterior of the residence has white wood siding with green trim and a black composite roof.  The front door of the residence is white and the numbers 8528 are on the south eve of the garage closer to the front door.  A photo of the residence is below.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.

The place to be searched also includes the following vehicles: (1) a Jeep Compass bearing CA license plate number 6ASU504, registered to Rafael Orozco, 8528 Bellamy Way, Sacramento, California, (2) a Ford Explorer bearing CA license plate number 6GGM623; (3) a GMC Yukon bearing CA license plate number 7WUX983, registered to Rafael R. Orozco, 8528 Bellamy Way Avenue, Sacramento, California.



# Attachment A-6

### 4190 Sierra Vista Avenue, Sacramento, California

Location to be searched: 4190 Sierra Vista Avenue, Sacramento, California is a single-story residence located on the south side of Sierra Vista Avenue, and is the southwest corner house at the intersection of Sierra Vista Avenue and 42nd Street. The exterior of the residence has grey stucco with green trim and the roof is grey composite. The front door of the residence has a white security door and the numbers "4190" are displayed on the south exterior wall next to the front door. There is a chain link fence surrounding the residence. A photo of the residence is below.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.

The place to be searched also includes the following vehicle: a black 2015 Chrysler sedan bearing CA license plate number 8JSR366.



# Attachment A-7

### 5241 Crystal Hill Way, Sacramento, California

<u>Location to be searched</u>**:** 5241 Crystal Hill, Sacramento, California is a single-story residence located on the north side of Crystal Hill Way.  The exterior of the residence has tan wood siding with white trim and a brown composite roof.  The front door of the residence has a white security door and the numbers 5241 are east of the garage door on the siding.  A photo of the residence is below.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.

The place to be searched also includes the following vehicles: (1) a Honda Accord bearing CA license plate number 6JXW131, registered to Rosario ROJO, 7809 Sinbad Court, Sacramento, California, (2) a Honda Civic bearing CA license plate number 8AME145, registered to Leonardo FLORESBELTRAN or Guadalupe ZAMORAROJO, 7551 32nd St, Sacramento, California 95822; (3) a Chevrolet Silverado bearing CA license plate number 32899V1, registered to Evetzequiel FLORESBELTRAN or Edy Chavez, 7551 32nd St, Sacramento, California 95822.



## Attachment A-8

### 3205 West Capitol Avenue, #21, West Sacramento, California

Location to be Searched: 3205 West Capitol Avenue, #21, West Sacramento, California is a mobile home single-family residence situated within the Skylark Mobile Home Park.  The closest intersection to the west of the mobile home park is Sutter Street.  Skylark Mobile Home Park is "U" shaped with a separate entrance from and exit to West Capitol Avenue.  Space #21 is located in the southeast corner of the mobile home park.  The main body of the trailer is grey with white trim.  The trailer has grey tin roofing.  When facing the trailer, there is an attached structure on the left side which is yellow in color with white trim.  Also when facing the trailer, there is a brown wooden fence surrounding the left side of the trailer.  There is no numbering visible on the trailer or fence; the trailer is situated between trailers #22 and #18.  A photo of the trailer is below.

The place to be searched includes the person of Jaime Castro Lazcano.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.

The place to be searched also includes the following vehicles: (1) a black Chrysler 300, bearing CA license plate 8RSZ217, registered to Jaime CastroLazcano, 3205 West Capital Avenue, 21, West Sacramento, CA; and (2) a white 2009 Chevrolet Tahoe, bearing CA license plate 7BAV301, registered to Jaime Castro, 3205 W. Capital Ave, Spc 21, W. Sacramento, CA.



## <u>Attachment A-9</u>

### 3205 West Capitol Avenue, #38, West Sacramento, California

<u>Location to be Searched</u>: 3205 West Capitol Avenue, #38, West Sacramento, California is a mobile home single-family residence situated within the Skylark Mobile Home Park. The closest intersection to the west of the mobile home park is Sutter Street. Skylark Mobile Home Park is "U" shaped with a separate entrance from and exit to West Capitol Avenue. Space #38 is the last trailer on the right side when exiting the trailer park onto West Capitol Avenue. The main body of the trailer is tan with white trim. The trailer has grey tin roofing. When facing the trailer there is a detached carport on the left side of the trailer. There is a brown wooden fence marked with a spray painted number "38" surrounding the trailer; there is also a chain link gate attached to the wooden fence in front of the carport. Photos of the trailer are below.

The place to be searched includes the person of Javier Hernandez. The place to be searched also includes the following vehicle: a silver 1997 Honda Civic, bearing CA license plate 3XBJ248.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.





# Attachment A-10

## 1182 Franklin Avenue, Yuba City, California 95991

<u>Location to be searched</u>: 1182 Franklin Avenue, Yuba City, California is a single-story residence located on south side of Franklin Avenue.  The exterior of the residence has yellow wood siding with white trim and a red/brown composite roof.  The front door of the residence is dark colored and the numbers 1182 are on the west side of the front door on the wood siding.  A photo of the residence is below.

The place to be searched includes the person of Robert Scott Frandsen.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.

The place to be searched also includes the following vehicles: (1) a Dodge truck, bearing CA license plate 54470U1, registered to Diana Frandsen, 1182 Franklin Avenue, Yuba City, CA; and (2) a Toyota sedan, bearing CA license plate 8HFY114, registered to Diana Frandsen, 1182 Franklin Avenue, Yuba City, CA.



# Attachment A-11

## 425 Chablis Way, Manteca, California

Location to be searched: 425 Chablis Way, Manteca, California is a single-family residence located on the southeast side of Chablis Way.  The closest intersection to the east of the residence is Champagne Lane.  The exterior of the residence is beige colored stucco with white trim and a clay tile roof.  When facing the residence there is an attached two-car garage on the left side of the residence and an attached wooden fence.  The numbers 425 are displayed in black aligned vertically along the stucco next to a window near the entryway of the residence.  Photos of the residence are below.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.

The place to be searched also includes the following vehicle: A grey 2019 Dodge Charger, bearing CA license plate number 8HTP712, registered to Amerilix Lopez or Rudi FLORES, 425 Chablis Way, Manteca, CA 95337.



# Attachment A-12

## 7618 Amherst Street, Apt. 4, Sacramento, California

Location to be searched: Whispering Pines Apartments, 7610 Amherst Street, Sacramento, California is a gated multi-family apartment complex with multiple two-story buildings each labeled with separate addresses, which are located on the west side of Amherst Street at the southwest corner of the intersection of Amherst Street and Meadowview Road.  Building "7618" is marked in black numbering and is beige in color with brown trim, and is located in the southwest corner of the apartment complex.  Apartment 4, within building 7618, is on the ground floor and has a brown colored door with a security gate and the number "4" is displayed in black on the wall directly above the doorway.  Photos of the residence are below.

The place to be searched includes the residence, all rooms, attics, basements, and storage areas; all trash receptacles; and all surrounding grounds, garages, storage rooms, or outbuildings of any kind, attached or unattached, located on the premises.

The place to be searched also includes the following vehicles: (1) Black 2008 Toyota Scion, bearing CA license plate number 6YVS157, registered to Maria Alvina Lopez, 7618 Amherst Street, Apt 1, Sacramento, CA; and (2) White 2016 Nissan Versa, bearing CA license plate number 8ROZ764, registered to Jasmine Ortega, 3991 67th St, Sacramento, CA.



# Attachment B
**Items to be Seized**

Law enforcement is authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"):

- 21 U.S.C. §§ 841(a)(1) and 846 – Conspiracy to distribute and possess with intent to distribute controlled substances, including counterfeit opioid pills containing fentanyl, cocaine, methamphetamine, and Xanax.

- 21 U.S.C. § 841(a)(1) – Distribution and possession with intent to distribute controlled substances, including counterfeit opioid pills containing fentanyl, cocaine, and methamphetamine, and Xanax.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1.  Controlled substances, including  fentanyl, counterfeit opioid pills, cocaine, methamphetamine, and Xanax, or items used to distribute controlled substances; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2.  United States and foreign currency linked to drug trafficking and/or the proceeds of drug trafficking, including the pre-recorded U.S. currency used to purchase heroin and counterfeit oxycodone pills during this investigation;

3.  Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold or concealed;

4.  Telephone paging devices, beepers, mobile phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

5.  Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

6.  Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug trafficking activities;

7.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including traveler's checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

9.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.  Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person; and

11.  Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records.